**KILPATRICK TOWNSEND & STOCKTON LLP**
Erick Durlach, Arizona Bar No. 024253
edurlach@ktslaw.com
Dennis L. Wilson, California Bar No. 155407
(admitted *pro hac vice*)
dwilson@ktslaw.com
Sara K. Stadler, New York Bar No. 2620276
(admitted *pro hac vice*)
sstadler@ktslaw.com
6909 E. Greenway Parkway, Suite 100
Scottsdale, Arizona 85254-2149
Tel: (602) 726-7319
Fax: (623) 321-1009

**BRYAN CAVE LEIGHTON PAISNER LLP**
George C. Chen, Arizona Bar No. 019704
george.chen@bclplaw.com
Jacob A. Maskovich, Arizona Bar No. 021920
jamaskovich@bclplaw.com
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
Tel: (602) 364-7000
Fax: (602) 364-7070

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Early Warning Services, LLC, <br><br> Plaintiff, <br><br> v. <br><br> Warren Vurl Johnson; Brandon O'Loughlin; and P.A.Z.E., LLC, <br><br> Defendants. | Case No. CV-24-01587-PHX-SMB <br><br> **DECLARATION OF PARAS SHAH IN SUPPORT OF PLAINTIFF EARLY WARNING SERVICES, LLC'S MOTION FOR PRELIMINARY INJUNCTION [16]** |

I, Paras Shah, declare under penalty of perjury as follows:

1.      I am a resident of the State of Illinois, over eighteen years of age, and employed by Plaintiff Early Warning Services, LLC ("EWS") as its Senior Intellectual Property Counsel. The statements made in this Declaration are true and based on my personal knowledge and the business records that EWS maintains as part of the ordinary course of its business.

**A.     EWS's Intellectual Property Indices**

2.      Specific members of the Intellectual Property team in EWS's legal department maintain indices containing detailed information about ongoing legal matters and business initiatives involving EWS's intellectual property, including its patents, trademarks, and domain names. Among my job duties as EWS's Senior Intellectual Property Counsel is populating these indices with EWS's data and maintaining them to ensure they remain accurate and current. This enables EWS's legal department to track the development, harvesting, acquisition, and enforcement of EWS's intellectual property rights.

3.      When Defendant Warren Vurl Johnson ("Johnson") was employed as EWS's Senior Intellectual Property Counsel, his job duties also included populating the indices with EWS's data and maintaining the accuracy and currency of those indices.

4.      While some of the data in EWS's indices is publicly accessible, such as patent or trademark application numbers and filing dates, much of the data in those indices is privileged, proprietary to EWS, highly confidential, and valuable precisely because EWS maintains its secrecy.

5.      For example, EWS's Concept Brief Index and Invention Disclosure Index track titles of inventions and notes, among other data. Working titles of unpublished inventions often contain technical detail that can disclose aspects of the underlying inventions to those familiar with the subject matter. The notes in EWS's indices often reflect the details of consultations between EWS's attorneys and

1  inventors, as well as legal advice about which components of inventions would be
2  considered patentable. The same was true as of Johnson's termination from EWS's
3  employment. In fact, Johnson's initials ("WVJ") still appear in many of the notes
4  fields in EWS's indices alongside information about Johnson's consultations with
5  inventors and Johnson's advice about how best to protect those inventions.

6. As part of his job duties as EWS's Intellectual Property Counsel and Senior Intellectual Property Counsel, Johnson regularly gave EWS legal advice on how to protect its inventions—whether by filing patent applications or by maintaining the concept briefs and invention disclosures as trade secrets indefinitely. Obtaining a patent allows EWS to secure exclusive patent rights for a limited time, while maintaining an invention as a trade secret allows EWS to secure exclusivity for so long as the invention remains secret.

7. Regardless of how EWS protects its inventions and other intellectual property, those assets give EWS a competitive advantage in the competitive financial services field. Maintaining the secrecy of EWS's indices is essential to EWS's ability to maintain certain of its inventions and other intellectual property as trade secrets and preserve its position in the financial services industry. This secrecy, in turn, enables EWS to effectively develop, harvest, acquire, and enforce its intellectual property rights.

8. Knowing this, EWS makes reasonable efforts to maintain the secrecy of its indices (and other privileged, confidential, and sensitive information). One way in which EWS accomplishes this is to restrict full access to the indices to a select group of its employees on a "need-to-know" basis and enforce those restrictions using password protection. A broader group of EWS's employees may be given limited access to the indices for a limited time for the purposes of disseminating various statistics about the company's intellectual property portfolio, but only employees who are added to the group or affirmatively provided "read-only" access can view this data.

9. EWS has invested significant resources to develop, maintain, and safeguard its indices, mostly (but not exclusively) in the form of salaries paid to employees in the legal department, among others. EWS invested these resources during Johnson's employment, and continues to make these investments to this day.

**B.    The Privileged Chat**

10. The Privileged Chat occurred on or about November 3, 2022, and references negotiations of a confidential contract with one of EWS's valued partners. The contract under discussion was not executed until November 17, 2022, after which the parties continued to negotiate a series of binding statements of work ("SOWs") that would detail the parties' obligations with respect to the actual work to be completed under the executed contract. The Privileged Chat contains Johnson's legal advice and feedback in response to Ms. Cheney's questions about related negotiations.

11. EWS's contract negotiations with partners and vendors and its internal deliberations about terms are highly confidential and sensitive. EWS's competitors could undermine EWS's position in future negotiations if they had access to this information.

**C.    Johnson's Acts of Misappropriation**

12. When EWS terminated Johnson, it knew Johnson had emailed some of EWS's documents to his personal email account, but EWS is still discovering which documents Johnson took, and EWS has no way of knowing which he still possesses.

13. Johnson knew he did not have EWS's authorization to email EWS's indices and other documents to his personal email address. Johnson reviewed and approved EWS's Intellectual Property Policy on multiple occasions (including, without limitation, on November 21, 2014, October 15, 2015, October 10, 2016, and September 19, 2017). As of September 19, 2017, this Policy required EWS's employees, *inter alia*, to "protect Company IP, in addition to the intellectual property of . . . third parties, against deliberate, unintentional, inappropriate, or unauthorized disclosure"; refrain from disclosing "[t]he Company's IP, including trade secrets, . . .

to third parties . . . without executed non-disclosure agreements in place"; and, "[u]pon termination of employment or at any time the Company requests, . . . immediately turn over to the Company all Company materials and Trade Secrets and Confidential Information, and all copies thereof." The Policy also provided that EWS's former employees "have a continued obligation to protect this information even after leaving the Company." A redacted copy of this Intellectual Property Policy is attached as **Exhibit 1**.

14. Notably, EWS's Intellectual Property Policy also provides (and provided during Johnson's employment with EWS) that "[t]he patent database maintained by the Legal department is considered Trade Secret and access to the database is limited to Employees who have confidentiality agreements with the Company. Under no circumstance should any portion of the patent database be copied or distributed to third parties without confidentiality agreements. Likewise, new products and services that may be developed by the Company should not be discussed with or disclosed to any third party without having an executed non-disclosure agreement between the parties prior to such disclosure or discussions." See **Exhibit 1**.

15. On January 19, 2023, shortly after EWS terminated Johnson's employment, Johnson sent Ms. Cheney an email threatening to "team up" with "my girl Elizabeth Warren," presumably meaning the United States Senator from Massachusetts. An accurate and complete copy of this email is attached as **Exhibit 2**. P.A.Z.E.'s website also contains references to Senator Warren in connection with P.A.Z.E.'s complaints about EWS and its Zelle® services. See Dkt. 17-5 at 75.

16. When Johnson served EWS with a copy of his complaint on or after July 20, 2023, Johnson did not serve EWS with copies of any exhibits beyond Exhibit 21. Nonetheless, when EWS learned that Johnson may have filed a copy of the Privileged Chat as Exhibit 24, EWS filed a motion to seal that exhibit on July 1, 2024. The Arizona Superior Court's case docket initially did not reflect the document in question as publicly filed, but the Superior Court eventually located Exhibit 24 and granted

EWS's motion to seal on July 30, 2024. Exhibit 24 is now designated as a "confidential document" on the Arizona Superior Court's docket. An accurate and complete copy of the Arizona Superior Court's Minute Entry is attached as **Exhibit 3**.

17. EWS did not receive confirmation of Johnson's involvement with Defendants Brandon O'Loughlin and P.A.Z.E., LLC until June 11, 2024, when the metadata from one of P.A.Z.E.'s filings in the TTAB proceedings revealed Johnson as the author of that document.

18. Until Johnson filed and served his opposition papers on August 8, 2024, EWS was not aware that Johnson still possessed the documents marked as Exhibits 6, 7, 8, 10, and 12 to his declaration. *See* Dkt. 24-2 at 33–34, 36–39, 41, 48–50, 54–76.

19. According to his LinkedIn page, Frankie Ho was the Director and Associate General Counsel, Intellectual Property, at PING Golf from August 2006 through November 2013. Accurate and complete copies of Frankie Ho's LinkedIn profile and resume are attached as **Exhibit 4**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 15, 2024, in Chicago, Illinois.

Paras Shah