WARREN V. JOHNSON
warrenvjohnson@gmail.com
2406 Alabama Street
Unit 7C
Lawrence, KS 66046
*Attorney for Warren V Johnson, pro se*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| EARLY WARNING SERVICES, LLC<br><br>Plaintiffs,<br><br>v.<br><br>MR. WARREN V. JOHNSON;<br>BRANDON O'LOUGHLIN; P.A.Z.E.,<br>LLC<br><br>Defendants. | Case No.: CV-24-01587-PHX-SMB<br><br>**RESPONSE TO PLAINTIFF'S<br>APPLIICATION FOR<br>TEMPORARY RESTRAINING<br>ORDER AND PRELIMINARY<br>INJUNCTION** |

Defendant Mr. Warren V Johnson ("Warren") submits this Response to Plaintff Early Warning Services, LLC ("EWS") Application for Temporary Restraining Order and Preliminary Injunction s ("Application"). This response is preliminary in nature and Warren hereby reserves the right to supplement the response after the parties have had an opportunity to participate in discovery, and a complete factual record has been fully developed.

**Cases**

**Lopez v. Brewer**, 680 F.3d 1068 (9th Cir. 2012)
Page 14

**Bowyer v. Ducey**, 506 F. Supp. 3d 699 (D. Ariz. 2020)
Page 14

**Winter v. Nat. Res. Def. Council, Inc.** 555 U.S. 7, 129 S. Ct. 365 (2008)
Page 14

**TDBBS LLC v. Ethical Products Inc.**, No. CV-19-01312-PHX-DWL, 2019 WL
1517568 (D. Ariz. Apr. 8, 2019)
Page 16

**Calisi v. Unified Financial Services, LLC**, 232 Ariz. 103, 302 P.3d 628 (Ariz. Ct. App.
2013)
Page 16, 20

**Enterprise Leasing Co. of Phoenix v. Ehmke**, 197 Ariz. 144, 3 P.3d 1064 (Ariz. Ct.
App. 1999)
Page 16

**InteliClear, LLC v. ETC Glob. Holdings, Inc.**, 978 F.3d 653 (9th Cir. 2020)
Page 15

**Berkadia Real Estate Advisors LLC v. Wadlund**, Dist. Court, D. Arizona 2022
Mention: Page 15

**TRADITIONS HEALTH LLC v. Paulson**, District Court, D. Arizona 2023
Page 21

**Valley Medical Specialists v. Farber**, 982 P.2d 1277 (Ariz. 1999)
Page 23

**Orca Commc'ns Unlimited, LLC v. Noder**, 233 Ariz. 411, 314 P.3d 89 (App. 2013)
Page 23

**Joshua David Mellberg LLC v. Will**, 96 F. Supp. 3d 953 (Dist. Court, D. Arizona
2015)
Page 23

**Statutes**

    1. **Arizona Uniform Trade Secrets Act (AUTSA)**
- Citation: A.R.S. § 44-401(2)
- Mention: Page 20
- Context: Definition and elements of trade secret misappropriation.

    2. **Defend Trade Secrets Act (DTSA)**
- Citation: 18 U.S.C. § 1839(5)
- Mention: Page 20
- Context: Definition and elements of trade secret misappropriation.

**Other Authorities**

    1. **Plaintiff's Declaration**
- Mention: Various
- Context: Supporting evidence and claims by Plaintiff.

    2. **Warren's Declaration**
- Mention: Various
- Context: Supporting evidence and claims by Defendant.

    3. **Exhibits**
- Mention: Various

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## 1) __INTRODUCTION__

This matter arises from a case initiated by EWS regarding a third-party challenge to their Intent-to-Use ("ITU") Trademark application for "Paze." Warren filed the "Paze" ITU application while employed by Plaintiff EWS. Warren is not a party to the TTAB proceedings. Originating from Ms. Tracy Cheney, EWS's Complaint makes broad and defamatory accusations against their former Intellectual Property Counsel. Ms. Cheney published these conclusions not only in this court proceeding but also unnecessarily at the USPTO (Application (Doc 16), at 15, FN3); the very institution where Warren practices his profession.

EWS has intentionally attacked Warren's character by defaming him within his professional circle, committing a clear act of per se libel, and attempting to inflict extreme emotional distress as retaliation for the so-called Privileged Chat. EWS is aware that Warren was starting his first permanent job in 18 months on August 5 and has to move to Kansas City imminently. Despite this, EWS filed this Motion, requiring Warren to review over 800 pages of submissions and draft a reply to numerous false claims. EWS also made it clear to Warren that they would opposed any request for an extension to reply, putting tremendous pressure on Warren. To say EWS's conduct has impeded Warren's ability to focus on his new career is a gross understatement. To make matters worse, Warren was served the Complaint one day after submitting to a background check for his new job.

EWS has knowingly and intentionally defamed Warren within his professional circle, hindering his ability to perform when he most needed to, without regard for his professional reputation, ability to earn a living, or mental health. This conduct, driven by Ms. Cheney's retaliatory malice and misguided counsel, is outrageous by any standard. Below, Warren will demonstrate that EWS fails to allege any "trade secret" information was taken by Warren because the information was created by Warren long ago to avoid such allegations. The Court will see that EWS cannot identify any specific instances of trade secret use by Mr. O'Loughlin. Therefore, there is no likelihood of success, and no injunction or restraining order is warranted. Peel back the bare assertions and conclusory

1  statements, and all that remains is the damage already done to Warren's professional
2  reputation and mental well-being.
3       The Court should see this lawsuit for what it is, an attempt by Ms. Cheney to hide
4  the so-called "Privileged Chat." This case is not about the "paze" trademark, EWS could
5  have easily bought their way out of that dispute. This case is not about Warren's indexes
6  that have no sensitive information in them, or any other alleged trade secret. This case is
7  about the Privileged Chat and Ms. Cheney's determination to ensure it does not fall into
8  the hands of the Department of Justice or the Arizona Attorney General.

9                              **FACTUAL ALLEGATIONS**

10 **1) WARREN AS SENIOR IP COUNSEL FOR EWS**

11       Ms. Cheney granted Warren full autonomy from day one at EWS. He
12 initiated his own projects, drafted policies, set up trainings, implemented a docketing
13 system, and expanded EWS's IP portfolios significantly. Warren had signatory
14 authority for all intellectual property matters, allowing him to make and execute
15 decisions. He received praise from Ms. Cheney and other leaders for his work
16 (Warren Dec, EX 12). Warren managed thousands of matters, documents,
17 communications, deadlines, templates, and policies through the docketing system he
18 devise, and the Indexes that tied it all together.

19 **2) The Design and Purpose Of Warren's Indexes**

20       Warren's indexes ("Indexes") are individual Excel spreadsheet templates created
21 at his previous job at Ping® golf and brought to EWS. Each major IP category had an
22 index, except for Trade Secrets. The Indexes associated each IP matter with a docket
23 number corresponding to a folder on SharePoint and Outlook where substantive
24 documents and communications were kept. Warren tracked data to ensure
25 accountability and transparency, urging others to reference his indexes. (See Warren
26 Dec., EX 3 for data elements and their origin.)
27       Warren's 2022 goals included creating a fully accessible SharePoint site outside
28 the restricted Legal Team SharePoint to display IP data. He had the architecture

drawn on a whiteboard when terminated (Warren Dec EX 7 and 8). Warren systematically emailed templates of his Indexes to his personal email throughout his 8 years at EWS, deleting all EWS data immediately for the purpose of template preservation. EWS may be surprised to learn who is listed as the "author" of their allegedly trade secret Indexes: Frankie Ho (Warren Dec EXHIBIT 11).

**3) The Circumstances Surrounding the Privilege Chat**

The screenshot of the Privileged Chat was taken for the purpose of evidence gathering in Warren's wrongful termination lawsuit. This is a protected activity under Federal Law as long as it is carried out reasonably. The portion of the Privileged Chat document Warren was interested in was Warren's inquiry regarding the Grecia bonus, which he originally raised in an email dated October 31, 2022 (Warren Dec. Ex 10)[1]. The screenshot was submitted as Exhibit 24 in Warren's wrongful termination lawsuit, filed in July 2023, and is published on the Superior Court of Arizona docket. Warren never officially served EWS the Complaint, but he did provide them an entire copy of the Complaint and exhibits.

The Privileged Chat is the focal point of this litigation. Warren contends that the Privileged Chat is neither a trade secret nor privileged or confidential. The chat in question is between two attorneys, not between an attorney and a client, which is a necessary condition for claiming privilege; and no legal advice is being given.

Moreover, the doctrine of implied waiver is pertinent in this context. This doctrine is invoked when a party makes the content of privileged material relevant to a claim or defense in the case. Even if the party does not explicitly disclose the advice received but merely alludes to it, the privilege can be deemed waived by implication. As established in *Chevron Corp. v. Pennzoil Co*., 974 F.2d 1156, 1162 (9th Cir.

---

[1] The Grecia bonus was a bonus Warren had been promised by Ms. Cheney several times over the course of several years. Ms. Cheney's "transition plan" and her alleged "spot bonus" of $50,000 was supposed to her finally paying out the Grecia bonus, but it turned out to be a reallocation of Warren's 2022 Merit bonus. More on that later.

1992), "Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived."

Further, the exceptions to the attorney-client privilege duty of confidentiality described in the Professional Rules of Conduct 1.6(d)(1) and (2) have been interpreted in Opinion 652 of the Committee on the Rules of Professional Conduct[2] wherein they conclude: "if the [attorney's] former client in fact made allegations to the effect that the [attorney] attorney represented him incompetently and engaged in a conspiracy with the prosecution, we believe the inquiring attorney is permitted to disclose confidential information pursuant to ER 1.6(d) to the extent reasonably necessary to defend himself." The exception of 1.6(d) also allows an attorney to disclose confidential information to stop or mitigate damage to *another's property* being caused by the client using the attorney's services in committing illegal or fraudulent activity.[3]

EWS cannot use the attorney-client privilege as both a sword and a shield. By making the Privileged Chat the subject of this lawsuit, EWS has implicitly waived any attorney-client privilege regarding the same. This version aims to be clear, concise, and professional, ensuring that the judge can easily understand the key points and legal arguments being made.

**4) Warren's Termination**

Ms. Cheney's recollection of Warren's termination is inaccurate. She fails to mention that Warren was investigating and gathering evidence regarding alleged misconduct and disciplinary actions just two hours before his termination, again, a protected activity under federal law. Ms. Cheney had set up a meeting with Warren for the next day, less than an hour before termination, attempting to spring the

---

[2] https://www.azbar.org/for-legal-professionals/ethics/rules-of-professional-conduct/?V=Opinions&OpinionId=652
[3] EWS committing fraud on the Trademark Office using trademark applications Warren originally filed would fall into this exception, and the harm to the

termination unexpectedly (Warren Dec, EX 6). Ms. Cheney's declaration timeline materially differs from the Complaint regarding when Warren disclosed the Handbook email (Complaint, Doc1, at ¶40). However, in both versions, Ms. Cheney does consistently cite that her discovery of Warren emailing "confidential information" to himself as the reason for termination, and then again to support Ms. Cheney's fabricated recollection of Warren being untruthful about his emailing his Indexes to himself.

On January 19, 2023, Ms. Cheney claimed *she discovered* Warren had emailed EWS's proprietary and confidential information from his work email to his personal email. She immediately terminated his employment and instructed him to return company equipment and delete EWS's proprietary materials.[4] Shortly after, an investigation *revealed* that Warren had sent a volume of EWS's documents to his personal email from November 2022 to January 18, 2023 (Plaintiff Declaration (Doc 17) at 3-4).

These clear inconsistencies in Ms. Cheney's recollection of the events surrounding Warren's termination suggests a lack of candor and an attempt at deception. Ms. Cheney is trying to support her narrative by imputing false motives to Warren. Fortunately, Warren sent an email to Ms. Cheney recollecting the oddities of the termination conversation in the following days that describe the actual discussion during the termination call (Warren Dec, EX 5).

## 5) NEGOTIATIONS LEADING UP TO THE SETTLEMENT AGREEMENT

When Warren notified EWS of his wrongful termination suit 16 months ago, EWS counsel threatened him with the same claims made in this lawsuit. EWS alleged Warren's affiliation with Mr. O'Loughlin's domain registrations. Warren responded by referencing the public nature of the "Paze" mark application since November 9,

---

property of P.A.Z.E. and Mr. O'Loughlin has been and will continue to be substantial.

2022, leaving no confidential information. EWS threatened Warren with trade secret theft for the November emails. Warren clarified that most emailed documents were open-source academic articles, and he had brought the Indexes to EWS, emailing the most recent iteration for templates. EWS took no action then.

## 6) WARREN, MR. O'LOUGHLIN, AND P.A.Z.E. DID NOT HATCH A SCHEME

EWS falsely asserts that Warren and Mr. O'Loughlin attended Mesa High and plotted a scam to extract money from EWS using nonexistent trade secrets. Warren attended Highland High School in Pocatello, ID, before obtaining a GED in 1999. He then attended Idaho State University and later Arizona State University Sandra Day O'Connor College of Law in 2009.

Warren reproduced the <old-friends.co> Mesa High class of 1999 graduates list, and to demonstrate how easy it is to make additions to the class of 1999 he added some extra "Warren Johnsons" … it only took him a matter of minutes[5]. (Id. Ex 2).[6]

EWS has relied on this false information as the reason Warren "enlisted" Mr. O'Loughlin as a "front man" (*Id.* at 2), was part of a scheme that involved registering domains (*Id.)*, participated in the formation of Paze, LLC (*Id.*), created a "sham" gripe site (*Id.*), is connected to the settlement communications sent from P.A.Z.E., LLC to EWS (*Id.*), and for various other similarly false conclusions throughout the rest of the Application (*Id* at 1-3, 6-8, 12-15) and the Complaint.

If not EWS's misfeasance, then EWS's counsels': they have the duty of due diligence, and the obligation to *not present fraudulent or false* evidence. Counsel should have taken it upon themselves to check such a dubious source out: the class of 1999 year book was only 2 clicks away, or a phone call/email to Mesa High would have sufficed.

---

[5] Other members of the class of 1999 at Mesa High at <old-friends.co> are Darth Vadar, Bilbo Baggins, and Donald J. Trump.

[6] This also begs the question: Who put Warren's name on <old-friends.co>? To be clear it wasn't Warren, and we may never know. EWS certainly had the greatest interest in "locating" such evidence and were desperate to find something so they could use bring this suit against Warren. Just saying….

## 7) EWS's CONFIDENTIAL INFORMATION IS NOT A TRADE SECRET

EWS struggles to clearly allege which stolen documents (or information) are trade secrets as opposed to confidential or privileged because of the way they refuse to separate "Confidential Information" from "Trade Secrets". Fundamentally this means EWS has not identified with any specificity any trade secret or confidential information, as opposed EWS's view that both have been well plead both.

This should be viewed as fatal to not only their Motion but to every claim in their Complaint based on trade secrets or confidential information. Warren certainly cannot read the Motion any other way. Below is the consistency with which EWS attempts to combine the two legal concepts:

- "EWS's privileged and highly confidential patent and *trademark* matters and strategy (collectively, EWS's "Confidential Information" and "Trade Secrets") Id at 2.
- "EWS's Confidential Information and Trade Secrets at issue include proprietary and highly sensitive information about EWS's patent and *brand* strategies, much of which is privileged." Id. at 3
- "Defendants from…. Disclos[ing] EWS's Confidential Information and Trade Secrets…. could permanently destroy EWS's trade secret protection, eroding EWS's competitive advantage
- "EWS's confidential and proprietary information constitute valuable trade secrets" Id.
- "Confidential Information and Trade Secrets regarding EWS's private and internal… discussions regarding… EWS's… application to register the PAZE mark Id. at 5.
- "Defendants use these online platforms to disclose EWS's Confidential Information and Trade Secrets, *including* by posting copies of the Privileged Chat." Id at 7.
- "Defendants have waged this campaign of disparagement … to pressure EWS into ransoming its … Confidential Information and Trade Secrets. Id. at 8

1    • **EWS's Confidential Information and Trade Secrets Qualify as "Trade Secrets."**

2    *Id.* Header for §III(B)(1)(a)[7]

3    • "EWS develops and maintains sensitive proprietary and confidential information.

4    [citation omitted]. That information comprises valuable trade secrets." Id at 9.

5    • "To preserve the value of its proprietary Confidential Information and Trade Secrets,

6    EWS takes substantial precautions to safeguard that information" Id at 10.

7         The initial attempt at defining EWS Confidential Information and Trade Secrets

8    intermingles and confuses the two most important concepts of EWS's lawsuit. By

9    using "collectively" instead of "respectively," EWS cross-contaminates the legal

10   concepts they must differentiate to state a claim. This merger benefits EWS by

11   allowing the Privileged Chat's lack of value to be offset by the Indexes. Conversely,

12   the Indexes lack of misappropriation may be offset by the Privilege Chat, therefore

13   benefiting the collective.

14        Separate the Privileged Chat, the Indexes and the Domain Documents do not each

15   fulfill the requirements for trade secret misappropriation, but together they can

16   provide all the characteristics for trade secret misappropriation. Unfortunately for

17   EWS the factors for a trade secret claim are not associative.

18   **EWS IS NOT ENTITLED TO A PRELIMINARY INJUNCTION OR
     RESTRAINIGN ORDER BECAUSE A LIKLIHOOD OF SUCCESS ON THE
     MERITS IS UNLIKELY**

19

20        Temporary restraining orders and preliminary injunctions are "extraordinary and

21   drastic remedies... that should not be granted unless the movant, by a clear showing,

22   carries the burden of persuasion." Lopez v. Brewer, 680 F.3d 1068, 1072 (9th Cir. 2012)

23   (emphasis in original); Bowyer v. Ducey, 506 F. Supp. 3d 699, 724 (D. Ariz. 2020);

24   Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24, 129 S. Ct. 365, 376, 172 L. Ed. 2d

25   249 (2008). To obtain preliminary injunctive relief, the movant must demonstrate that:

26   (1) it is likely to succeed on the merits of the claim; (2) it is likely to suffer irreparable

27

28   ───────────────
     [7] The quotation marks are confusing, normally quotation marks are used when using a
     term in a nonstandard or ironic way, or it means that EWS thinks Confidential

harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. Lopez, 680 F.3d at 1072. The Ninth Circuit applies the same standard for issuing a temporary restraining order. Bowyer, 506 F. Supp. 3d at 724.

EWS cannot demonstrate a likelihood of success on the merits for the misappropriation of trade secrets claims. EWS has failed to show trade secret rights in any of the material they reference as "stolen." EWS only presents baseless, conclusory presumptions that Warren transferred trade secret information to random third parties, yet they cannot point to any proprietary information in Mr. O'Loughlin's submissions. EWS's attempts to use the Privileged Chat as trade secret information being misappropriated fail unless they show that the Privileged Chat is indeed a trade secret..

## 3) EWS DOES NOT ALLEGE STOLEN TRADE SECRETS

EWS accuses Warren of stealing "detailed indices of concept briefs and invention disclosures relating to EWS's patent portfolio, detailed indices of EWS's trademark matters, documents relating to EWS's domain names, and numerous contracts, including in draft form, and, on information and belief, the Privileged Chat." Motion, at 6. The definition of a trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret. *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). "To plead misappropriation of trade secrets, the Complaint must identify the trade secret with particularity to provide notice to a defendant of what he is accused of misappropriating." *Berkadia*, Dist. Court, D. Arizona 2022.

Importantly, EWS Confidential Information is not a trade secret. "Confidential information is not the same as trade secret information." *TDBBS LLC v. Ethical Products Inc.*, No. CV-19-01312-PHX-DWL, 2019 WL 1517568 (D. Ariz. Apr. 8, 2019). "As we explained in Enterprise Leasing Co., not every commercial secret will be a trade secret; only those secrets 'affording a demonstrable competitive advantage'

---

Information falls under the specific, technical meaning of trade secret.

will qualify." *Calisi v. Unified Financial Services, LLC*, 232 Ariz. 103, 302 P.3d 628 (Ariz. Ct. App. 2013).

### a) Warren's Indexes Are Not EWS Trade Secrets

EWS claims Warren's indexes are EWS trade secrets. This is not true. The indexes' makeup is known and used by others, and the data is categorically excluded because it is published publicly and easily accessible. Id. Specifically:

- Warren created the Index templates before his employment at EWS and then used them at EWS (Warren Dec. EXHIBIT 4).

- The Indexes only include easily ascertainable public data and incidental data like dates of reception and completion.

- EWS did not invest substantial money, resources, and energy in Warren's Indexes and does not claim as much.

- The password protection on the Indexes was to prevent editing and not for secrecy; anybody could bypass the password by clicking "read only.

- The secrecy of the indexes is not "critical" for EWS to file patents; the indexes do not have information that would allow disclosure

- The Trademark Index contained only already filed trademark applications; its secrecy is irrelevant to whether EWS can obtain trademark rights.

The only argument EWS provides for Warren's Indexes having value in their secrecy relates to EWS's "highly confidential patent and trademark matters and strategies" (Id. at 10), but this claim is not made for the Indexes but for EWS Confidential Information and Trade Secrets. EWS also claims that maintaining the secrecy of the stolen documents is critical for EWS's ability to seek patent and trademark protection (Id. at 10). These vague, sweeping claims do not create trade secrets out of Warren's Indexes. Further, the claims are made about the comingled EWS confidential information and trade secrets, making it unclear what they are claiming the Indexes to be in the Motion. If the "Documents related to domains" is

actually Warren's Domain Name Index (which EWS does not clarify), then it is subject to the same reasons for not being an EWS trade secret.

**b) The Privileged Chat and The Domain Documents Are Not EWS Trade Secrets**

   i) THE PRIVILEGED CHAT

The Privileged Chat does not fit within EWS's description of the trade secrets at issue: information related to patent and trademark strategies. (Id.) Ms. Cheney describes the Privileged Chat as a "reflection" of "Johnson's legal advice to EWS concerning EWS's contract negotiations and trademark applications" (Plaintiff's Dec., at 2). This is not an accurate description. Warren's request for an in-camera review of the Privileged Chat will clarify this, but in reality, the contract being discussed in the Privileged Chat had already been executed and there was no changing that; so the Privileged Chat is more about Warren complaining about an executed contract. Notwithstanding, EWS makes no argument and provides no evidence that the Privileged Chat creates independent value from secrecy, or that reasonable precautions were taken to keep the Privileged Chat secret, or that the Privileged Chat provides any sort of market advantage for EWS or competitors, or that EWS spent substantial time, resources, and energy on creating the Privileged Chat. Therefore, the Privileged Chat cannot qualify as an EWS trade secret.

EWS may try to claim the User Responsibility Agreement is a reasonable step to keep the Privileged Chat secret, but they do not make that claim with any specificity.

   ii) THE DOCUMENTS RELATED TO DOMAINS

"Documents relating to EWS's domains" is so vague it could refer to any documents wherein information about domains are found, public, private, or commercial. EWS makes no effort to show it has value in its secrecy, what contents are in the document, whether it provides an advantage, or whether

substantial time, money, and energy were required to compile public information that is not easily accessible. "Documents related to EWS domains" does not describe a protectable trade secret.

### c) EFFORTS TO KEEP TRADE SECRETS A SECRET

Warren did not treat his indexes as trade secrets, quite the opposite. Ms. Cheney should not be allowed to now claim how the Indexes were treated when Warren was the one who made those decisions while he was employed at EWS. Whether or not EWS now treats their various IP indexes secretly is not relevant in determining whether the documents Warren sent himself are trade secrets.

The Privileged Chat is nothing more than a Microsoft Teams chat between Warren and Ms. Cheney wherein Warren is complaining to Ms. Cheney about the execution of a contract without allowing any input from Warren during the negotiations. EWS does not have reasonable measures in place to keep Microsoft Teams chats secret. Quite the opposite, in the EWS Employee Handbook it says, "Employees should not have any expectation of privacy in any correspondence, activity or information while using the Company's systems." (Plaintiff Dec., EX 17 at 42). The Handbook goes on to say that "Early Warning's internal or external communication systems shall not be used as a forum to promote illegal activities." Id. This is exactly what the Privileged Chat is: a use of the EWS communication system to promote illegal activity by EWS. And this is why there is so much fuss about the Privileged Chat despite it not being a trade secret or confidential. The Handbook also explicitly states: "Neither the Employee Handbook nor the Intellectual Property and Confidentiality Agreement is intended to... prohibit employees from reporting concerns to, filing a charge or complaint with, making lawful disclosures to... providing documents or other information to... any other federal, state or local agency charged with the enforcement of any laws." (Id. at 22). Warren is of the opinion that the Privileged Chat is precisely the type of information that falls under this category, and Warren should be allowed to disclose it to the

DOJ and/or the Arizona Attorney General as part of "reporting concerns to..." portion of that clause of the Handbook. EWS is too vague about the "Document related to EWS domains" to make any analysis about efforts to keep it a secret.

## 4) EWS CANNOT SHOW MISAPPROPRIATION BY WARREN OF THE ALLEGED TRADE SECRETS

Under the Arizona Uniform Trade Secret Act, EWS must prove two elements: (1) the existence of a trade secret, and (2) actual or threatened misappropriation. See Calisi, 302 P.3d at 631-32; Miller v. Hehlen, 104 P.3d 193, 201 (Ariz. Ct.App. 2005). Misappropriation is defined as either:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means [OR]

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who either:

(i) Used improper means to acquire knowledge of the trade secret.

(ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

A.R.S. § 44-401(2). The definition 18 U.S.C. § 1839(5) is almost identical.

### a) Warren Did Not Steal Trade Secrets

EWS stating that "Johnson also began sending EWS's documents from his work email account to his personal email account. Those documents comprised a large volume of sensitive materials and information of a highly confidential and sensitive nature" (Complaint, Doc1, at 2¶8) and "Johnson had sent a volume of EWS's confidential documents from his work email account to his personal email account at least as early as November 2022" (Motion, at 6) is misleading at best, and an attempt to bend facts to Ms. Cheney's narrative at worst. Warren emailed documents to himself the entire 8 years he worked at EWS; his indexes were mailed

repeatedly to save updated templates and other documents to print on the

printer/scanner that EWS had bought Warren.

**b) EWS Cannot Show Warren Misappropriated Any Trade Secrets**

EWS's accusations and the facts regarding misappropriation are very similar to

those in *TRADITIONS HEALTH LLC v. Paulson,* Dist. Court, D. Arizona 2023.

There, it was found that Paulson had emailed trade secret information to herself

before leaving her job at Traditions. During the lawsuit, Traditions presented

evidence that the Court said did not allow it to confirm that any confidential or trade

secret information was disclosed: "Traditions was not able to present information

that Paulson had disclosed that information. Instead, they presented evidence that

Thema had acquired seven patients that were previously patients with Traditions.

Because Traditions was not able to identify which, if any, of those patients were on

the wrongly acquired list—and the exhibits demonstrating the transfer of the

patients have the names redacted—the Court was unable to confirm if any of the

trade secret information was used or disclosed. Therefore, the Court finds Traditions

has not shown a likelihood of success on the trade secrets claims."

The evidence EWS presents is not as direct as that in Traditions, but EWS

similarly has presented evidence that will not allow the Court to confirm any

misappropriation. The metadata on PDFs showing authorship when the documents

supposedly authored do not have any trade secret info is merely consistent with

Warren being liable, while the fact that the full versions of the submissions are

absent any proprietary knowledge and focus on events that happen after Warren's

departure. EWS's evidence does not indicate misappropriation happened, even if

one takes it as evidence of Warren's involvement, there is still no showing of

misappropriation, and like the Traditions case, therefore won't allow the Court to

confirm misappropriation. (See also *TDBBS LLC v. Ethical Products* Inc.) (Ethical

hired an employee of TDBBS, the employee took trade secrets on his last day,

TDBBS 18-month development for product, but Ethical did it in 6, TDBBS claimed

1   trade secrets were disclosed, the court ruled TDBBS not likely to be successful

2   without more evidence).

3       The challenge to the Paze trademark application is in no way based on

4   information taken by Warren and does not "reflect" his knowledge, it is based solely

5   on actions taken by applicant, notably it is based on fraud in filing their Amendment

6   to Alleged Use. The fraud committed by EWS related to the AAU happened well

7   after Warren's departure, so Warren has no confidential or proprietary knowledge of

8   those activities. ████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████

11  ██████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████

13      EWS implies that Warren disclosed information about two domains to Mr.

14  O'Loughlin, leading to their registration by him (Motion Doc 16, at 14). However,

15  Warren was unexpectedly terminated less than two days after allegedly receiving a

16  domain report. In that time, Warren did not discuss or review the domains report

17  with Marketing. ████████████████████████████████████████████████████

18  ████████████████████████████ Unlike EWS seems to think, Mr. O'Loughlin had as much

19  right to register those domains as EWS, and Warren's knowledge regarding EWS's

20  desire to register certain domains was no greater than Mr. O'Loughlin's.

21      EWS should be familiar with Mr. O'Loughlin's type of activity; Warren dealt

22  with a lot more than that when Zelle came out. "Domain Parking Monetization" is

23  big business, and having an ITU trademark application in the public, combined with

24  the goods and services description, provides ample information for these businesses

25  and individuals to speculate on domains. The fact that Mr. O'Loughlin registered

26  103 more domains than the two EWS wanted is strong evidence of a domain "land

27  grab," which is where a business or individual speculates on domains and registers

28  them in bunches hoping for a payday. This activity is not illegal unless it involves

an established trademark and intention to make money off it is apparent.[8] Neither of those factors are present here. EWS should have registered the "paze" related domains when they filed the ITU application for this very reason.

**5) EWS CANNOT SUCCEED ON THE MERITS FOR ANY OF THEIR BREACH OF CONTRACT CLAIMS**

The legitimate purpose of post-employment restraints is "to prevent competitive use, for a time, of information or relationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment." Valley Medical Specialists v. Farber, 982 P.2d 1277, 1281 (Ariz. 1999). A covenant not to compete is invalid unless it protects some legitimate interest beyond the employer's desire to protect itself from competition. Id. at 1281. EWS mentions the contract claims at the beginning of the Motion and discusses them briefly, but only to support the trade secret misappropriation claims, not as stand-alone allegations. Regardless, Warren will address all four alleged "agreements" here.

**a) Warren Is Not In Violation Of The Intellectual Property And Confidentiality Agreement**

In Arizona, an overly broad confidentiality agreement amounts to a noncompetition agreement. See Orca Commc'ns Unlimited, LLC v. Noder, 233 Ariz. 411, 417, 314 P.3d 89, 95 (App. 2013). Generally, restrictive covenants "are enforceable if they are 'no broader than necessary to protect the employer's legitimate business interest." Id. at 95. In assessing the scope of a confidentiality agreement, the key question is "whether the information [sought to be restricted] is truly confidential—not known to the public and 'substantially inaccessible.'" Joshua David Mellberg LLC v. Will, 96 F. Supp. 3d 953, 986 (D. Ariz. 2015) (quoting Orca).

---

[8] The record EWS provides shows that it was EWS who contacted Mr. O'Loughlin about purchasing the domains, and not Mr. O'Loughlin who contacted EWS to sell the domains. *Plaintiff Dec*, EX 12 at 11.

The Intellectual Property and Confidentiality Agreement ("IP Agreement") (Plaintiff Dec., EXHIBIT 18) is more restrictive than the confidentiality agreements in Orca, Unisource, or Joshua cases. It defines "Company Intellectual Property" to include any patent, copyright, trade secret, trademark, moral rights, or other intellectual property or proprietary rights of the Company or its licensors. "Trade Secrets" are defined broadly, *and without limitation*, to include any data or information that is competitively sensitive or commercially valuable and not generally known by the public, as well as scientific or technical information, designs, processes, procedures, formulas, or improvements, whether or not patentable or copyrightable, *without limitation*.

This expansive definition of Trade Secret covers, *without limitation,* information/data that EWS "reasonably tries to keep secret," including generally known scientific or technical information, formulas, source code, and system information, whether EWS can own it or not. This overarching clause makes it possible for public information/data to be classified as Trade Secret. The current lawsuit exemplifies the potential abuse of this IP Agreement due to its overly broad definition of Trade Secret and Confidential Information. EWS is indirectly claiming they have "reasonably tried to keep secret" a Teams Chat, an ill-defined "document related to domains," and a publicly filed intent-to-use trademark application (Motion, at 5–7).

EWS's own allegations in this case demonstrate why the IP Agreement is too expansive: EWS uses the User Responsibility Agreement (URA) which claims everything that touches EWS's system is confidential or a trade secret according to EWS, and the Handbook is just as broad. Then EWS wields the IP Agreement's legal causes of action giving EWS a license to go after any former employee for any activity they performed at EWS and are now performing elsewhere. The overly broad definition subjects the IP Agreement to non-compete scrutiny, so the geographic and temporal restrictions on disclosure must be reasonable to protect

EWS's interests and no more. The restrictions are also drafted overly broad and unreasonably:

> "I agree that I will not disclose, or disseminate to any other person, organization, or entity any Confidential Information, Company Intellectual Property, or Trade Secrets. I further agree that during my employment and after the cessation of my employment with the Company, I will not use or otherwise employ any Confidential Information, Company Intellectual Property, or Trade Secrets outside the direct provision of my services to Company. The obligations set forth herein do not apply to any Trade Secrets or Confidential Information which becomes generally known to competitors of the Company through no act or omission of me." (Plaintiff Dec., EXHIBIT 18)

This restriction has no temporal or geographic limitation and requires that Confidential Information or Trade Secrets be used only in the provision of services to the company. The exclusion is too narrow as it only calls out EWS competitors' knowledge, which indicates very few entities.

**b) The Employee Handbook**

In Arizona, an employment contract must "clearly evidence an intent" for separate documents to "be made part of the contract." Hannibal-Fisher v. Grand Canyon University, 523 F. Supp. 3d 1087 (D. Ariz. 2021). Warren's IP and Confidentiality contract has no such expressed intent. The EWS Employee Handbook explicitly states that it is not to be construed as a contract, but as guidelines for how the company should act. Therefore, any "violation" would indicate penalties at the workplace but not in a court of law.

**c) Warren Has Not Violated The User Responsibility Agreement**

The User Responsibility Agreement ("URA") suffers from the same lack of intent to be made part of the employment contract as the Handbook. Further, the URA is a special-purpose document for data and information security, not a measure to keep information secret. See (Plaintiff Dec., Doc 17, EXHIBIT 9). The word "Restricted" is the highest confidential classification of data and less common information at EWS. The URA refers to "Restricted Data," "nonpublic data," or "Restricted Information" (Motion, at 13). The URA intentionally differentiates

between "data" and "information" (Plaintiff Dec., EX 19, compare ¶1 to ¶2).
Further, EWS's interpretation of the clause about Warren not being allowed to
"remove Restricted information from the office on any form of media without
documented management approval" (*Motion*, at 13) is not reasonable because it is
EWS policy that all employees take their laptops home every night. It is clear that
the parties did not intend to enter into a binding contract when acknowledging the
URA, as it is not called out in the IP Agreement and "The Purpose" of the URA as
written does not indicate a binding contract between the parties but a policy
acknowledgment. (Id. at 1)

**d)  No Violation of the Settlement Agreement Has Occurred**

Warren has adhered to the Settlement Agreement (Id., EX 3) since its execution.
He has complied with the requirements of §7 and adhered to proactive requirements
like those in 7(d) by removing his reviews of EWS on various platforms and all
other negative reviews and postings regarding EWS. EWS, with no evidence, makes
bare assertions that Warren violated the Settlement Agreement. EWS's claim that
the TTAB submissions "reflect" Warren's knowledge of proprietary and
confidential information is false on its face. According to the TTAB filings
(*Plaintiff* Dec., Ex 10, 12, 14), the fraudulent activities EWS undertook happened
after Warren's departure. EWS makes an over-hopeful conclusion about the
metadata. Metadata indicates at best that the PDF Mr. O'Loughlin submitted passed
through an Adobe license registered under Warren Johnson. This, without more
direct evidence, does not lead to a plausible conclusion that Warren authored the
submissions, let alone shared trade secrets.

Metadata attaches to a PDF at creation and can persist indefinitely or be changed
manually very easily. It can come from a template downloaded off the internet, an
old version of Adobe that has been sold or given away, from an old computer the
licensee no longer has, a loaned computer, shared Adobe credentials, or
misappropriated Adobe credentials. Metadata can survive on a PDF through

exportations, conversions, downloads, copying, and other manipulations of an originally created document. For example, if Mr. O'Loughlin had a copy of a publicly available complaint he downloaded and wanted to file a motion in an official proceeding, he could repurpose the downloaded PDF to use the cover sheet in his filing, thus transferring the old metadata showing someone else as the author with the filing. According to EWS's logic and the metadata on their allegedly trade secret Indexes, Frankie Ho must have been the author, and he had no obligation to assign ownership to EWS, therefore EWS cannot own the Indexes. EWS would not accept this conclusion as plausible, and the Court should not either. Yet that is the exact conclusion EWS is claiming based on metadata on Mr. O'Loughlin's submission. Even assuming Warren did author the submissions, that fact still does not support a misappropriation of trade secrets or confidential information claim because the submissions contain no confidential or trade secret information. Therefore, it must be found that EWS is unlikely to succeed on the merits for a claim of breach of the Settlement Agreement.

**6) EWS CANNOT SHOW IRREPARABLE HARM**

No harm will come to EWS if no injunction is ordered against Warren, let alone irreparable harm. Despite this, EWS relies on Fire Sec. Elec. & Commc'ns, 2024 WL 620813, at *6 (citing Saini v. Int'l Game Tech., 434 F. Supp. 2d 913, 919 (D. Nev. 2006)) to argue that irreparable harm should be presumed because this is a trade secret case (Motion, at 16). Warren alleges that in this lawsuit it "may not." There is no information in Warren's Indexes or the Privileged Chat that could be used the way EWS alleges, causing "the permanent loss of its valuable intellectual property and consequent loss of competitive advantage" (Id.). As discussed, Warren's Indexes were designed to avoid having the information to create such a loss. Additionally, EWS has delayed any action regarding the alleged trade secret "theft" for almost two years. EWS's knowledge of what Warren emailed to himself is not new, and EWS has done nothing until now, when they are being outmaneuvered at the TTAB as a last-ditch effort to avoid the outcome at the TTAB. The "documents related to domains" are also outdated. If EWS

had domains in any documents two years ago, allegedly stolen by Warren or not, then they would be registered by now or deemed not desirable. EWS will not suffer any harm, including irreparable harm, if no injunction is instituted. Their alleged potential for "incalculable damages" is inaccurate and a little dramatic.

### 7) THE BALANCE OF *INEQUITIES* WEIGH HEAVILY AGAINST WARREN IF AN INJUNCTION IS ISSUED

Due to EWS's malleable definition and vague identification of their "EWS Confidential Information and Trade Secrets" as "information relating to EWS's highly confidential and proprietary patent and trademark strategy" and that "…are trade secrets" (Id., at 4), an injunction would put Warren in virtual lockdown regarding his profession. Warren was the only architect and manager of all of EWS's intellectual property strategies, matters, and portfolios. An injunction as EWS requests, covering the information that EWS so vaguely defines, would cripple his ability to practice his trade. Additionally, forcing Warren to submit to a full electronic cavity search by EWS would be an extreme violation of his privacy, covering the last two years. Further, Warren would not be the only one impacted because such an expansive injunction would include devices that have been provided to him by his current employer.

### 8) PUBLIC POLICY DOES NOT FAVOR EWS's PRELMINARY INJUNCTION

"Granting an injunction will protect EWS's significant investment in creating and protecting the Confidential Information and Trade Secrets" (Id., at 17) is not accurate based on the facts here. A staple of intellectual property is diligence in seeking protection contemporaneously with the creation. EWS cannot be threatened with two-year-old information about their proprietary interests if they have acted diligently as the law requires, and if they have not acted diligently, then public policy does not support rewarding EWS for a lack of diligence by granting an injunction. Public policy would support not issuing an injunction so that the TTAB proceedings can continue, and the two frauds committed by EWS at the Trademark Office, after Warren's departure, can be corrected. The real focus of this action is the Privileged Chat document. This is because it is a key piece of evidence to be submitted to the Department of Justice and the

Arizona Attorney General in an attempt to get an investigation into apparent illegal activity being carried out by EWS's owner banks and the "Service Provider." The public policy in allowing the Privileged Chat to be used for this purpose weighs heavily in favor of no injunction.

**9) <u>CONCLUSION</u>**

For the foregoing reasons, Warren respectfully requests that the Court deny Plaintiff's Motion for a Preliminary Injunction and Temporary Restraining Order.

**MOTION FOR IN CAMERA REVIEW OF THE PRIVILEGED CHAT**

**Warren** respectfully moves this Court for an order directing an in-camera review of the document referred to as the "Privileged Chat" in the Plaintiff's Motion for Preliminary Injunction (*Plaintiff Declaration*, Doc 1, at 2 ¶10). In support of this motion, Warren states as follows:

**I. <u>INTRODUCTION</u>**

The Plaintiff, Early Warning Services, LLC ("EWS"), has included the "Privileged Chat" document as part of its claims for injunctive relief, alleging it contains confidential information and trade secrets. Warren disputes these claims, asserting that the document is neither privileged nor a trade secret. Furthermore, even if the document were privileged, EWS has implicitly waived any such privilege by making it a subject of this lawsuit, thereby triggering an implicit subject matter waiver.

**II. <u>BACKGROUND</u>**

   1. **Employment and Termination**

Warren was employed by EWS as Senior Intellectual Property Counsel until his unexpected termination on January 23, 2023. During his tenure, Warren was responsible for various IP-related tasks, including all IP matters, portfolios, and databases.

   2. **Privileged Chat Document**

The "Privileged Chat" is a Microsoft Teams conversation between Warren and EWS's General Counsel, Ms. Tracy Cheney, dated November 3, 2022. Plaintiff claims

this document contains confidential and proprietary information, even goes as far as (sort of) claiming trade secret protection for it.

In Plaintiff's Motion to Lodge Under Seal, Doc 19, at 3 EWS states "       Not only does the Privileged Chat contain Confidential Information and Trade Secrets belonging to EWS, but the Privileged Chat is protected from disclosure by EWS's attorney-client privilege, which EWS has not waived." This is simply not true. Not only is the Privileged Chat not protected by the privilege, EWS refuses to separate Confidential Information from Trade Secret.

### 3. **Dispute Over Privilege and Trade Secret Status**

Warren contends that the "Privileged Chat" does not meet the criteria for trade secrets under the Arizona Uniform Trade Secrets Act (AUTSA) and is not privileged as it does not involve attorney-client communications or legal advice.

Even if what Plaintiff alleges is true; "Johnson and Ms. Cheney were the only parties to the Privileged Chat, which reflected Johnson's legal advice to EWS concerning contract negotiations and trademark applications" (*Id.* at 2), then only Johnson's messages need to be redacted as allegedly he was giving advice. Despite the contract already being executed at the time this is what EWS claims.

Further, the business relationship with the "Service Provider" was not a hidden at the time the Privileged Chat took place. Warren was under the impression that the partnership would  be celebrated, announced in a press release or something, not totally concealed from the public and regulators the way EWS has done. The contract itself may have been confidential, but the relationship was spoken about openly and without regard for secrecy or confidentiality at the time.

### 4. **Implied Waiver of Privilege**

By making the "Privileged Chat" a central piece of its claims in this lawsuit, EWS has implicitly waived any privilege that might have attached to the document or the subject matter therein.

## III. LEGAL STANDARD

In camera review is appropriate when there is a legitimate question regarding the privileged status of a document. Courts have the inherent authority to conduct such reviews to determine whether a document is indeed privileged or if any privilege has been waived.

## IV. ARGUMENT

### A. The "Privileged Chat" is Not a Trade Secret or Privileged Document

#### 1. Lack Of Trade Secret Status

The "Privileged Chat" does not contain information that derives independent economic value from not being generally known or readily ascertainable by proper means. Nor did it take substantial time, energy, and resources to create, nor does it provide an economic advantage, nor was there reasonable measures to keep it secret in place. It does not meet the statutory definition of a trade secret under AUTSA.

#### 2. Lack Of Privilege

The "Privileged Chat" is a conversation between two attorneys discussing general business matters, or more accurately, Warren complaining to Ms. Cheney about the way the negotiations went regarding a "Service Provider" agreement for the new product Paze, and not legal advice or attorney-client communications. As such, it does not qualify for attorney-client privilege.

## B. IMPILICIT WAIVER OF PRIVILEGE

#### 1. Implied Subject Matter Waiver

By making the "Privileged Chat" subject of its claims, EWS has implicitly waived any privilege that might have attached to the document. The implicit subject matter waiver doctrine holds that in order to prevent a party from using the attorney-client privilege as a sword and a shield, just as EWS is attempting to do with the "Privileged Chat" document, when a party makes privileged information part of a claim in a judicial proceeding, it implicitly waives the privilege as to all other communications on the same subject matter.

#### 2. Fairness Considerations

Allowing EWS to wield the content of the "Privileged Chat" against Warren as part of a trade secret misappropriation lawsuit while claiming privilege over the contents of the document would be unfair and prejudicial to Warren. The Court should ensure that the privilege is not used as both a sword and a shield.

## C. Professional Rules of Conduct

### 1. Rule 1.6(d)(1) and 1.6(d)(2)

According to the Rules of Professional Conduct, specifically Rule 1.6(d)(1) and 1.6(d)(2), a lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary to prevent the client from committing a crime or fraud that is reasonably certain to result in substantial injury to the financial interests or property of another, or to mitigate or rectify substantial injury to the financial interests or property of another that is reasonably certain to result or has resulted from the client's commission of a crime or fraud. Even if the "Privileged Chat" were found to be privileged, these rules would still allow Warren to disclose it to the Department of Justice, Arizona Attorney General, or other tribunal to stop EWS, their owner banks, and their service provider from continuing to commit various antitrust violations

## D. REQUEST FOR RULING OR REDACTION

### 1. Ruling on Privilege and Trade Secret Status

Warren requests that the Court conduct an in-camera review of the "Privileged Chat" to determine whether it is privileged or a trade secret. If the Court finds that it is neither, the document should be excluded from the injunction and labeled accordingly.

### 2. Redaction

If the Court finds that parts of the "Privileged Chat" are privileged, Warren requests that the Court order the redaction of privileged portions while allowing the non-privileged parts to be used in the proceedings.

## V. CONCLUSION

For the foregoing reasons, Warren respectfully requests that this Court:

1. Order an in-camera review of the "Privileged Chat" document.
2. Determine whether the document is privileged or a trade secret.
3. If the document is found to be privileged, determine whether EWS has implicitly waived the privilege.
4. Order the redaction of any privileged portions if partial privilege is found.
5. Grant any other relief the Court deems just and proper.

Respectfully submitted,

/Warren V Johnson/

Warren Johnson

122 S Hardy Drive, Apt 59
Tempe, AZ 854281

208.317.1686
wjohnson@ipprotection.experts

# Certificate of Service

I, Warren V. Johnson, hereby certify that on August 8, 2024, I electronically filed the foregoing Response to Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order and the Motion for In-Camera Review by the Court of the "Privileged Chat" with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Respectfully submitted,

/Warren V Johnson/

Warren Johnson
2406 Alabama Street
Unit 7C
Lawrence, KS 66046
208.317.1686
warrenvjohnson@gmail.com

1  WARREN V. JOHNSON
2  warrenvjohnson@gmail.com
   122 S. HARDY DRIVE
3  Tempe, AZ
   Plaintiff/Attorney
4

5              **IN THE UNITED STATES DISTRICT COURT**

6                  **FOR THE DISTRICT OF ARIZONA**

7
   EARLY WARNING SERVICES, LLC        Case No.:
8
9              Plaintiffs,            **DECLARATION OF WARREN**
          v.                         **V. JOHNSON IN SUPPORT OF**
10                                    **OPPOSITION TO MOTION**
11  MR. WARREN V. JOHNSON;           **FOR PRELIMINARY**
    BRANDON O'LOUGHLIN; P.A.Z.E.,    **INJUNCTION**
12  LLC
13
14             Defendants.
15
16              **Declaration of Warren V. Johnson**
17      I, Warren V. Johnson, declare under penalty of perjury that the following is true
18   and correct to the best of my knowledge, information, and belief:

19   **Introduction**

20      1.    This declaration supports all claims, assertions, facts, and allegations in my
21   Response to Plaintiff Early Warning Services, LLC's ("EWS") Application for
22   Temporary Restraining Order and Preliminary Injunction. This declaration
23   references all exhibits mentioned in the Response.
24
25      2.    I have recently secured my first permanent job in 18 months, starting on
26   August 5, 2024, which required me to move to Kansas City. This job represents a
27   significant milestone in my career, especially after the wrongful termination by
28   EWS. The filing of this Motion by EWS has caused extreme stress and distraction,

significantly impeding my ability to focus on my new job. I was served the Complaint one day after submitting to a background check for the new job, adding to the pressure and emotional distress. EWS has knowingly and intentionally defamed me within my professional circle, hindering my ability to perform when I most needed to. This conduct has severely impacted my professional reputation, ability to make a living, and mental health.

**Employment at EWS**

3.      I was employed as Senior Intellectual Property Counsel at EWS. I had full autonomy from day one, making and defining my own projects, initiating programs, drafting policies, setting up trainings, and implementing a docketing system. I expanded EWS's IP portfolios significantly and received praise for my work from Ms. Tracy Cheney and other leaders (Exhibit 12).

4.      I created individual Excel spreadsheet templates, referred to as "Indexes," at my previous job at Ping® golf and brought them to EWS. These indexes included Patent Index, Invention Disclosure Index, Concept Brief Index, IP Matter Index, Trademark Index, and Domain Name Index (Exhibit 4 for original email sending templates to EWS). The indexes were designed to track data and ensure accountability and transparency (Exhibits 3).

5.      

6.      Throughout my eight years at EWS, I systematically emailed templates of my indexes to my personal email solely to preserve a template each time, deleting all EWS data immediately. This practice was known and accepted, evidenced by EWS purchasing a printer for my home use.

7.      I was terminated on January 23, 2023, for allegedly emailing "confidential information" to myself despite my messages with HR requesting information related to my discipline and looming wrongful termination being likely the reason. (Exhibit 6) Ms. Cheney's account of the termination is inconsistent and misleading. I was terminated without a clear explanation of the "recent actions" leading to my termination (Exhibit 5).

**Privileged Chat**

8.      

9.      The chat does not contain trade secrets or privileged information, and certainly did not at the time of taking. It is a discussion between a subordinate and a superior, not legal advice.

10.      When I put EWS on notice of my wrongful termination suit 16 months ago, EWS counsel threatened me with the same claims EWS is making in this lawsuit. EWS claimed I was affiliated with Mr. O'Loughlin's domain registrations. I responded by referencing the intent-to-use application for the "paze" mark being public since November 9, 2022, leaving no information to be claimed as confidential. EWS also accused Warren of trade secret theft for the November emails. Warren in turn stated that most the documents were open source academic articles, and Warrens' indexes which he had brought to EWS; and the email in November was to preserve templates.

**Lack of History with Mr. O'Loughlin**

11. I did not attend Mesa High with Mr. Brandon O'Loughlin. EWS's claims that we plotted a scheme to extract money from EWS using nonexistent trade secrets are baseless. I attended Highland High School in Pocatello, ID, and obtained a GED in 1999, later attending Idaho State University and Arizona State University Sandra Day O'Connor College of Law (Exhibit 1).

12. EWS's reliance on easily manipulable information from websites like <old-friends.co> shows a complete lack of due diligence. EWS's claims that I "enlisted" Mr. O'Loughlin as a "front man" and participated in the formation of Paze, LLC are false (Exhibit 2).

**Treatment of the Indexes**

14. The indexes were created by me before my employment at EWS and were brought to EWS as templates. They contain publicly accessible data and were designed to track information for transparency and accountability (Exhibit 4).

15. The indexes do not contain trade secrets. They were not kept secret and were shared with other attorneys and employees for their use. The password protection on the indexes was to prevent editing, not to maintain secrecy (Exhibit 3).

16. The indexes included information that was publicly accessible, such as dates of reception and completion. EWS did not invest substantial resources in these indexes, and their secrecy was not critical for EWS to file patents or trademarks (Exhibit 4).

**Allegations and Claims**

17. The indexes are not trade secrets. They contain publicly accessible data and were created by me before my employment at EWS. EWS did not invest substantial resources in these indexes, and they were not kept secret (Exhibit 4).

18. The chat does not meet the criteria for trade secrets under the Arizona Uniform Trade Secrets Act (AUTSA). It does not contain information that derives independent economic value from not being generally known or readily ascertainable by proper means.

19. The term "documents related to EWS domains" is vague and does not describe a protectable trade secret. The documents do not contain information that provides a competitive advantage or was kept secret.

## Misappropriation Claims

20. I did not steal trade secrets. EWS's claims of misappropriation are baseless and lack evidence (Exhibit 4).

21. The metadata on the pdfs does not prove misappropriation. It only shows that the documents passed through an Adobe license registered under my name, which can happen for various reasons. Otherwise, applying EWS reasoning the Indexes would have to be authored by Frankie Ho as their meta data indicates as much (Exhibit 11).

22. I did not author any of the submissions that Mr. O'Loughlin submitted to the TTAB.

## Breach of Contract Claims

22. The Intellectual Property and Confidentiality agreement is overly broad and amounts to a non-competition agreement. It restricts the use of information without geographic or temporal limitations, making it unenforceable (*Plaintiff Dec,* EX 18). (Exhibit 18).

23. The handbook is not a contract but a set of guidelines. Any alleged violation would not be enforceable in a court of law. *Id.*

24. The URA is not intended to be a binding contract but a policy acknowledgment. It differentiates between "data" and "information" and does not restrict the removal of information from the office (*Plaintiff Dec,* EX 19).

25. I have adhered to the Settlement Agreement, removing all negative reviews and posts about EWS. The TTAB submissions do not reflect my knowledge of proprietary information (*Plaintiff Dec,* EX 10, 12, 14).

**Conclusion**

26. For the foregoing reasons, I respectfully request that the Court deny Plaintiff's Motion for a Preliminary Injunction and Temporary Restraining Order.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

____/Warren V Johnson/____
Warren Johnson

122 S Hardy Drive, Apt 59
Tempe, AZ 854281
208.317.1686
wjohnson@ipprotection.experts