REDACTED CONTENT

WARREN V. JOHNSON
warrenvjohnson@gmail.com
2406 Alabama Street, Unit 7 C
Lawrence, KS 66046
Defendant/Counterclaimant Attorney

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Early Warning Services, LLC<br>Plaintiffs/Counterclaim Defendant, and<br><br>Sara Stadler<br>Co-Counterclaim Defendant<br><br>v.<br><br>Mr. Warren V. Johnson,<br>Defendant/Counterclaim Plaintiff; and<br><br>Brandon O'Loughlin, P.A.Z.E., LLC<br>Defendants. | Case No.:CV-24-01587-PHX-SMB<br><br>**MR. WARREN V. JOHNSON'S ANSWER AND COUNTER CLAIMS** |

Defendant Mr. Warren Johnson Answer to Plaintiffs' Complaint state as follows:

1. The allegations of paragraph 1 are admitted.

2. The allegations of paragraph 2 are admitted.

3. The allegations of paragraph 3 are admitted.

4. The allegation of paragraph 4 is admitted.

5. The allegations of paragraph 5 are admitted

6. The allegations of paragraph 6 are admitted

7. The allegation of paragraph 7 are denied.

8. The allegations of paragraph 8 are denied.

9. The allegations of paragraph 9 are denied.

10. The allegations of paragraph 10 are admitted except for the settling to "avoid the cost of litigation' allegations are denied, and Warren is without sufficient information or knowledge upon which to form a belief with respect to EWS considering the matter closed.

11. The allegations of paragraph 11 are denied

   a. The allegations in paragraph 11a are denied except the allegations of Warren providing legal advice to EWS on intellectual property issues are admitted.

   b. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 11b.

   c. The allegations of paragraph 11c are denied.

   d. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 11d.

   e. The allegations of paragraph 11e are denied.

12. The allegations of paragraph 12 are denied.

## PARTIES

13. The allegations of paragraph 13 are admitted.

14. The allegations of paragraph 14 are admitted.

15. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 15.

16. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 16.

## JURISDICTION AND VENUE

17. The allegations of paragraph 17 are denied

18. The allegations of paragraph 18 are denied.

19. The allegations of paragraph 19 are admitted as far as they state Warren resides and is domiciled in the State of Arizona.

20. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 20.

21. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 21.

## FACTS COMMMON TO ALL CLAIMS FOR RELIEF

22. The allegations in paragraph 22 are admitted as far as EWS being a financial services technology company for 3 decades.

23. The allegations of paragraph 23 are admitted as far as EWS's Zelle and Zelle Network send and receive money.

24. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 24.

25. The allegations in paragraph 25 are admitted as far as EWS making substantial investments and efforts to promote its Zelle Network and Zelle services, and that those services are widely used. Warren is without sufficient information or knowledge with respect to the rest of the allegations in 25.

26. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 26.

### B. Johnson, O'Loughlin, and P.A.Z.E.

27. The allegations in paragraph 27 are denied.

28. The allegations in paragraph 28 are admitted

29. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 29.

30. Warren denies the allegations of paragraph 30 as far as Warren launching a gripe website. Warren is without sufficient information or knowledge upon which to form a belief with respect to rest of the allegations of paragraph 30.

31. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 31.

## C. EWS's Termination of Johnson's Employment

32. The allegations in paragraph 32 as far as EWS issuing a written warning to Warren on August 8, 2022, are admitted. The rest of the allegations in paragraph 32 are denied.

33. The allegations of paragraph 33 as far as Warren protesting EWS's written warning in are admitted. The rest of the allegations in paragraph 33 are denied.

34. The allegations in paragraph 34 are admitted as far as Warren continuing to perform his duties and that Warren was instructed to sign and file several trademark applications on EWS's behalf, including the 97669754 applications to register PAZE in class 036 is admitted. The rest of the allegations in paragraph 34 are denied.

35. The allegations in paragraph 35 are admitted as far as a transition plan discussed over the phone with Ms. Cheney including the $50,000 bonus for the Grecia litigation. The rest of the allegations in paragraph 35 are denied.

36. The allegations in paragraph 36 are denied.

37. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 37.

38. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 38.

39. The allegations in paragraph 39 are admitted as far as Ms. Cheney giving Warren a 4 week notice of termination on January 17, 2023. All other allegations in paragraph 39 are denied.

40. The allegations in paragraph 40 are admitted as far as Ms. Cheney terminating Warren two days later. All other allegations in paragraph 40 are denied.

## D. EWS's Confidential and Proprietary Trade Secret Information

41. The allegations of paragraph 41 are admitted.

42. The allegations of paragraph 42 are denied.

43. The allegations of paragraph 43 are admitted as far as EWS's ability to create products is critical to growing its business. All other allegations in paragraph 43 are denied.

44. The allegations in paragraph 44 are admitted as far as EWS investing substantial about of money in their patents and trademarks. All other allegations of paragraph 44 are denied.

45. The allegations in paragraph 45 are admitted as far as Warren's role as IP Counsel he had knowledge EWS's patents and brands. All other allegations in paragraph 45 are denied.

46. The allegations in paragraph 46 are denied.

47. The allegations in paragraph 47 are admitted as far as information about EWS's patents and trademarks are maintained in a database. The other allegations of paragraph 47 are denied.

48. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 48.

49. The allegations in paragraph 49 are admitted as far as EWS employees executing an IP and Confidentiality Agreement and that pursuant to a EWS 's User Responsibility Agreement employees acknowledge responsibilities related to security of data. The rest of the allegations in paragraph 49 are denied.

50. The allegations in paragraph 50 are admitted as far as Warren executing EWS's IP and Confidentiality Agreement. The rest of the allegations in paragraph 50 are denied.

51. The allegations in paragraph 50 are admitted as far as Warren acknowledging and accepting the EWS User Responsibility Agreement. Warren is without sufficient information or knowledge upon which to form a belief with respect to the other allegations of paragraph 51.

52. The allegations of paragraph 52 are denied.

53. The allegations in paragraph 53 are denied as far as every employee was subject to the annual trade secret course.

## E. Johnson's Theft of EWS's Trade Secrets

54. The allegations of paragraph 54 are admitted as far as Warren representing to Ms. Cheney that he emailed the employee handbook to his personal gmail account which he later deleted. The allegations in paragraph 54 that Warren represented the employee handbook was the *only* confidential document emailed to his personal Gmail account is denied.

55. The allegations in paragraph 55 are denied as far as the admitted allegations in paragraph 54 being false. The allegations in paragraph 55 that Warren had sent documents from his work email to his personal email are admitted. Warren is without sufficient information or knowledge upon which to form a belief with respect to the other allegations of paragraph 55.

56. The allegations in paragraph 56 are admitted as far as Warren not seeking authorization to send his Indexes to his personal Gmail account. The other allegations of paragraph 56 are denied.

## F. O'Loughlin's Acts of Cybersquatting

57. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 57.

58. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 58.

59. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 59.

60. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 60.

61. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 61

62. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 62.

63. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 63.

64. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 64.

65. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 65.

## G. Defendant's Fraudulent Trademark Applications and Abusive Language

66. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 66.

67. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 67.

68. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 68.

69. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 69.

70. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 70.

    a. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 70a.

    b. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 70b.

71. The allegations of paragraph 71 are denied.

72. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 72.

73. The allegations in paragraph 73 are admitted as far as Warren inadvertently making a screen capture of the alleged "Privileged Chat" while evidence gathering for his wrongful termination lawsuit. The allegations in paragraph 73 are denied as far as Warren making the screen capture in November 2022.

Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 73.

74. The allegations of paragraph 74 are admitted.

75. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 75.

76. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 76.

77. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 77.

78. The allegations in paragraph 78 are admitted as far as Warren signing and being instructed to file EWS applications to register the PAZE and Z-logo while employed as EWS legal counsel. The other allegations in paragraph 78 are denied.

## H. Defendant's Demand for Payment

79. The allegations in paragraph 79 are denied as far as Warren laying the groundwork for demanding payment. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 79.

80. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 80.

81. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 81.

82. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 82.

## I. Johnson's Wrongful Termination Action and Parties' Settlement

83. The allegations in paragraph 83 are admitted.

84. The allegations in paragraph 84 are admitted as far as the parties agreeing the settle the lawsuit in a Settlement Agreement effective August 24 2023. The other allegatios in paragraph 84 are denied.

85. The allegations in paragraph 85 are admitted as fare as EWS expressly denying any wrongdoing or liability, Warren agreeing to dismiss the Civil Action with prejudice in return for a settlement payment and the retention of a vendor to provide Warren with job placement services. The other allegations of paragraph 85 are denied.

86. The allegations of paragraph 86 are admitted.

87. Warren is without sufficient information or knowledge upon which to form a belief with respect to the allegations of paragraph 87

    a. The allegations of paragraph 87a are denied.

    b. The allegations of paragraph 87b are denied.

    c. The allegations of paragraph 87c are denied.

    d. The allegations of paragraph 87d are denied.

**FIRST CLAIM FOR RELIEF**

**AGAINST ALL DEFENDANTS**

**Misappropriation of Trade Secrets Under the DTSA (18 U.S.C. § 1836)**

88. Warren repeats and incorporates by reference all allegations admitted, denied, and that Warren is without sufficient information or knowledge upon which to form a belief in the proceeding paragraphs.

89. The allegations of paragraph 89 are admitted.

90. Warren is without sufficient information or knowledge upon which to form a belief in the other allegations of paragraph 90.

91. The allegations of paragraph 91 are denied

92. The allegations of paragraph 92 are denied

93. The allegations of paragraph 93 are denied

94. The allegations of paragraph 94 are denied

95. The allegations of paragraph 95 are denied.

96. The allegations of paragraph 96 are denied.

97. The allegations of paragraph 97 are denied.

98. The allegations of paragraph 98 are denied.

99. The allegations of paragraph 99 are denied.

100. The allegations of paragraph 100 are denied.

101. The allegations of paragraph 101 are denied.

102. The allegations of paragraph 102 are denied.

103. The allegations of paragraph 103 are denied.

## SECOND CLAIM FOR RELIEF

## AGAISNT ALL DEFENDANTS

## Misappropriation of Trade Secrets Under AUTSA

## (A.R.S. § 44-401 *et seq.*)

104. Warren repeats and incorporates by reference all allegations in the proceeding paragraphs.

105. The allegations of paragraph 105 are denied.

106. The allegations of paragraph 106 are denied.

107. The allegations of paragraph 107 are denied

108. The allegations of paragraph 108 are denied.

109. The allegations of paragraph 109 are denied.

110. The allegations of paragraph 110 are denied.

111. The allegations of paragraph 111 are denied.

112. The allegations in paragraph 112 are denied.

113. The allegations of paragraph 113 are denied.

## THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANT JOHNSON

## Breach of Fiduciary Duty Under Arzona Law

114. Warren repeats and incorporates by reference all allegations in the proceeding paragraphs.

115. The allegations of paragraph 115 are admitted as far as the relationship between EWS and Warren being that between an attorney and an ex-client.

116. The allegations of paragraph 116 are admitted as far as Warren being a fiduciary for EWS during his employment.

117. The allegations of paragraph 117 are denied.

118. The allegations of paragraph 118 are denied.

119. The allegations of paragraph 118 are denied.

120. The allegations of paragraph 118 are denied.

121. The allegations of paragraph 118 are denied.

## FOURTH CLAIM FOR RELIEF

## AGAINST DEFEDNAT O'LOUGHILIN

### Cybersquatting Under the ACPA

### (15 U.S.C. § 1125(d))

122. Warren repeats and incorporates by reference all allegations in the proceeding paragraphs.

123. The allegations in paragraph 123 are admitted as far as EWS owning rights in the Zelle mark in the United States. Warren is without sufficient information or knowledge upon which to form a belief in the other allegations of paragraph 123.

124. The allegations in paragraph 124 are admitted as far as the Zelle mark being a valid mark entitled to protection under federal and common law. Warren is without sufficient information or knowledge upon which to form a belief in the other allegations of paragraph 124

125. Warren is without sufficient information or knowledge upon which to form a belief in the allegations of paragraph 125.

126. Warren is without sufficient information or knowledge upon which to form a belief in the allegations of paragraph 126.

127. Warren is without sufficient information or knowledge upon which to form a belief in the allegations of paragraph 127.

128. Warren is without sufficient information or knowledge upon which to form a belief in the allegations of paragraph 128.

129. Warren is without sufficient information or knowledge upon which to form a belief in the allegations of paragraph 129.

130. Warren is without sufficient information or knowledge upon which to form a belief in the allegations of paragraph 130.

131. Warren is without sufficient information or knowledge upon which to form a belief in the allegations of paragraph 131.

## FIFTH CLAIM FOR RELIEF

## AGAINST ALL DEFENDANTS

## Unjust Enrichment Under Arizona Law

132. Warren repeats and incorporates by reference all allegations in the proceeding paragraphs.

133. The allegations of paragraph 133 are denied as far as Johnson misappropriation of trade secrets and breach of fiduciary duty enabled Warren to demand that EWS pay $20,000 to acquire certain of the Accused Domain Names. Warren is without sufficient information or knowledge upon which to form a belief in the other allegations of paragraph 133.

134. The allegations of paragraph 134 are denied.

## SIXTH CLAIM FOR RELIEF

## AGAINST ALL DEFENDANTS

## Declaration of Noninfringement of an Unregistered Mark Under the Federal Declaratory Judgement Act, the Lanham Act and Arizona Common Law

(28 U.S.C. §2201(a) and 15 U.S.C. §1125(a))

135. Warren repeats and incorporates by reference all allegations in the proceeding paragraphs.

136. Warren is without sufficient information or knowledge upon which to form a belief in the allegations of paragraph 136.

137. Warren is without sufficient information or knowledge upon which to form a belief in the allegations of paragraph 137.

138. Warren is without sufficient information or knowledge upon which to form a belief in the allegations of paragraph 138.

139. Warren is without sufficient information or knowledge upon which to form a belief in the allegations of paragraph 139.

140. The allegations in paragraph 140 are denied as far as P.A.Z.E.'s threats to EWS customers and merchants for displaying EWS's PAZE mark in a confusingly similar way to P.A.Z.E.'s "PAZE" [stylized] mark is a necessary implication that EWS's Z-logo [stylized] mark infringe P.A.Z.E.'s trademark rights in it "PAZE" [stylized] mark. P.A.Z.E. has no trademark with which to sue EWS over the Z-logo [stylized]. Warren is without sufficient information or knowledge upon which to form a belief in the other allegations of paragraph 140.

141. The allegations in paragraph 141 are denied as far as the creation of a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Warren is without sufficient information or knowledge upon which to form a belief in the other allegations of paragraph 141.

142. The allegations in paragraph 142 are admitted as far as the application being filed on November 9, 2022 by EWS  for the mark PAZE under Serial No. 97669754 for services in class 036 was an intent-to-use application that only provides a constructive use date that is not effective or enforceable until the registration of the intent-to-use application, and at no time before.

143. Warren is without sufficient information or knowledge upon which to form a belief in the other allegations of paragraph 143.

144. The allegations of paragraph 144 are denied as far as EWS owning prior rights to the PAZE mark based on the *intent to use* application serial number 97669754 filed by EWS. Warren is without sufficient information or knowledge upon which to form a belief in the other allegations of paragraph 144.

145. The allegations in paragraph 145 are denied.

146. The allegations in paragraph 146 are admitted.

147. The allegations in paragraph 147 are admitted.

148. The allegations in paragraph 148 are admitted.

149. Warren is without sufficient information or knowledge upon which to form a belief in the other allegations of paragraph 149.

150. The allegations in paragraph 150 are admitted as far as the filing of the Sections 8 & 5 affidavit for EWS's Z [stylized] mark on April 26, 2024. Warren is without sufficient information or knowledge upon which to form a belief in whether the Section 8 & 5 affidavit was filed in good faith.

151. Warren is without sufficient information or knowledge upon which to form a belief in the other allegations of paragraph 151.

152. The allegations in paragraph 152 are denied.

153. The allegations in paragraph 153 are denied as far as P.A.Z.E. not being able to succeed in establishing that use of EWS's PAZE mark infringes any trademark rights in P.A.Z.E.'s alleged PAZE and PAZE [stylized] mark. The allegations in paragraph 153 are admitted as far as P.A.Z.E. not being able to succeed in establishing that use of EWS's PAZE Z-logo [stylized]] mark infringes any trademark rights in P.A.Z.E.'s alleged PAZE and PAZE [stylized] mark.

    a. The allegations of paragraph 153(a) are denied as far as EWS owning prior rights in its PAZE mark. The allegations of paragraph 153(a) are admitted as far as EWS owning prior rights in the Z-logo [stylized] mark.

    b. The allegations of paragraph 153(b) are denied.

154. The allegations of paragraph 154 are denied.

155. Teh allegations in paragraph 155 are denied.

**SEVENTH CLAIM FOR RELIEF**

**<u>AGAINST DEFENDANT JOHNSON</u>**

**Breach of Contract Under Arizona Law**

156. Warren repeats and incorporates by reference all allegations in the proceeding paragraphs.

157. The allegations of paragraph 157 are denied as far as the Intellectual Property and Confidentiality Agreement and the User Responsibility Agreement and are admitted as far as the Settlement Agreement.

158. The allegations of paragraph 158 are denied.

159. The allegations of paragraph 159 are denied.

160. The allegations of paragraph 160 are denied.

## GENERAL DENIAL

161. Warren denies all allegations not specifically admitted herein.

## AFFIRMATIVE DEFENSES

162. One or more claims fail to state a claim upon which relief may be granted.

163. One or more of the Agreements at issue are unlawful, unenforceable, void, voidable, or against public policy. These Agreements are overly broad in that they include unnecessarily expansive geographic and/or temporal limitations in some instances, lack any such limitations in other instances, are drafted to create an unlawful in terrorem effect on the employee, are too vague to permit reasonable enforcement, lack consideration, grossly impair the fundamental right of client choice, and other defects.

164. The information at issue in this case does not constitute a trade secret, and the information at issue is readily ascertainable by proper means.

165. The lack of the existence of any trade secrets.

166. The lack of any theft of any trade secrets.

167. No confidential, proprietary, or trade secret information was ever disclosed.

168. No independent value is created by any information in this case begin not known, or that any information provides a commercial advantage by not being known, or that substantial effort, resources, and time were invested in any of the information in this case.

169. One or more claims have been waived by EWS by knowingly allowing Warren's practices while employed at EWS for an 8 year period, without any objections.

170. One or more claims are barred by estoppel because of reliance on EWS's acceptance of certain behaviors for an extended period.

171. One or more claims are barred because of implied consent from EWS and tacit approval of the Warrens work practices.

172. The information in this case does not constitute confidential or proprietary business information entitled to protection, and the information at issue is readily ascertainable by proper means

173. EWS failed to take reasonable measures to protect the confidentiality and/or secrecy of the information it claims is trade secret, confidential, or proprietary business information.

174. EWS failed to take reasonable steps to maintain secrecy of information of alleged trade secrets.

175. One or more of EWS's claims are barred by the doctrine of unclean hands.

176. One or more of EWS's claims are barred by the doctrine of illegality.

177. One or more of EWS's claims are barred by the doctrines of waiver and/or estoppel.

178. One or more of EWS's claims lacks standing and/or venue.

179. One or more of EWS's claims are preempted by the AUTSA.

180. Whistleblower Immunity and protections under UTSA, AUTSA, and the Agreements.

181. Illegal activity on the part of EWS.

182. No common law fiduciary duty existed.

183. The Professional Rules of Conduct 1.9(c), 1.9(b), 1.6(c), 1.6(d)(1), and 1.6(d)(2).

184. Compliance with ethical obligations

185. Reasonable professional belief.

186. Goof faith reliance on Professional Rules of Conduct

187. Warren has on relation or interest in the P.A.Z.E. business, dealings, or outcome of the TTAB proceedings.

188. One or more of EWS breach of contract claims fail to plead any breach of any the Agreements.

189. EWS are not entitled to orders of non-infringement or invalidation of trademark applications under *BBK*.

190. No enrichment by Warren gained from disclosure of confidential, proprietary or confidential information.

191. There was no inequity caused by enrichment to defendant Warren.

192. EWS fails to establish any impoverishment of EWS caused by Warren.

193.  Warren acted in good faith with no intent of harming EWS.

194. No breach of a fiduciary duty if one existed.

195. One or more of EWS's trade secret misappropriation claims are barred because of the inevitable disclosure of the alleged trade secret.

196. One or more of EWS's alleged trade secrets were easily ascertainable.

197. One or more of EWS alleged trade secrets was known to Warren before EWS alleged it to be a trade secret.

198. Lack of causation for at least one or more of EWS's claims.

199. EWS would not reasonably/uniformly apply restriction/rules while Warren was employed at EWS.

200. One or more claims are barred as being contrary to public policy.

201. One or more of EWS's claims are barred by EWS's acquiesces during Warren's employment.

202. EWS lacks commercial goodwill in its alleged PAZE marks.

203. The EWS PAZE mark is descriptive/not inherently distinctive of the goods and services which are offered in association with the mark by EWS.

204. EWS has junior rights in the PAZE mark until registration of the intent to use application currently in front of the TTAB.

205. Lack of case or controversy between EWS and Warren.

## PRAYER FOR RELIEF

WHEREFORE, Warren requests that this court enter judgment in his favor and against EWS, and provide the following relief:

(i) EWS's Complaint and Motion for Preliminary Injunction be dismissed with prejudice with EWS take nothing thereby,

(ii) a judgment awarding Warren his attorneys' fees and costs as permitted by any applicable statute, rule, or contract; and

(iii) the Court order such other and further relief as it deems just and proper

## JURY DEMAND

Warren demands a trial by jury of the maximum number of jurors allowed, on all issues so triable.

Respectfully submitted,

/Warren V Johnson/
Warren Johnson

2406 Alabama St, Unit 7C
Lawrence, KS 66046
208.317.1686
wjohnson@ipprotection.experts

CO-DEFENDANT WARREN JOHNSON'S ANSWER, DEFENSES AND COUNTER CLAIMS

## SUMMARY OF THE COUNTER CLAIMS

1. Early Warning Serivces, LLC ("EWS"), plaintiff/counter defendent is a financial services company co-owned by seven of the largest banks in the United States. EWS facilitates collaboration among these banks to offer financial products, including the well-known payment service, Zelle. EWS is also in the process of developing a new digital wallet Paze.

2. Warren Johnson ("Warren") codefendant/counter claimant served as the sole intellectual property counsel for EWS for over eight years. His responsibilities included managing all intellectual property matters, overseeing confidentiality, licensing, invention harvesting, marketing reviews, and ensuring trade secret protection.

3. The "Privileged Chat" at the center of this litigation is a communication that involves statements ████████████████████████████ ████████████

4. EWS has attempted to shield this chat from public scrutiny by invoking a trademark impersonation complaint, confidentiality, attorney-client privilege, and now trade secret protection over the last few months.

5. EWS has misused and abused the legal process multiple ways to conceal potentially illegal activities revealed in the "Privileged Chat." EWS abused process by using the Motions to Seal to damage Warren's reputation and obstruct his ability to litigate effectively.

6. EWS has committed an abuse of process by including Warren as a co-defendant not to get justice, but to harass and defame him, using baseless claims and fraudulent evidence in the hopes that threatening Warren's professional reputation and career, EWS can coerce Warren into pressuring co-defendant PAZE into ceasing their activities.

7. EWS and their counsel, Ms. Sara Stadler, have defamed Warren by making false statements in legal filings, including those submitted to the TTAB. These

statements falsely accused Warren of conspiring to steal trade secrets and extort money, damaging his professional reputation.

8. EWS and Ms. Cheney engaged in extreme conduct, including withholding bonuses, wrongful termination, and defamation, causing Warren severe emotional distress. This conduct was intentional or reckless.

9. EWS's negligent actions, including submitting false evidence and filing baseless lawsuits, caused Warren significant emotional distress, impacting his health and career.

10. EWS initiated legal proceedings without probable cause, using fabricated evidence to harass and intimidate Warren. These actions were intended to damage his reputation rather than pursue legitimate legal objectives.

11. EWS and associated parties intentionally misrepresented facts by fabricating evidence, such as adding Warren's name to an unreliable website, to create a false narrative against him. This fraudulent conduct caused reputational harm and emotional distress.

12. Warren seeks compensatory and punitive damages for these actions, along with attorneys' fees, costs, and any other relief deemed just by the court. He also requests injunctive relief to prevent further defamatory actions by EWS. public.

## FACTS COMMON TO ALL COUNTER CLAIMS
## PAZE AND THE ALLEGED PRIVILEGED CHAT



13.

14.

15.



19. There had been no indication that EWS intended to keep the partnership with the Service Provider secret. The relationship was openly discussed in the office, and copies of the contract were circulated. Warren believed that the partnership would

---

[1] The U.S. Department of Justice (DOJ) and several states accused Microsoft of engaging in anti-competitive behavior by bundling its Internet Explorer browser with its Windows operating system, effectively making it difficult for consumers to use alternative browsers like Netscape. This bundling strategy, combined with restrictive agreements with Original Equipment Manufacturers (OEMs) and Internet Service Providers (ISPs), was seen to stifle competition … these practices violated the Sherman Antitrust … restraining trade in the browser market, ultimately harming consumer choice and innovation

be publicly announced, with press releases and co-marketing efforts, and did not anticipate that it would be kept from public or regulatory scrutiny.

### EWS's NEED TO HIDE THE PRIVILEGED CHAT



21. The legal tactics employed by EWS, including the voluminous filings in both this case and before the Trademark Trial and Appeal Board (TTAB), suggest that EWS's true motive is not the protection of trade secrets, but the suppression of the privileged chat.

22. The timing and nature of Ms. Cheney's declaration, along with the extensive exhibits, reinforce the conclusion that EWS is using the legal process to silence any disclosure of this evidence.

23. EWS's Complaint repeatedly refers to a Microsoft Teams chat as a "trade secret," asserting this claim without providing any basis for how the chat satisfies the legal criteria for trade secret protection.





CO-DEFENDANT WARREN JOHNSON'S ANSWER, DEFENSES AND COUNTER CLAIMS



38. Recognizing the gravity of the situation, Warren felt compelled to act and draft a letter to the Department of Justice and the Arizona Attorney General to report the conduct, submitting the Privileged Chat as part of the exhibits.

39. Warren drafted the letter but has not sent it.

### WARREN'S NAME ON A FACIALLY UNRELIABLE AND UNTRUSTWORTHY WEBSITE

40. Warren did not attend Mesa High School and did not graduate in 1999.

41. Somehow EWS found the only source of this inaccurate information, and it so happened to be on an easily manipulable, unmonitored and unreliable website <old-friends.net>.

42. EWS heavily relied on this evidence without conducting due diligence on this crucial information for their lawsuit, which at best they obtained from a facially unreliable website, and at worst fraudulently created themselves.

43. In the domain industry, websites with hyphenated domains, like <old-friends.co> instead of <oldfriends.co>, are viewed with skepticism as they suggest the use of a cheaply priced and undesirable domain.

44. The use of a lesser known <.co> Country Code Top Level Domain (ccTLD), which is assigned to Colombia, substantially adds to the suspect nature of a website.

45. ccTLDs are regulated solely by their respective countries, meaning Colombia sets the rules for .co domains.

46. Registering a .co domain generally has no specific restrictions or requirements different from other generic top-level domains (gTLDs). Notably, <.co> is often mistaken for "company," leading to its use in fraudulent activities online.

47. Other factors to consider include the website's security measures, functionality, contact-ability, and content legitimacy.

48. <old-friends.co> lacks any oversight and/or verification[2], is cluttered with intrusive ads, has a non-functional "request name removal" option despite being a live website since at least 2015, and a broken "contact us" link that leads to an error page.

49. The FAQ section reveals:

    a.  Not all listed names are registered.

    b.  Some "alternate names" are computer-generated.

    c.  Alternate names are designed to maximize search results.

    d.  Names can be added by visitors or automatically by a computer process.

50. The site even lists sources for obtaining yearbooks to verify information which was ignored by EWS.

51. EWS relied solely on this website to set the foundation for their claims against Warren.

**THE ADDITION OF WARREN'S NAME TO <OLD-FRIENDS.CO>**

52. EWS has never disclosed when or how they found this evidence in their extensive filings. And the <old-friends.co> website does not provide a "added on" date or a date of listing for the names on the high school class lists.

53. EWS discovered metadata that they improperly used to allege Warren's authorship of submissions by PAZE to the TTAB. Knowing this metadata was insufficient, EWS fabricated a false past association between co-defendants.

---

[2] According to <old-friends.co> as it currently reads, there are four different "Warren [some odd statement] Johnsons, Bilbo Baggins, Darth Vadar, and Donald J. Trump that all graduated Mesa High in 1999. Warren added these about 2 months ago and there was no verification whatsoever, not even the requirement of a legitimate email address.

54. Under information and belief EWS first created this fraudulent evidence by adding Warren to the <old-friends.co> website, and then promoted this fabricated narrative to establish a connection between co-defendants in court.

55. The connection via <old-friends.co> was crucial for EWS's baseless abuse of legal process.

56. Warren's name appearing on an unregulated website indicating attendance at a some random high school over 800 miles away from where Warren did attend high school, in the same class as the co-defendant is suspect at best.

57. EWS's effort to keep Privileged Chat private through threats to Warren's professional reputation relied on this <old-friends.co> finding, despite it being fraudulently planted to initiate this lawsuit and influence the court's perception of any affiliation between co-defendants.

## MS. CHENEY'S FALSE DECLARATION USED FOR IMPROPER PURPOSES

16. After all the "multiple instances of unprofessional interactions with co-workers" (Cheney Declaration, Doc 17, ¶6) by Warren, Ms. Cheney acknowledged Warren's correctness in taking his position, but he was still punished, which he accepted without protest.

17. In August 2022, Warren had an emailed HR in reaction to hearing that two HR individuals (HR1 and HR2) had planned to violate a contract.

18. Subsequently HR1 filed a complaint against Warren regarding the "tone" of his email, and HR2 investigated the complaint and determined guilt within hours of the email.

19. On August 8, Warren protested directly to Ms. Cheney in an email asserting that the HR employee was retaliating against him.

20. Over the following month, Warren protested HR2's refusal to provide Warren with due process by sending emails to all levels of HR, and the compliance department. Not one protest was heard, or investigation held.

21. Warren did not set an end-of-year quit date on September 2.

22. On or around September 2, Warren informed Ms. Cheney of his intent to seek other employment, again.

23. Warren committed to providing Ms. Cheney with up to 30 days' notice of his departure, and offered to hire and train his own replacement, to which Ms. Cheney appeared agreeable.

24. On September 11, 2022, Ms. Cheney provided Warren with a mid-year performance review which was notably positive.

**CORRECTING MS. CHENEY'S UNTRUE ACCOUNT OF WARREN'S BONUS**

25. On October 31, 2022, Warren emailed Ms. Cheney regarding a bonus he had been promised for successfully defending against the patent troll, Grecia, which had targeted EWS's customers.

26. On November 4, 2022, Ms. Cheney acknowledged Warren's successful year, despite the "incident," and expressed her intent to recognize his efforts.

27. On November 9, 2022, Ms. Cheney suggested to Warren that she would make the Grecia bonus contingent on Warren *staying with EWS until the end of the year*.

28. Warren replied that, as always, his departure would depend on finding new employment and that he would not remain at EWS for a bonus he believed was already owed.

29. Warren reiterated his intent to leave as soon as he secured a new position, even if it meant forfeiting the bonus.

30. On November 18, Warren and Ms. Cheney discussed his Grecia bonus ($50,000) *and* one of his three Long-Term Incentive (LTI) Bonuses ($30,000), both of which would vest at the end of 2022.

31. Warren was assured he would receive both bonuses. His yearly merit bonus and two other accruing LTI bonuses were not discussed.

32. After the call, Warren messaged Ms. Cheney, confirming he could accommodate her timeline and requested the transition plan in writing. Ms. Cheney agreed to provide it within two days.

33. On November 21 Ms. Cheney expressed concern about the unpredictability of the

situation with Warren's intention to leave.

34. On November 22, Ms. Cheney began pushing for a more definite end-of-year quit date, citing the need for certainty and a smooth transition.

35. On November 22, Ms. Cheney presented a written transition plan, which *required* Warren quit at the end of the year, and contained discrepancies.

36. The transition plan letter stated that the $50,000 bonus was for "outstanding results on patent matters" rather than the "Grecia Matter" as discussed.

37. The transition plan email also referenced "LTI Documents" that governed the $30,000 LTI bonus, Warren had never seen or heard of these documents.

38. Warren did not accept the written plan.

39. Later the same day, November 22 Warren noticed that his $50,000 2022 merit bonus had disappeared from his Workday profile, which he wrongfully assumed was due to the prior written warning.

40. On November 23, Warren messaged Ms. Cheney to ask what was really going on with the bonus situation.

41. Ms. Cheney falsely claimed that the $50,000 was specifically for the Grecia matter, when in fact it was Warren's 2022 merit bonus, which she had reallocated to be the Grecia bonus.

42. Ms. Cheney also falsely informed Warren that he would forfeit his partially completed 2023 and 2024 LTI bonuses if he resigned, though the LTI documents required payment of the prorated portion, approximately $56,000.

43. Ms. Cheney denied knowledge of the merit bonus disappearance from Workday and claimed she had not made decisions regarding it, which was untrue—she had already converted the merit bonus into the Grecia bonus.

44. Throughout November and December, Ms. Cheney repeatedly sent Warren emails that framed the transition plan as mutually agreed upon.

45. Warren consistently reminded her that he had not agreed to resign by the end of the year.

## THE ACCURATE ACCOUNT OF WARREN'S TERMINATION

46. On January 17, 2023, Ms. Cheney informed Warren that he had four weeks until his termination.

47. There was no stating "at the latest." This would undermined the purpose of the notice period, as termination could have occurred at any time within the four weeks, rendering the notice ineffective.

48. On January 19, 2023, Ms. Cheney used the allegation that she had discovered that Warren had sent proprietary and confidential EWS information from his work email to his personal email but never indicated what documents she was referring to during the termination call. She terminated him immediately, instructing him to return company equipment and delete EWS materials.

49. Ms. Cheney then claimed an investigation *later revealed* that Warren had sent a significant number of EWS documents to his personal email from November 2022 to January 18, 2023.

50. Ms. Cheney's double recollection of discovering emails Warren had sent brings her condor into question.

51. Warren documented the January 17 termination call with Ms. Cheney and HR2 in an email to Ms. Cheney which describes that Warren did not claim to have only emailed the Handbook to himself, nor did he admit to this action "shortly after" termination, as Ms. Cheney's declaration claims (Cheney Dec. ¶18).

## EWS's ACTIONS FOLLOWING THE RETALIATORY TERMINATION

52. In mid-March 2023 Warren realized Ms. Cheney was not going to pay him the $30,000 bonus she had promised him if he worked through the end of 2022.

53. The merit bonus pays the first payday in March, but Ms. Cheney had already deceitfully paid that out to Warren under the guise of the Grecia bonus, however the LTI bonus was never paid.

54. Ms. Cheney's chosen termination date of February 14th suddenly made sense, this was the last day before the pay period wherein company bonuses were to be paid

was going to begin, and since Ms. Cheney had planned on withholding those bonuses, she had to get Warren out.

55. Nonpayment of the LTI bonuses was contrary to the "LTI Documents" and illegal. Not to mention pretty devastating to someone who had just been surprised fired. Ms. Cheney never mentioned anything about not paying the bonus to Warren.

56. In April 2023 Warren received a phone call from the Arizona State Bar informing him that his bar fees for 2023 were never paid despite Warren working at EWS into 2023, Ms. Cheney gave Warren no notice of her intention to cancel payment on his bar fees.

57. Ms. Cheney's silence regarding her intention to not pay such a minuscule, but very important to Warren, fee is strong evidence of an intention to cause Warren hardship and harm.

58. Warren put EWS on notice of the wrongful termination in April, prior to filing to facilitate negotiations. EWS responded by alleging the same trade secret theft and misuse of confidential information claims EWS is now pursuing.

59. At the time Warren promptly and conclusively rebutted these accusations, leading to the initiation of settlement discussions for the wrongful termination lawsuit.

60. Notably, during the negotiations when Warren included his 2022 merit bonus as part of the settlement Ms. Cheney claimed that the November bonus, the Grecia Bonus—alternatively described as a bonus for outstanding work on patent matters or for a separate patent matter—was Warren's 2022 merit bonus.

61. However, Ms. Cheney has now returned and refers to this $50,000 bonus as a bonus for "an unrelated patent matter." (Id. at ¶12) This marks the fourth different explanation from Ms. Cheney regarding the bonus, further highlighting her lack of forthrightness about its origins or purpose.

**WARREN'S TIME OF UNEMPLOYMENT**

62. Until August 5, 2024, Warren has not held a constant job since being retaliated against by Ms. Cheney despite the placement service and applying to over 500 jobs. He has been in financial hardship and struggling since his savings have been depleted.

63. Nevertheless, Warren attributes his difficulty in finding work to the fact that he was not allowed to find a job while employed. Exacerbating Warren's job search was his inability to trust Ms. Cheney as a reference despite his 8 years of excellent service, and the reason he was terminated.

64. Warren's unemployment was made much harder knowing that Ms. Cheney had deceived him regarding $104,000 in bonuses he was owed, and then depriving him of a $30,000 bonus he was promised by Ms. Cheney.

65. Ms. Cheney's conduct put Warren on a path that has taken 16 months to recover mentally and fiscally.

### CHENEY'S DEFAMATION AND RETALIATION

66. EWS has wrongfully involved Warren in this lawsuit to discredit him, to do so EWS has fabricated elaborate and baseless claims, including allegations of trade secret theft and a conspiracy between Warren and a co-defendant to extort money.

67. These false accusations are based on Warren's alleged trade secret theft with a predetermination to extract money using a high school friend. EWS's accuses Warren of stealing trade secrets while he had legitimate access to the trade secrets, and at a time when EWS and Warren were on good terms.

68. According to the Complaint, Ms. Cheney offered Warren a $50,000 spot bonus for his work, and in September gave Warren a glowing review. Warren also received messages from Ms. Cheney on November 12 praising Warren's work that year.

69. Warren was open with Ms. Cheney through the beginning of November, sending her messages keeping her up to date on a job he was interviewing for, and training the replacement he had recently hired.

70. Warren was so close to getting the job that he took the templates of his indexes to use them in his next position, that was the purpose of the November email of his indexes.

71. At the time Warren took the index templates the relationship with EWS and Ms. Cheney was amicable, Warren was close to his new job, and Ms. Cheney was offering him a large bonus.  There was no ulterior motive or plan associated with Warren taking templates of what he had brought to EWS. Warren immediately deleted all the information; it was of no use to him.

72. Further, the policies and the Intellectual Property Agreement forbid the "disclosure" of confidential information. The Senior Intellectual Property Counsel sending his own indexes to his personal email does not constitute disclosure.

73. Now, after passing on the same charges last year, EWS and Ms. Cheney have maliciously dragged Warren into this lawsuit, aiming to destroy his professional reputation through defamation, abuse of process and inflicting extreme emotional distress.

### EWS's MISUSE OF TRADE SECRET CLAIMS

74. EWS's perversion of the concept of a trade secret by claiming confidentiality over ordinary documents without a legitimate basis is unfortunately not an uncommon practice among disgruntled ex-employers.

75. However trade secret protection is far more nuanced than most these cases treat them, the underlying information that comprises a trade secret is not the source of the "independent value." The *secrecy* of the underlying information must have value independent of the information itself. This implies a requirement of planned and sustained long-term secrecy.

76. To reasonably protect something valuable and susceptible to complete and unrecoverable loss based on disclosure alone, only measures that are proactively preventative to keep it secret are reasonable, not reactive NDAs or confidentiality agreements that only provide remedies *after the secret is out*.

77. Also the trade secret owner cannot have any intention of making the information publicly available because of the value loss. This is why trade secrets cannot be ephemeral business practices, those are the realm of confidentiality.

78. The clearest examples of how this works are cheap objects or concepts that are hugely valuable trade secrets: coca cola, kfc recipe, the mud for MLB baseballs.

79. The KFC recipe is only 13 herbs and spices that people have figured out though mass spectroscopy and reverse engineering, despite having the information that makes up the trade secret, these third parties do not have the "secrecy" that creates the immense value around the same 13 herbs and spices.

80. The trade secret is only valuable to KFC. If they openly gave the recipe to McDonalds then they would have to transfer the secrecy for McDonalds to gain value. McDonalds offering the same recipe as KFC is not very valuable, but if KFC transfers the recipe *and* the secrecy so that McDonalds is now offering the KFC secret recipe (which is the same as the other recipe, but not cloaked in secrecy), and that is hugely valuable.

81. A customer or third parties' awareness of their lack of knowledge regarding a trade secret creates value, so something that has no effect outside of the four walls of a company cannot have value in secrecy because there is no result or connection making the awareness of the secrecy.

82. The fact that something or some information is valuable, or a competitor would want it does not provide the "independent value" of the statute. The value of secrecy must be independent of that which is being kept secret, they cannot be one in the same, there needs to be independence from the information or object itself.

83. Would someone rather have the benefit of the KFC recipe itself; proclaiming I have it here see, come taste it? Or would someone rather have the benefit of the secrecy of the KFC recipe? The latter being independent is valuable regardless of the cheapness of the herbs and spices.

84. Things that are ephemeral, or that will inevitably become public can hardly be the subject of reasonable efforts to keep them secret if the reasonable efforts involve public disclosure in the future.

85. Another misunderstanding by EWS is what happens when confidential or trade secret information is included in typically non-confidential documents (e.g., performance reviews, Teams chats), this does not change the non-confidential nature of the documents, only the way EWS treats the documents can do that.

86. All it does is violate EWS's internal policy and puts the confidential or trade secret information at risk.`

87. The non-confidential documents EWS is claiming as trade secrets lack any confidentiality markings, contractual obligations, or policies requiring nondisclosure, and there are no indicia to suggest they contain confidential or trade secret information.

88. EWS has falsely claimed that Warren's performance reviews, his knowledge of trademark law, public trademark applications, and inevitably public domain name registrations are confidential or trade secret information.

89. EWS has also accused Warren of trade secret theft based on independently created indexes, public data, and a Teams chat. These claims, made with reckless disregard for the truth, have been repeatedly paraded by EWS.

90. As a result of EWS's overly broad view of trade secrets they are abusing the Motion to Seal process by attempting to seal Warren's positive performance reviews, which contain no confidential information. The only purpose for sealing these reviews is to suppress the truth about Warren's strong work history, thereby harming his reputation.

91. Performance appraisals are not confidential under EWS policy or the law. If confidential information was improperly included by EWS or Ms. Cheney, that would be a violation of policy, but it does not justify sealing the reviews.

92. Over a year ago, EWS threatened Warren with baseless trade secret misappropriation charges in retaliation for his wrongful termination lawsuit, but it

failed to pursue those charges. Their revival now is an attempt to pressure Warren, as EWS believes he can influence PAZE in the TTAB proceedings.

93. EWS's inclusion of Warren in this lawsuit, despite knowing he has no meaningful connection to PAZE, demonstrates reckless disregard for the truth and malicious intent.

94. The serious nature of the accusations against an in-house IP counsel and the narrative Ms. Cheney has presented is based on one piece of circumstantial evidence at best, and not supported by facts.

95. EWS has jeopardized Warren's professional reputation by falsely alleging trade secret misappropriation, using it as a tool to protect its own interests in an illegal business relationship.

96. EWS is also using these threats to coerce Warren into influencing someone they incorrectly believe is an old high school acquaintance to drop the TTAB proceedings and suppress evidence of illegal activity contained in the so-called privileged chat document.

## DEFAMAMATORY DAMAGE HAS BEEN DONE

97. EWS and its counsel have recklessly defamed Warren by falsely linking him to co-defendants based on unreliable information from a highly suspected <.net> webpage: such as a supposed high school connection.

98. They submitted false statements as facts to the USPTO in a TTAB proceeding, which Warren is not a party, maliciously accusing him of conspiring to have Warren draft motions to invalidate a trademark application that he filed on behalf of EWS. All lacking any substantive proof.

99. The responses in question, which Defendants included as exhibits, contain no trade secret or confidential information, relying solely on publicly available data. Despite the lack of factual support, Defendants presented these allegations as factual, further defaming Warren.

100. EWS also made defamatory claims to the TTAB that were irrelevant to the proceedings, not pertinent to the motion for a stay, and were made with the intent

to destroy Warren's career. Every chance EWS has gotten to communicate or publish the highly defamatory narrative including Warren teaming up with a old high school buddy they have jumped to publish it.

101. Under information and belief Ms. Cheney has also spread these falsehoods within her organization and beyond, further damaging Warren's professional reputation in retaliation for his involvement with the "privileged chat."

102. EWS filed a Motion for Preliminary Injunction, supported by the false and defamatory Declaration of Ms. Cheney which needlessly focused on and inaccurate, irrelevant and malicious account by Ms. Cheney of Warren's wrongful termination.

103. This Declaration was accompanied by 800 pages of exhibits intended to further harass and coerce Warren, the timing forced him to review all that information at a time when he was relocating out of state and starting a new job.

104. EWS's conduct amounts to an abuse of process, as it misuses the judicial system for an ulterior motive, causing significant harm to Warren's career and reputation.

## EWS AND MS. CHENEY'S ACTIONS EFFECT ON WARREN'S LIFE AND MENTAL STATE

105. In 2022, Ms. Cheney and EWS withheld over $100,000 in bonus money owed to Warren and lied about it, causing him distress.

106. Warren was wrongfully terminated in retaliation for protected activities, after months of being pressured to leave, adding to his emotional strain.

107. EWS maliciously failed to pay Warren's 2023 bar fees while he was employed, increasing his stress when he became unemployed.

108. In June 2024, EWS and Ms. Cheney initiated wrongful legal proceedings against Warren, worsening his distress.

109. EWS served Warren with a defamatory lawsuit the day after his background check was submitted to the University of Kansas for his new job, causing severe bouts of anxiety about losing this opportunity.

110. The lawsuit falsely accused Warren of conspiring to steal trade secrets with someone he didn't know, certainly enough of a reason not to hire an IP counsel.

111. EWS filed over 800 pages of exhibits to harass Warren, knowing he was moving and couldn't afford legal representation.

112. EWS made no attempt to avoid litigation, or to put Warren on notice that EWS wrongly suspected his involvement, in contrast to both notices provided to them by Warren and PAZE prior to litigation.

113. EWS is leveraging its immense resources for litigation against Warren, disregarding fraudulant evidence used against him and causing emotional harm.

114. Since being served Warren has suffered from severe anxiety, sleep loss, stress headaches, and temporary blindness, as some of the worst weeks of health metrics over the over four years of health data Warren has from his Garmin watch.

115. The lawsuit overshadowed his new job opportunity, forcing him to delay moving to Kansas and focus on defending himself instead of his career.

116. Unable to afford an attorney due to unemployment Warren has to represent himself, never having litigated in civil court, let alone against a plaintiff willing to do anything to keep the Privileged Document out of the public who has infinite resources, and two of the largest law firms in the world.

117. The pressure and time needed to fight this lawsuit forced Warren to make the decision to give up his dog before relocating.

118. Ms. Cheney's false declarations and submission of hundreds of pages of unnecessary exhibits and irrelevant evidence worsened Warren's mental state.

## FIRST CLAIM FOR RELIEF

### AGAINST EWS

ABUSE OF PROCESS UNDER ARIZONA COMMON LAW

119. Defendant/counterclaimant ("Warren") repeats and incorporates by reference all preceding allegations new line

120. To show an abuse of process under Arizona Common Law one must show that the defendant used a "willful act in the judicial process" in a manner not proper in the regular conduct of proceedings. The focus is on the improper use of process after it has been issued, rather than the initiation of the legal action itself. The willful act in the judicial process must have an "ulterior purpose" beyond the intended purpose of the legal process. This means showing that the process was used to achieve an outcome not intended by law. *DENOGEAN v. SAN TAN BEHAVIORAL HEALTH SERVICES LLC*, Dist. Court, D. Arizona 2017.

**Abuse of Process: Motions to Seal Motivated by Damaging Reputation and Obstructing Warren's Ability to Litigate**

121. Warren claims that EWS has systematically abused the document sealing process to keep information off the public record and out of his reach.

122. EWS asserts that certain documents contain confidential or trade secret information, warranting protection, even if they were not confidential under EWS policy or law. This retroactive classification forms the basis of the lawsuit and is used in motions and declarations to justify sealing documents.

123. EWS's misuse of the sealing process constitutes an abuse of legal procedure, aimed at obstructing Warren's ability to litigate effectively and concealing relevant information from the public. This conduct has prejudiced Warren's case, damaged his reputation, and harmed the public interest by withholding non-confidential information from the judicial record.

124. EWS has made post hoc confidentiality claims on submissions made by themselves and by Warren, despite these documents not being classified as such during relevant events. This is a clear attempt to suppress information retroactively.

125. By abusing the sealing process, EWS hinders Warren's litigation efforts by sealing critical defense documents, disadvantaging him. This misuse also harms

the public interest by undermining judicial transparency and restricting public access to important information that should be publicly available.

**Abuse of Process: Using Trade Secret Claims with the Ulterior Motive to Conceal Illegal Business Activity**

126. Defendant Warren brings a counterclaim for abuse of process against EWS. EWS has improperly used the legal process by filing a motion for a preliminary injunction, supported by a declaration and over 800 pages of exhibits, not to achieve a legitimate legal purpose but with the primary intent to suppress evidence of alleged illegal activities within the company.

127. Simply labeling information as confidential does not suffice under the law, and EWS has failed to meet its burden to demonstrate that the chat contains protectable trade secret material. Instead, EWS is using the claim of confidentiality as a pretext to prevent disclosure of information that may reveal misconduct.

128. The declaration of Ms. Cheney focuses extensively on the use of the Privileged Chat being a alleged misappropriation of trade secrets yet fails to establish that the evidence in question meets the legal definition of a trade secret.

129. The filing appears aimed at securing a court order to seal this evidence, thereby preventing its public disclosure and shielding EWS from potential scrutiny.

130. The Microsoft Teams chat in question contains no indicia of confidentiality or inherent proprietary value. Instead, it reveals potential evidence of unlawful conduct by EWS, which the company is attempting to conceal by falsely invoking trade secret protections.

131. Filing this lawsuit under such circumstances constitutes an abuse of process, as it is designed to retaliate against Warren for his possession of this evidence and to damage his reputation, rather than to protect legitimate legal interests.

**Abuse of Process: Inclusion of Warren as Co-Defendant to Harass, Defame, Intimidate, and Coerce**

132. Warren asserts a counterclaim for abuse of process against EWS, alleging they included him as a co-defendant solely to harass, defame, and intimidate him. EWS aimed to pressure Warren into influencing PAZE, whom they mistakenly believe is Warren's long-time friend, to resolve issues related to the TTAB proceeding and PAZE's use of Privileged Chat. Warren has no personal relationship with PAZE.

133. EWS filed unfounded trade secret misappropriation claims to tarnish Warren's professional reputation and intimidate him, rather than pursue legitimate legal objectives. They also filed a Motion for Preliminary Injunction to harass Warren by demanding intrusive personal information.

134. By July 1, 2024, EWS had already damaged Warren's reputation by defaming him before the USPTO's TTAB. In a Motion to Stay the TTAB proceeding—where Warren was not involved—EWS falsely claimed Warren led a group extorting money from them, furthering their harassment and defamation campaign.

135. On July 16, 2024, Warren requested a 60-day extension to file an Answer due to his relocation for a new job at the University of Kansas. EWS agreed but immediately stated they would not allow extensions to respond to their planned Motion for Preliminary Injunction.

136. Despite agreeing to the extension for the Answer, EWS filed the Motion for Preliminary Injunction on July 23, 2024, with 800 pages of exhibits, complicating Warren's situation as he prepared to move.

137. Due to improper service, he received the documents on July 25, 2024, with a response deadline of August 9, 2024, adding unnecessary pressure.

138. EWS's filing interfered with Warren's obligations to his new employer, forcing him to delay his relocation by over three weeks to address the Motion, disrupting his personal and professional life.

139. Additionally, EWS accused Warren of trying to invalidate trademarks he filed, despite PAZE's challenge being based on fraudulent activities occurring after

Warren left EWS. These accusations further exemplify EWS's intentional harassment and infliction of personal hardship on Warren.

WHEREFORE, Warren requests judgement against EWS and is seeking relief or damages for EWS's actions, via Ms. Cheney, and the damages caused by them in the form of compensatory and punitive damages, attorneys' fees and costs; and whatever else compensation the court may deem necessary

**SECOND CLAIM FOR RELIEF**

**AGAINST EWS AND SARA K. STADLER**

DEFAMATION UNDER ARIZONA COMMON LAW

140. Warren repeats and incorporates all references and allegations in the proceeding paragraphs.

141. Defamation Under Arizona Common Law. When one party makes a false statement about another, the false statement is published to the third party who is not the subject of this statement, causing harm to the reputation of the subject of the publisher. *Sign Here Petitions LLC v. Chavez, No*. CV-18-01211-PHX-GMS, 2019 WL 366903, at *2 (D. Ariz. Jan. 30, 2019)

a) If an absolute and/or and unabused qualified privilege attaches to the defamatory statements, then they may be defenses.

b) Defamation per se is considered so harmful that damage is presumed and does not need to be proven. Certain statements are considered defamatory per se because they are inherently harmful to the plaintiff's reputation, such as statements that impute serious criminal conduct, a loathsome disease, or misconduct in a person's trade or profession

c) Arizona Common Law does not recognize administrative proceedings as quai judicial and therefore no absolute privilege exists in such settings. *Yeung v. Maricopa Cty.*, 219 Ariz. 59, 62, 193 P.3d 675, 678 (Ct. App. 2008) (Arizona Court of Appeals addressed the application of privilege in administrative proceedings and found that not all such proceedings automatically confer absolute privilege.)

142. Actual Malice can be shown by showing a reckless disregard for the truth of the defamatory statements, which is demonstrated through a serious doubt standard. Subjective doubt can be shown by showing the Defamer was aware that it was highly probably that [its] story was (1) fabricated….; or (2) based wholly on an unverified anonymous telephone all or some other source that [it] had obvious reasons to doubt" *US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42 - Dist. Court, Dist. of Columbia 2021

143. Warren Johnson asserts a counterclaim for defamation against Early Warning Services, LLC (EWS) and its counsel, Sara K. Stadler (collectively, "Co-Counter Defendants"), for false statements made in filings before the TTAB of the USPTO.

144. These statements falsely alleged that Warren, a registered patent agent uninvolved in the TTAB proceedings, conspired with a former classmate to steal trade secrets and extort money from EWS. They also falsely accused him of authoring responses in the TTAB matter and using confidential information.

145. The Co-Counter Defendants aggravated the defamation by unnecessarily mentioning Warren's past role as EWS's intellectual property counsel, implying an unethical relationship with PAZE to damage his reputation in the legal and patent communities. These statements were maliciously repeated in motions and exhibits, amplifying their impact.

146. The Defamers' statements are not protected by any legal privilege. The defamatory remarks were made outside the context of the proceeding that could potentially give rise to privilege, were directed to individuals who are not protected by privilege, were irrelevant to the furtherance of the litigation, and were made with malicious intent aimed at damaging Warren's professional reputation.

147. Moreover, the TTAB proceeding is an administrative process, and absolute privilege does not apply. The TTAB lacks the authority to issue subpoenas, conduct cross-examinations, or make binding determinations on trademark

infringement, damages, or the right to use a trademark. Although its decisions can be appealed to federal court, this does not automatically confer quasi-judicial status upon the TTAB that would shield the Defamers' statements from liability.

148. As a result of these false statements, Warren suffered severe damage to his professional reputation and standing within his industry. The statements were made in a forum directly affecting his career as a registered patent agent, with intent to harm his professional community reputation. This defamation has significantly harmed Warren's career prospects and credibility, jeopardizing his ability to continue working in his fielchosen field.

WHEREFORE, Warren Johnson respectfully requests that this Court find in his favor on his counterclaim for defamation and award him damages against EWS and Ms. Sara Stadler for the harm caused to his professional reputation, emotional distress, and future earnings, including presumed damages, compensatory damages, punitive damages, attorneys' fees, costs, and any further relief that the Court deems just and proper.

### THIRD CLAIM FOR RELIEF
### AGAINST EWS AND MS. TRACY CHENEY
### DEFAMATION UNDER ARIZONA COMMON LAW

149. Warren repeats and incorporates all references and allegations in the proceeding paragraphs.

150. Defendant Warren Johnson asserts a counterclaim for defamation against Ms. Cheney and Early Warning Services, LLC ("EWS"), his former supervisor and employer, based on information and belief that Ms. Cheney and EWS have repeatedly published or communicated the false and defamatory narrative regarding Warren's teaming up with his high school classmate to extract money from EWS.

151. These defamatory statements have been made to other EWS employees, to individuals within Warren's professional circle—including both in-house and

outside counsel—and to individuals within the financial industry, a key area of Warren's professional expertise.

152. These statements were made with malice and reckless disregard for their truth. As a direct result of Ms. Cheney and EWS's defamatory conduct, Warren has suffered significant harm to his reputation and professional standing, making it difficult for him to regain trust and secure employment in his field.

153. Warren's counterclaim for defamation is further supported by well-founded information and belief that Ms. Cheney and other EWS employees have made defamatory statements about him to colleagues within EWS, as well as to individuals in Warren's broader professional circle.

154. These statements have likely contributed to the damage to Warren's reputation within his profession, affecting both his in-house and external professional relationships.

155. Although Warren does not currently possess direct evidence of all defamatory statements made by Ms. Cheney and EWS, such evidence is expected to emerge through the discovery process.

156. At this stage, Ms. Cheney and EWS have exclusive control over much of the relevant information, making it inaccessible to Warren. Defendant reasonably believes that discovery will substantiate his claims of defamation, as the existing information and belief—coupled with the demonstrable harm to Warren's reputation—provide a strong basis for this counterclaim.

WHEREFORE, Warren respectfully requests that this Court find in his favor on his counterclaim for defamation and award him damages against Ms. Cheney and EWS for the harm caused to his professional reputation, emotional distress, and future earnings, including presumed damages, compensatory damages, punitive damages, attorneys' fees, costs, and any further relief that the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

### AGAINST EWS

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER
ARIZONA COMMON LAW

157. Warren repeats and incorporates all references and allegations in the proceeding paragraphs.

158. In Arizona a claim for Intentional Infliction of Emotional Distress ("IIED") is based on three key elements, as established by the Arizona Supreme Court case *Ford v. Revlon, Inc.*, 153 Ariz. 38, 734 P.2d 580 (1987). First EWS's conduct must have been extreme and outrageous such as repeated harassment, threats, or behavior that goes beyond simple negligence or carelessness. Second, EWS had to have acted intentionally or recklessly such as with specific purpose to cause emotional harm or when EWS knew or should have known that the actions would cause severe emotional distress. Third, Warren suffered emotional distress as a result, the emotional stress must be severe such as being diagnosed with anxiety, depression, PTSD, or physical manifestations of emotional harm (e.g., insomnia, headaches, or gastrointestinal issues).

159. Further, in *Watts v. Golden Age Nursing Home*, the Arizona Supreme Court explained that the threshold of extreme and outrageous conduct is determined by whether reasonable minds could differ in concluding that the conduct was extreme. If so, the issue is submitted to a jury; otherwise, the court may dismiss the claim as a matter of law.

160. Warren asserts a counterclaim for intentional infliction of emotional distress against Early Warning Services, LLC ("EWS") and Ms. Cheney. Over the past 18 months, EWS and Ms. Cheney have engaged in a pattern of extreme and outrageous conduct, intentionally or recklessly causing Warren severe emotional distress.

161. This conduct includes withholding over $100,000 in bonus money owed to Warren, lying about the bonus, wrongfully terminating him after months of pressuring him out of his position, failing to pay his bar fees without notice, defaming him within his professional community, harassing him by filing this

lawsuit, and initiating a wrongful legal action accusing Warren of trade secret theft. These actions have had a cumulative effect, inflicting severe emotional distress upon Warren, and meet the legal standard for intentional infliction of emotional distress.

162. EWS also committed libel per se by making defamatory statements about Warren within his professional circle, These false statements have caused irreparable damage to Warren's professional reputation.

163. EWS has engaged in repeated efforts to coerce, harass, intimidate, and defame Warren, not only as part of their wrongful prosecution but also to avoid a TTAB proceeding in which Warren is not even a party. These actions represent a clear abuse of the legal process and have been carried out with malicious intent.

164. As a direct result of EWS and Ms. Cheney's extreme and intentional conduct, Warren has suffered severe emotional distress.

165. Since being surprised with the complaint and allegations in June 2024, Warren has been placed on additional prescriptions for anxiety, again a first for Warren in his life.

166. The stress of defending himself in this lawsuit has also impaired his performance at his new job, disrupted his sleep, and caused severe headaches, some of which have resulted in temporary blindness, likely due to sleep deprivation.

167. The cumulative effect of EWS's and Ms. Cheney's actions over an extended period amounts to extreme and outrageous conduct, intentionally and recklessly causing Warren severe emotional distress.

168. Their actions have affected Warren's livelihood, his new career, his health, and his mental well-being. As a result, Warren has experienced significant emotional harm, including anxiety, depression, and loss of enjoyment of life.

WHEREFORE, Warren requests judgment against EWS and Ms. Cheney and seeks relief in the form of economic damages, compensation for pain and suffering, loss of

enjoyment of life, punitive damages, attorneys' fees, costs, and any other relief that the Court deems just and proper.

## FIFTH CLAIM FOR RELIEF

### AGAINST EWS

NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS UNDER ARIZONAN COMMON LAW

169. Warren repeats and incorporates all references and allegations in the proceeding paragraphs.

170. In Arizona, the legal standard for Negligent Infliction of Emotional Distress is primarily guided by the Restatement (Second) of Torts § 313. To establish a claim for NIED in Arizona, several elements must be satisfied: (a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge or peril of the harm of a third person, and (b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm. *See also Rowland v. Union Hills Country Club,* 157 Ariz. 301, 757 P.2d 105 (Ct. App. 1988).

171. Warren counterclaims for negligent infliction of emotional distress (NIED) against EWS. EWS's negligence in submitting and relying on fraudulent evidence, filing it with the USPTO in an unrelated TTAB proceeding, and publishing it without basis caused Warren significant emotional distress. EWS failed to verify its claims and recklessly distributed false information, leading to Warren's severe emotional suffering.

172. EWS served Warren with a summons for this baseless lawsuit at a critical time, just after he submitted a background check for new employment. This timing increased his anxiety and stress, resulting in physical symptoms like the need for medication, sleep loss, increased heart rate, headaches, and temporary blindness.

173. EWS's actions forced Warren to give up his dog, delay his move to Kansas for a new job, and underperform at work. The emotional distress was a foreseeable consequence of EWS's negligence. EWS and Ms. Cheney maliciously involved Warren in litigation, falsely accusing him of stealing trade secrets to damage his reputation in retaliation for exposing a "privileged document."

174. The relentless legal actions and false accusations worsened Warren's mental health. After wrongful termination by EWS, he faced 18 months of unemployment and financial instability. The lawsuit triggered a relapse in his anxiety, requiring therapy and medication.

175. EWS's refusal to investigate the claims or engage in settlement discussions exacerbated Warren's distress. Filing over 800 pages of irrelevant exhibits during his personal struggles further harmed his health. Warren experienced severe insomnia, stress-induced headaches, and temporary blindness due to overwhelming pressure, forcing him to delay his move and give up his dog.

176. Warren's well-being continues to suffer from EWS's negligent conduct. Despite knowing the impact on Warren's life, EWS refused extensions in legal proceedings, deepening his emotional distress and affecting his personal and professional life.

WHEREFORE, Warren requests judgement against EWS and is seeking relief in the form of economic, pain and suffering, loss of enjoyment of life, punitive damages, and attorneys' fees and costs; and whatever else compensation a jury may deem necessary in the name of justice.

## SIXTH CLAIM FOR RELIEF

### AGAINST EWS

MALICIOUS PROSECUTION UNDER ARIONA COMMON LAW

177. Warren repeats and incorporates all references and allegations in the proceeding paragraphs.

178. To prove malicious prosecution under Arizona Common Law one must show that plaintiff must have initiated or continued legal proceedings against the

defendant, there was a lack of probable cause, Plaintiff filed the case with malice, the proceedings were unsuccessful, and defendant suffered damages.

179. In *Bradshaw v. State Farm Mutual Automobile Insurance Co.*, 157 Ariz. 411, 758 P.2d 1313 (1988), the court emphasized that both malice and lack of probable cause are distinct elements that must be proven, and the presence of one does not necessarily imply the other.

180. Warren Johnson brings a claim for malicious prosecution against Early Warning Services, LLC (EWS), asserting that EWS initiated and continued legal proceedings against him without probable cause and with malice. These actions have severely harmed Warren's reputation, career, and emotional well-being.

181. EWS pursued legal action against Warren, accusing him of trade secret misappropriation and other unfounded allegations. However, EWS lacked any probable cause for these claims, as evidenced by their reliance on false and fraudulent evidence they fabricated.

182. EWS has accused Warren of conspiring with others to extort money and steal trade secrets without any supporting evidence. This demonstrates that EWS acted with malice, intending to harass, defame, and intimidate Warren rather than pursue legitimate legal objectives.

183. The proceedings initiated by EWS have either been resolved in Warren's favor or are expected to be resolved favorably due to the lack of evidence supporting EWS's claims.

184. EWS's actions were not intended to achieve legitimate legal outcomes but were instead aimed at suppressing evidence of alleged illegal activities within the company. Their misuse of the legal system was designed to retaliate against Warren for his potential whistleblowing activities and to damage his reputation.

WHEREFORE, Warren seeks relief from the court, including compensatory damages for harm suffered due to EWS's malicious prosecution. He also requests punitive damages against EWS for their malicious conduct, as well as reasonable attorneys'

fees and costs incurred in defending against EWS's claims. Additionally, Warren seeks any further relief deemed just and proper by the court.

### SEVENTH CLAIM FOR RELIEF

### AGAINST EWS, MS. TRACY CHENEY, MR. ERICK DURLACH, MR. DENNIS L. WILSON, AND MS. SARA STANDLER

MISREPRESENTATION OF FACTS AND FABRICATING EVIDENCE

185. Warren repeats and incorporates all references and allegations in the proceeding paragraphs.

186. Warren, the defendant, files this counterclaim against EWS, Ms. Tracy Cheney (General Counsel EWS), Mr. Erick Durlach (Counsel for EWS), Mr. Dennis L. Wilson (Counsel for EWS), And Ms. Sara Stadler (Counsel for EWS) (collectively "Co Counter Defendants"), alleging that Co Counter Defendants intentionally misrepresented facts by fabricating evidence and submitting it to the court, knowing it was false.

187. Warren did not attend Mesa High School and did not graduate in 1999. After due diligence, it was determined that this information only appears on the unreliable website <old-friends.net>.

188. At best Co Counter Defendants relied heavily on this fabricated evidence without conducting any due diligence, using it as a key component of their lawsuit. The same information about Warren going to school at Mesa High School found nowhere else

189. At worst Co Counter Defendants knowingly added Warren's name to <old-friends.co>, a website known for its lack of oversight and verification.

190. This action was taken to create a false narrative and establish a non-existent connection between Warren and other co-defendants.

191. Co Counter Defendants submitted this fraudulent evidence to the court, presenting it as legitimate despite knowing its falsity.

192. The reliance on such evidence was intended to deceive the court and manipulate the legal process against Warren.

193. As a result of Co Counter Defendants' fraudulent actions, Warren has suffered reputational harm and emotional distress.

194. The fraudulent narrative has caused significant damage to Warren's professional reputation and standing in the community.

195. Co Counter Defendants actions constitute fraud, as they intentionally misrepresented facts and fabricated evidence to gain an unfair advantage in litigation. Warren requests that the court hold Co Counter Defendants accountable for their fraudulent conduct.

WEHREFORE, Warren seeks compensatory damages for harm suffered due to EWS's fraudulent conduct, punitive damages to deter Co Counter Defendants from engaging in similar conduct in the future, any other relief deemed just and proper by the court.

**PRAYER FOR RELEIF**

WHEREFORE, Defendant Warren Johnson respectfully requests that this Court enter judgment in his favor and against Plaintiff Early Warning Services, LLC (EWS), and provide the following relief:

196. Dismissal of Claims: Dismiss all claims brought by EWS against Warren Johnson with prejudice.

197. Declaratory Relief: Declare that Warren Johnson has not misappropriated any trade secrets or confidential information belonging to EWS.

198. Compensatory Damages: Award compensatory damages to Warren Johnson for the harm suffered due to defamation per se, abuse of process claims, intentional infliction of emotional distress and negligent infliction of emotional distress in the amount of his potential earnings had he remained in the intellectual property industry that EWS published information attempting to defaming Warren. Minus what Warren is now earning as Senior Licensing Manger.

199. Using the respective salaries and rates of salary changes while working in each profession Warren can calculate the totals of each over the entirety of the rest of his career, 20 years. Also included is compensatory damages for the money Warren spent getting his now unused legal education which he still owes $286,666.

200. This gives a difference in potential earnings of $7,861,730 to pay back his loans and over the time until Warren turns 65 due to the harm caused by EWS, Ms. Cheney and Ms. Sara Sadler.

201. Punitive Damages: Award punitive damages against EWS and its representatives for their malicious, fraudulent, outrageous, relentless, and retaliatory conduct based on a multiplier of the Compensatory damages to be determined by a jury.

202. Attorneys' Fees and Costs: Award reasonable attorneys' fees and costs incurred by Warren Johnson in defending against EWS's claims and pursuing his counterclaims.

203. Injunctive Relief: Issue an injunction prohibiting EWS from further defamatory statements or actions against Warren Johnson.

204. Public Retraction: Require EWS to issue a public retraction of any false statements made about Warren Johnson's professional conduct.

205. Other Relief: Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Warren demands a trial by jury of the maximum number of jurors allowed, on all issues so triable.

## NOTICE OF WARREN'S INTENTION TO AMEND ANSWER

Despite Defendant's best efforts to prepare a comprehensive answer during the 60-day extension the court generously approved to assist Warren due to his need to move out of state, and learn the skills required for his new career while simultaneously learning the intricacies and complexity of the case. Exacerbating Warren's ability to prepare a comprehensive answer was EWS's excessive motion for preliminary injunction, which included extensive exhibits and complex arguments, thus adding further pressure and delay to Warren's ability to finalize the answer. Therefore, Defendant intends to file an amended answer to include additional claims of at least fraud, malicious prosecution, abuse of process, sanctions, and associated factual allegations. Defendant will seek leave of the court or consent of the opposing party, as required, before filing the amended answer.

Respectfully submitted,

/Warren V. Johnson/

Warren Johnson

2406 Alabama St, Unit 7C
Lawrence, KS 66046
208.317.1686
warrenvjohnson@gmail.com

**Certificate of Service**

I, Warren V. Johnson, hereby certify that on September 19, 2024, I electronically filed the foregoing Answer to Plaintiff Early Warning Services Complaint, Affirmative Defenses, and Counter Claims against Plaintiff Early Warning Services, LLC and counsel with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Respectfully submitted,

   /Warren V Johnson/

Warren Johnson
2406 Alabama St, Unit 7 C
Lawrence, KS 66046
warrenvjohnson@gmail.com