**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Early Warning Services LLC,<br><br>Plaintiff,<br><br>v.<br><br>Warren Vurl Johnson, et al.,<br><br>Defendants. | No. CV-24-01587-PHX-SMB<br><br>**ORDER** |

Pending before the Court is Plaintiff Early Warning Services LLC's ("EWS") Motion for Preliminary Injunction (Doc. 16). Defendant Warren Johnson filed a Response (Doc. 24 (sealed)), and EWS filed a Reply (Doc. 28). The Court held oral argument regarding the Motion on December 4, 2024. Having considered the parties' arguments and the relevant case law, the Court will grant the Motion.[1]

**I.   BACKGROUND**

To quote EWS, "[t]his case is about an intellectual property attorney who was terminated for workplace misconduct, and who sought revenge by enlisting his high school classmate to act as a front man to help him extract money from his former client and employer using stolen company documents, privileged information, and a lawfare campaign involving baseless trademark claims." (Doc. 1 at 1.) The relevant factual background supporting the instant Motion is no less dramatic.

EWS is a financial services technology company that operates Zelle®, a digital

---

[1] Neither Defendant P.A.Z.E. LLC nor Defendant Brandon O'Loughlin filed a response to the instant Motion or appeared at oral argument.

1  payment network. (Doc. 17 ("Cheney Decl.") ¶ 2.) EWS also operates Paze<sup>SM</sup>, which
2  EWS describes as a "reimagined digital wallet for ecommerce solution[s]." (*Id.* ¶ 3.) EWS
3  owns several trademarks, including "ZELLE" and "PAZE." (*Id.* ¶ 4.) EWS also possesses
4  the stylized trademarks Z and paze. (*Id.*)

5  Johnson worked as senior intellectual property counsel at EWS between September
6  2014 and January 2023. (*Id.* ¶¶ 5, 17.) Johnson's primary responsibilities included
7  acquiring, protecting, and enforcing EWS's intellectual property rights—including Z and
8  PAZE. (*Id.* ¶ 8.) EWS entrusted Johnson with confidential information regarding private,
9  internal business plans, and discussions regarding the Paze<sup>SM</sup> service, including EWS's
10 interest in procuring specific domain names and incorporating the "PAZE" mark. (*Id.*) In
11 turn, Johnson provided EWS legal advice regarding the development and launch of Paze<sup>SM</sup>.
12 (*Id.* ¶ 9.) In August 2022, after Johnson allegedly engaged in a series of unprofessional
13 interactions with coworkers and vendors, EWS issued him a written warning for workplace
14 misconduct. (*Id.* ¶¶ 5, 17.) In September 2022, Johnson informed EWS general counsel,
15 Tracey Cheney, of his intent to resign at the end of the year. (*Id.* ¶ 7.)

16 While EWS and Johnson's deteriorating work relationship was plainly evident,
17 Johnson's alleged clandestine extracurricular activities were not. EWS asserts that during
18 an unspecified period, Johnson began sending EWS's documents from his work email to
19 his personal email, including a large volume of sensitive and confidential information and
20 materials as well as a screen capture of an internal Microsoft Teams chat (the "Teams
21 Chat") between himself and Cheney. (*Id.* ¶¶ 10, 19.) EWS contends that the Teams Chat
22 reflected Johnson's legal advice to EWS concerning contractual negotiations and
23 trademark applications. (*Id.* ¶ 10.) Johnson's replacement, Paras Shah, explains that the
24 Teams Chat concerned a contract with a valued partner, and that disclosure of the
25 information could potentially jeopardize EWS's position in future negotiations. (Doc. 28-1
26 ("Shah Decl.") 10–11.) Additionally, Johnson instructed EWS's domain name vendor,
27 Corporation Service Company to run an availability report for domain names containing
28 PAZE (the "CSC Report"). (Cheney Decl. ¶ 14.)

On January 19, 2023, Cheney learned of Johnson's activities and terminated his employment. (*Id.* ¶ 17.) Shortly thereafter, Johnson sent Cheney a series of texts and emails that included language such as: "We are going to have some fun now," "how's [EWS] plan on defending against what's coming," and "there will be consequences, nothing you guys can't handle im sure." (*Id.* ¶ 21.) Around six months after Johnson's termination, he filed suit against EWS alleging wrongful termination. (*Id.* ¶ 22.) EWS and Johnson quickly settled the case, memorializing the decision in a formal agreement (the "Settlement Agreement"). (*Id.*) In the Settlement Agreement, Johnson affirmed that he "returned all of [EWS's] property, documents, and/or any confidential information in his possession or control" and agreed to "maintain the confidentiality of all of [EWS's] privileged, trade secret, proprietary or confidential information." (*Id.* ¶ 24.) Johnson also agreed to refrain from disparaging EWS in any public forum. (*Id.*)

EWS now accuses Johnson of having engaged in acts that violate the Settlement Agreement, company policy, and federal and state trade secrets law. EWS asserts that Johnson used the CSC Report to provide an old high school friend, Defendant Brandon O'Loughlin, the list of domain names EWS planned to acquire. (*Id.* ¶¶ 25–32.) Consequently, O'Loughlin registered EWS's desired domain names before EWS could do so.[2] (*Id.*) O'Loughlin also formed Defendant P.A.Z.E., LLC ("P.A.Z.E."), which EWS describes as a "sham gripe website at a domain name containing EWS's PAZE mark, with content directed at disparaging EWS and its business including the Zelle® and Paze$^{SM}$ services." (Doc. 1 at 3 ¶ 11; Cheney Decl. ¶ 27; Doc. 17-1 at 33.) One of the alleged domains, www.pazewallet.com, launched a website under the name "P.A.Z.E." or "People Against Zelle Erryday." (Cheney Decl. ¶¶ 28–29.) P.A.Z.E. "claims to be trying to bring to light the dark side of the banking industry." (Doc. 1 at 7 ¶ 30 (quotation marks omitted).) However, EWS alleges that Defendants are merely using its online platforms to disclose EWS's confidential information and trade secrets, including the information in the Teams

---

[2] EWS asserts that Johnson and O'Loughlin were high school classmates based on the website www.old-friends.co showing both graduated Mesa High in 1999. Johnson posits that anyone can be added to the list of 1999 graduates—Darth Vader, Bilbo Baggins, and Donald J. Trump being an acclaimed few. (Doc. 24 at 9 & n.5.)

Chat. (Cheney Decl. ¶¶ 40–43.) EWS has repeatedly submitted takedown requests to online service providers, however, upon removal, Defendants simply post it again. (*Id.* at ¶ 43.) O'Loughlin has sent two letters to EWS, expressing his intention to oppose EWS's pending trademark application and seek cancellation of existing marks. (Doc. 17-2.)

P.A.Z.E. also allegedly used EWS's confidential information and trade secrets to generate trademark filings in the Trademark Trial and Appeal Board ("TTAB"), including a petition to cancel EWS's Registration No. 5476070 of the Ż mark and opposition to EWS's Application Serial No. 97669754 to register the PAZE mark. (Cheney Decl. ¶¶ 35–37; Doc. 17-3; Doc. 17-4.) Specifically, O'Loughlin signed and filed trademark applications to register the PAŻE and PAZE marks. (Doc. 1 at 4 ¶ 11.) O'Loughlin also signed and filed the documents claiming EWS's applications to register its Ż and PAZE marks were invalid. (*Id.* ¶ 11.) The applications claimed use of those marks "in connection with P.A.Z.E.'s nonexistent services." (*Id.*) P.A.Z.E. has also attached copies of the Teams Chat to its public filings in the TTAB. (Cheney Decl. ¶ 41.)[3]

The dramatic twist to this story is EWS's allegations that Johnson was ghost-writing P.A.Z.E. and O'Loughlin's TTAB filings using confidential information and trade secrets he acquired while working for EWS. (Cheney Decl. ¶ 39.) According to EWS, Johnson attempted to conceal his role in this scheme, but on June 11, 2024, EWS uncovered metadata from one of P.A.Z.E.'s filings in the TTAB revealing "Warren Johnson" as the actual owner of the documents. (*Id.* ¶¶ 25, 39.) On June 28, 2024, EWS filed suit against Johnson, O'Loughlin, and P.A.Z.E. LLC, asserting six claims for relief. (*See* Doc. 1.) Relevant here are EWS's claims for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, and Arizona Uniform Trade Secrets Act ("AUTSA"), Ariz. Rev. Stat. §§ 44-401 to -407.[4] (Doc. 1 at 18, 20.) Now,

---

[3] P.A.Z.E. claims that the Teams Chat was located on a now unavailable unnamed thread on the popular online-forum website Reddit. (Cheney Decl. ¶ 41.)
[4] In the introduction to the instant Motion, EWS contends that it is likely to succeed on both its trade secret misappropriation and breach of contract claims. (Doc. 16 at 6.) In the discussion, EWS only litigates its potential success on the trade secrets misappropriation claim. Therefore, this Order does not make any finding related to EWS's success on its breach of contract claim.

EWS moves this Court to order a preliminary injunction against Defendants to preclude them from further utilizing EWS's confidential information and trade secrets to hinder the company's ability to compete in the financial services sector. (Doc. 16 at 5.)

## II.     LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, a party may seek injunctive relief if it believes it will suffer irreparable harm during the pendency of an action. Fed. R. Civ. P. 65. "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted))); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

A plaintiff seeking a preliminary injunction must show that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm without an injunction; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under this "serious questions" variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072.

## III.    DISCUSSION

EWS seeks an injunction to restrain Defendants from the following activities:

1. Not to access, use or disclose any of EWS's Confidential Information or Trade Secrets during the pendency of this action;

2. To return all hard copies of documents comprising or containing EWS's

- 5 -

      Confidential Information or Trade Secrets to EWS, without retaining any physical copies of those documents;

3. To preserve, without modification, all digital electronic copies of documents comprising or containing EWS's Confidential Information or Trade Secrets within their position, custody, or control; and

4. To provide access to all digital electronic devices and media and all electric mail and storage accounts within their possession, custody, or control—including, without limitation, all computers, laptops, tablets, external hard drives, other external media and storage devices, smartphones, personal email accounts, OneDrive, Dropbox, Box, Google Drive and similar accounts—that may include EWS's Confidential Information or Trade Secrets for forensic imaging of those devices and accounts (including all metadata) by EWS's forensics vendor.

(Doc. 16 at 5.)

**A. Likelihood of Success on the Merits**

EWS argues that it will prevail on its trade secret misappropriation claim because it can prove: (1) it possessed a trade secret that was (2) misappropriated by Defendants (3) causing damages. (Doc. 16 at 12–13 (citing *Fire Sec. Elec. & Commc'ns v. Nye*, No. CV-23-02730-PHX-DLR, 2024 WL 620813, at *3 (D. Ariz. Feb. 14, 2024)).) In response, Johnson argues that he did not steal trade secrets, nor does the information at issue constitute trade secrets. (*See* Doc. 24 at 12–18.)

It is unlawful to misappropriate trade secrets under both the DTSA and the AUTSA. *See* 28 U.S.C. § 1832; Ariz. Rev. Stat. § 44-401. Misappropriation of a trade secret is analyzed similarly under both federal and Arizona law. *See, e.g.*, *ReBath LLC v. HD Sols. LLC*, No. CV-19-04873-PHX-JJT, 2020 WL 7000071, at *2–3 (D. Ariz. Sept. 18, 2020). To state a claim for misappropriation, a plaintiff must allege that (1) it owns a trade secret, (2) that was misappropriated by Defendants, and (3) this caused damages. *Gordon Grado M.D., Inc. v. Phx. Cancer & Blood Disorder Treatment Inst. PLLC* ("*Grado*"), 603 F. Supp. 3d 799, 809 (D. Ariz. 2022); 18 U.S.C. § 1839(5). Key to a trade secrets appropriation claim is a claimant's preliminary showing that a legally protectable trade secret exists. *See Nye*, 2024 WL 620813, *3; *Calisi v. Unified Fin. Servs., LLC*, 302 P.3d 628, 631 (Ariz. Ct.

- 6 -

App. 2013).

1. Trade Secrets

The Court understands that the relief EWS requests seeks to preclude Defendants from misusing trade secrets in their possession housed in any medium. However, the parties' arguments center around Johnson's possession and misuse of information that amounts to trade secrets contained in, but not limited to, two places: (1) EWS's excel spreadsheet indices (the "Indices"); and (2) the Teams Chat.

The DTSA defines "trade secret" as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if . . . the owner thereof has taken reasonable measures to keep such information secret; and . . . the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).  The AUTSA defines "trade secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique or process, that both:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ariz. Rev. Stat. § 44-401(4).

*i.    The Indices*

EWS argues that the Indices house privileged, confidential information that enables EWS's legal department to track the development, harvesting, acquisition, and enforcement of EWS's intellectual property rights. (Doc. 16 at 13–14; Doc. 28 at 5.) EWS also argues that, at the time of Johnson's termination, the Concept Brief and Invention

Disclosure Indices tracked working titles of unpublished inventions. (Doc. 28 at 5; Shah Decl. ¶¶ 3, 5.) Those Indices also contained notes detailing Johnson's consultations with inventors and his legal advice about which components of inventions would be patentable. (Doc. 28 at 5; Shah Decl. ¶¶ 3, 5.) EWS also highlights that it secures its patent and trademark strategies in a database accessible only by certain individuals on certain electronic devices who need the information to perform their job duties. (Doc. 16 at 14–15.)

In response, Johnson argues that the Indices are not trade secrets for two reasons: (1) Johnson created the Indices while employed elsewhere and "systematically emailed" templates of the Indices to his personal email throughout his employment at EWS; and (2) the Indices are published publicly and easily accessible. (Doc. 24 at 5–6, 13.) Johnson believes that his laissez-faire treatment of the Indices by sending copies to himself throughout the course of his employment should preclude EWS from asserting the Indices are trade secrets. (Doc. 24 at 15.)

The Indices are likely trade secrets. *See Nye*, 2024 WL 620813, at *1, *3 (finding plaintiff would likely prove its "Building Reports," which contained information about clients and projects, were trade secrets). The Indices are alleged to include business concepts briefs and invention disclosures related to EWS's patent portfolio, trademark matters, domain names, and various contracts. (Doc. 1 at 10 ¶¶ 54–56; Cheney Decl. ¶ 19.) These Indices, according to EWS, contain information that are indispensable to EWS's ability to create its products and develop its branding. (Cheney Decl. ¶ 44.) Although, to Johnson's credit, EWS construes the term "Indices" to blanketly conclude that all Indices and the information therein are trade secrets. *Cf. Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-06930-RS, 2018 WL 1456697, *3–4 (N.D. Cal Mar. 23, 2018) (finding a plaintiff's allegations of trade secrets were set forth in insufficient "broad, categorical terms" when described as information not covered by a patent such as "source code, customer lists and customer related information, pricing information, vendor lists and related documents, marketing plans and strategic business development initiatives" (cleaned up)). However, the record supports finding that while the Indices are tinged with publicly available

information, they contain a wealth of proprietary data vital to EWS's patent and trademark strategies. *See W.L. Gore & Assocs., Inc. v. GI Dynamics, Inc.*, No. CV-10-8088-PHX-GMS, 2010 WL 5184254, at *8 (D. Ariz. Dec. 15, 2010) (finding allegations of "market studies, financial information, manufacturing methods, and . . . future plans" sufficient to plead the existence of valid trade secrets); *see also Arthur J. Gallagher & Co. v. Tarantino*, 498 F. Supp. 3d 1155, 1172 (N.D. Cal. Nov. 2, 2020) (departing from *Vendavo* and denying a motion to dismiss a complaint that identified (1) "client lists," (2) "[plaintiff's internal] documents and strategies," and (3) "client retention and renewal strategies and information" as alleged trade secrets).

EWS also took reasonable measures to broadly secure its trade secrets. It utilized a database only accessible on certain devices by persons with certain access permissions. (Cheney Decl. ¶¶ 47–48); *see also Nye*, 2024 WL 620813, at *3. EWS also instituted, and Johnson assented to, both the Employee Handbook and an Intellectual Property and Confidentiality Agreement with terms meant to protect EWS's confidential information and trade secrets. (*Id.* ¶¶ 49–53.) Finally, key stakeholders, like Johnson, were required to complete an annual trade secrets course. (*Id.* ¶ 55); *cf. Balearia Caribbean Ltd. v. Calvo*, 2018 WL 6261497, *4 (S.D. Fla. 2018) (finding that a business who implemented (1) multi-tiered password protections; (2) compartmentalizing its information such that high level employees did not have access to all documents; (3) providing top-secret access to a select few employees; and (4) terminating defendant's access upon separation from employment created a genuine dispute of fact as to whether plaintiff took reasonable steps to protect its information).[5]

Therefore, the Court finds that EWS will likely prove that the Indices and the information therein constitutes trade secrets.

---

[5] Johnson's contention that he created and controlled the Indices is of no moment in determining whether they constitute trade secrets. (Doc. 24 at 5, 15.) In essence, Johnson argues that his seemingly unfettered violation of EWS's internal policy precludes the company from attempting to protect its trade secrets. This argument does not withstand even modest scrutiny, and thus the Court finds that Johnson's alleged creation or treatment of the Indices has no bearing on Plaintiff's success on the merits of its trade secrets claims.

*ii.* *The Teams Chat*

The Teams Chat is undoubtedly privileged, however, it is unlikely that EWS will prove its status as a trade secret. The Teams Chat contains Johnson's legal advice to EWS regarding a pending contract negotiation. (Cheney Decl. ¶ 10; Shah Decl. ¶¶ 10–11.) While legal advice is privileged, such information is not also automatically a trade secret. *See Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981); *see also TDBBS LLC v. Ethical Prod. Inc.*, No. CV-19-01312-PHX-SMB, 2019 WL 1242961, *5 (D. Ariz. Mar. 18, 2019) (remarking that "[c]onfidential information is not the same as trade secret information"). Given the limited context and content of the Teams Chat, the Court concludes that while EWS has shown serious ethical concerns about Johnson's conduct, it has not demonstrated a likelihood of success on establish the Teams Chat as a trade secret.

2. Misappropriation

Once claimant has established a trade secret exists, he must show that the defendant has misappropriated that secret. *Grado*, 603 F. Supp. 3d at 809. The DTSA defines misappropriation, in part, as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent" by a person with some level of duty restricting disclosure. 18 U.S.C. § 1839(5). The AUTSA defines misappropriation as either of the following:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who either:

    (i) Used improper means to acquire knowledge of the trade secret.

    (ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

    (iii) Before a material change of his position, knew or had reason to

> know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ariz. Rev. Stat. § 44-401(2)(a), (b)(i)–(iii).

EWS is also likely to succeed on establishing misappropriation. Here, the evidence reflects that Johnson systematically sent confidential information and trade secrets from secured workplace computers to his personal email and devices. When Johnson knew his employment would be terminated, he took it upon himself to send additional droves of confidential information and trade secrets to his personal devices. Additionally, the recovered metadata tends to show that Johnson used this information to submit trademark applications for the P.A.Z.E. and PAŻE marks and challenge EWS's Ż mark. The evidence, although partly circumstantial, show that Johnson and O'Loughlin worked in concert to utilize the information Johnson allegedly stole from EWS to form the P.A.Z.E. entity, cybersquat, post the Teams Chat on various online platforms, and file trademarks and challenges in the TTAB. At bottom, these facts show that EWS will likely succeed in establishing misappropriation of its trade secrets. *Cf. Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1207 (E.D. Cal. 2020) (finding evidence indicating that former employees copied files at the time of their departure or shortly thereafter suggested that employees intended to use those files in their subsequent employment).

### 3. Damages

EWS contends that it has already paid O'Loughlin $20,000 to acquire fifty-five domain names containing EWS's PAZE mark, including www.pazewallet.com and www.pazenetwork.com. (Doc. 16 at 19.) According to EWS, Johnson knew that it intended to acquire both domain names. (Cheney Decl. ¶¶ 26, 31.) EWS also asserts that it has incurred significant costs from monitoring P.A.Z.E.'s website and social media, submitting takedown requests for the Teams Chat, and defending P.A.Z.E.'s allegations in the TTAB. (*Id.* ¶¶ 42, 43.) Johnson does not seemingly challenge this prong of the analysis. (*See* Doc. 24.)

EWS has demonstrated that the alleged misappropriation has already resulted in

1  monetary damages.  More importantly, however, the record tends to show that EWS may
2  suffer greater damages through the loss of trademarks and trade secrets.  Therefore, the
3  Court finds that EWS can likely establish that, because of the purported misappropriation,
4  it has and will continue to suffer damages.
5       Ultimately, EWS has shown that it will likely enjoy success on the merits of its trade
6  secrets misappropriation claims against Defendants.
7       **B.  Irreparable Harm**
8       EWS asserts that the threatened disclosure of its proprietary and confidential
9  information constitutes irreparable harm.  (Doc. 16 at 19.)  Further, EWS notes that
10  Johnson assented to its Intellectual Property and Confidentiality Agreement, which states
11  that any breach "may give rise to irreparable injury to [EWS]," entitling it to seek injunctive
12  relief. (*Id.* at 20.)  Finally, EWS contends irreparable harm will occur if its forensics vendor
13  cannot access and examine the devices and accounts Johnson used to retrieve and store
14  EWS's Confidential information and Trade Secrets, which is necessary to prevent or deter
15  disclosure.  (*Id.* at 20.)
16       In response, Johnson argues that neither the Indices, nor the Teams Chat contain
17  information that could be used to deprive EWS of trade secrets or betray confidentiality.
18  (Doc. 24 at 20–21.)  Additionally, Johnson argues that a preliminary injunction is not
19  warranted because EWS waited nearly two years before suing, despite knowing of
20  Johnson's actions. (*Id.*)
21       Irreparable harm is harm for which there is no adequate remedy at law, such as
22  money damages.  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).
23  "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs
24  from irreparable injury that will surely result without their issuance.  Demonstrating
25  irreparable harm is not an easy burden to fulfill."  *DTC Energy Grp., Inc. v. Hirschfeld*,
26  912 F.3d 1263, 1270 (10th Cir. 2018) (internal quotation marks and citation omitted); *see*
27  *also Dalkita, Inc. v. Distilling Craft, LLC*, 356 F. Supp. 3d 1125, 1131 (D. Colo. 2018).
28       Public disclosure of a trade secret will destroy its status as such.  *See Ruckelshaus*

*v. Monsanto Co.*, 467 U.S. 986, 1002 (1984). Disclosure harms the owner of the trade secret by depriving him of a property interest, *see id.* at 1002–03, and allows competitors to appropriate the work without a similar expense of time or capital. *See Winston Research Corp. v. Minnesota Min. & Mfg. Co.*, 350 F.2d 134 142 (9th Cir. 1965). Courts in Arizona have found that the loss of customer relationships or continued disclosure of trade secrets to constitute irreparable harm. *See Nye*, 2024 WL 620813, *6 (citing *E*Trade Fin. Corp. v. Eaton*, 305 F. Supp. 3d 1029, 1036 (D. Ariz. 2018) (finding "the loss of follow-on business, goodwill and reputation" constitute irreparable harm); *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919 (D. Nev. 2006) (finding that "disclosure of confidential information or trade secrets would create irreparable injury")); *cf. See Colo. River Indian Tribes v. Town of Parker*, 776 F.2d 846, 849–50 (9th Cir. 1985) (denying an injunction based on loss of goodwill where the likelihood of damage to customer relations is unsupported by the evidence).

As an initial matter, the Court finds that EWS's "delay" in filing for injunctive relief does not overshadow the potential irreparable harm. *See, e.g., Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief.") Johnson contends the alleged irreparable harm is manufactured because EWS waited two years to bring this lawsuit and motion for injunctive relief. (Doc. 24 at 23.) In response, EWS argues that, at first, it could merely surmise that Johnson possessed the documents at issue but could not discern the depth of Johnson's possession or involvement until it discovered the metadata in the TTAB filings. (Doc. 28 at 13–14.) Based on these circumstances, the Court finds any delay immaterial. Indeed, shortly after EWS discovered Johnson's ownership of the TTAB document, it filed this lawsuit and the instant Motion. (*See* Doc. 1; Doc. 16.)

Turning to irreparable harm, where threatened disclosure is at issue, the inquiry is

naturally directed at whether EWS "is *likely* to suffer harms absent injunctive relief." *See Nye*, 2024 WL 620813, *7 (emphasis in original). Like in *Nye*, the record is replete with evidence showing that Johnson had access to EWS's confidential information and trade secrets while working at the company. *See id.*, at *2. And, at the time of Johnson's termination, he used unscrupulous means to abscond with that information. *See id.*, at *2, *7. Johnson's possession of the Indices, paired with his alleged conduct both on the internet and in the TTAB, shows that there is a great risk of disclosure of EWS's trade secrets that would cause irreparable harm. *See id.*, at *7; *see also Ruckelshaus*, 467 U.S. at 1002. Moreover, based on the proffered evidence, the Court is convinced that Johnson is crusading against EWS and will likely continue to publish whatever information is in his possession to O'Loughlin and the public. Therefore, the Court finds the evidence sufficient to support a finding of likely irreparable harm.[6]

### C. Balance of Equities

EWS contends that Johnson will not be injured if enjoined because the scope of the injunction is meant only to prohibit use of EWS's confidential information and trade secrets. (Doc. 16 at 20–21.) In response, Johnson argues that EWS's broad definition of confidential information and trade secrets would "cripple his ability to practice his trade" as he was the "only architect and manager of all of EWS's intellectual property strategies, matters, and portfolios." (Doc. 24 at 24.) Additionally, Johnson argues that the proposed "full electronic cavity search" would violate his privacy and require that he include devices given to him by his current employer. (*Id.*)

"In each case, a court must balance the competing claims of injury and must

---

[6] The Court does find, however, that the alleged harm flowing from disclosure of the Teams Chat to be too speculative to support finding irreparable harm in the context of trade secrets. The reasoning that underpins this finding is twofold—first, the Teams Chat does not contain trade secrets, and second, any other cognizable trade-secret-related-harm, such as loss of amity with those entities discussed in the screen capture, is not supported by the record. *See Colo. River Indian Tribes v. Town of Parker*, 776 F.2d 846, 849–50 (9th Cir. 1985) (denying an injunction based on loss of goodwill where the likelihood of damage to customer relations is unsupported by the evidence).

consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) ("In assessing whether the plaintiffs have met this burden, the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'" (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir.1980))).

The Court agrees with EWS. The scope of the injunction is limited to devices, documents, and programs containing EWS's confidential information or trade secrets. Although Johnson likely has this information preserved across several platforms, it is not inequitable to enjoin him from using such information. Johnson's alleged ill-intent and misuse of the confidential information and trade secrets merely addles this sentiment; that is, Johnson cannot willfully misappropriate the property of another without expecting to return such property in every medium in which it is contained. While the Court is mindful of Johnson's concerns, turning over the requested devices and documents serves to prevent the great harm that would befall EWS if the confidential information and trade secrets are leaked and further exploited. *Cf. Nye*, 2024 WL 620813, *7–8 (finding the requested relief overly broad and inequitable where it sought (1) to prevent the defendants from competing with the plaintiff despite the parties likely sharing customers; (2) and to require the defendants to turn over *all* electronic devices and pay for the forensic expert to examine such devices). And, as EWS notes, simply because Johnson was the supposed principal architect of its intellectual property strategies, matters, and portfolio, does not entitle him to the private use of such information after the end of his employment.

Therefore, the balance of the equities weighs in favor of granting the injunction.

**D. Public Interest**

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). "Courts have held that the public interest is served by protecting a company's right to

proprietary information, business operations, and contractual rights." *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006).

The possibility of Johnson disclosing or misappropriating EWS's trade secrets during the pendency of this litigation is a continuing threat to EWS's rights. Moreover, this injunction is tailored such that it seeks to divest Johnson of any confidential information or trade secrets still in his possession so as to preclude him from misusing that information.

## IV. CONCLUSION

The Court finds that all four *Winter* factors weigh in favor of granting an injunction. And, while the parties' argument generally concerned the presence of confidential information and trade secrets contained in the Indices and Teams Chat, the Court finds appropriate an injunction that covers any medium in which such confidential information and trade secrets are contained.

Accordingly,

**IT IS HEREBY ORDERED** granting Plaintiff EWS's Motion for Preliminary Injunction

**IT IS FURTHER ORDERED** prohibiting Defendants from accessing, using or disclosing any of EWS's Confidential Information or Trade Secrets during the pendency of this action.

**IT IS FURTHER ORDERED** that Defendants (1) return all hard copies of documents comprising or containing EWS's Confidential Information or Trade Secrets to EWS, without retaining any physical copies of those documents; (2) preserve, without modification, all digital electronic copies of documents comprising or containing EWS's Confidential Information or Trade Secrets within their position, custody, or control; and (3) provide access to all digital electronic devices and media and all electric mail and storage accounts within their possession, custody, or control—including, without limitation, all computers, laptops, tablets, external hard drives, other external media and storage devices, smartphones, personal email accounts, OneDrive, Dropbox, Box, Google

Drive and similar accounts—that may include EWS's Confidential Information or Trade Secrets for forensic imaging of those devices and accounts (including all metadata) by EWS's forensics vendor.

**IT IS FURTHER ORDERED** instructing Defendants to remove any and all currently posted copies of the Teams Chat, or other confidential information or trade secrets, they have placed online or elsewhere.

**IT IS FURTHER ORDERED** that Defendants comply with this Order no later than **Friday, December 13, 2024.**

Dated this 4th day of December, 2024.

_____
Honorable Susan M. Brnovich
United States District Judge