WARREN VURL JOHNSON
warrenvjohnson@gmail.com
215 E 18th St
Lawrence, KS 66044

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

EARLY WARNING SERVICES, LLC

   Plaintiffs,
  v.

MR. WARREN V. JOHNSON;
BRANDON O'LOUGHLIN; P.A.Z.E.,
LLC

   Defendants.

Case No.: CV24-01587-PHX-SMB

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S PROPOSED PROTECTIVE ORDER**

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR ENTRY OF PROPOSED PROTECTIVE ORDER

Defendant Warren Vurl Johnson, appearing pro se, respectfully submits this Opposition. Plaintiff Early Warning Services, LLC ("EWS") seeks a protective order that is not a protective measure but a punitive weapon. It is based on a fabricated narrative of "repeated disclosures" and is designed to permanently conceal evidence and cripple the defense. ("Protective Order") The Court should reject it.

Defendant and the Cout had the following exchange at the preliminary injunction hearing on December 4, 2024:

> MR. JOHNSON: "…I had no reason to believe this was a trade secret or a confidential thing. I thought it was just a chat. I thought it was just—"
> THE COURT: A chat with your client, Mr. Johnson.
> MR. JOHNSON: Yes. Well, my boss at the time, yes. But, like I said, *I did not see legal advice being given. I still kind of have a hard time seeing legal advice being given in there.* (Emphasis added) (Oral Argument, Dkt 75. at pg 17: 17-24

At that time, **we did not know that two federal judges had already agreed with that statement. EWS did.**

In separate proceedings before the U.S. Patent and Trademark Office's Trademark Trial and Appeal Board—*P.A.Z.E., LLC v. Early Warning Services, LLC* (Cancellation No. 92085110)—**Administrative Trademark Judge Lynch** (Oct. 1, 2024) and **Administrative Trademark Judge Dunn** (Oct. 1, 2024) each issued written opinions finding that the same Microsoft Teams "privileged" chat **did not involve legal advice and was not privileged.** Both held that EWS "fell short of its burden of proving that the exhibits…are covered by the attorney-client privilege," because EWS "fails to show that the Chat is actually a communication regarding specific legal advice from its general counsel."

Those rulings were issued **two months before** the injunction hearing in this case. EWS knew about them and has concealed for a year now, continuously claiming the Teams Chat is "undoubtedly privileged," using that false claim to obtain sanctions, sealing orders, and now this proposed protective order. **Two independent federal adjudicators had already rejected that claim.**

The TTAB's own order underscores the point:

> "Although Respondent relies on the Standard Protective Order as the basis of its motion, Respondent does not invoke the confidentiality designations of the Standard Protective Order but rather relies on its assertion of attorney-client privilege." (Oct. 1 Order at 9.)

That statement exposes EWS's shifting narrative. The TTAB's **Standard Protective Order** already covers "confidential" and "trade secret" material—defined broadly to include sensitive technical, business, or financial information—but **EWS declined to invoke those designations.** It never claimed the Chat contained any technology, research, market data, or other commercially sensitive content. Only after this litigation began did EWS suddenly relabel the Chat as a "trade secret," because that label was necessary to sustain the injunction and seize my devices. The "trade-

secret" theory is purely post facto—a litigation invention, not a legitimate claim of protection. *(See Section III, infra.)*

Pursuant to Federal Rule of Evidence 201, Defendant respectfully requests that the Court take judicial notice of two public orders issued by the United States Patent and Trademark Office's Trademark Trial and Appeal Board in P.A.Z.E., LLC v. Early Warning Services, LLC (Cancellation No. 92085110 and 91291526):

(1) the October 1, 2024 Order, and

(2) the October 1, 2024 Order (attached as Exhibits A and B).

These are official records of a federal administrative tribunal whose accuracy cannot reasonably be questioned. See Fed. R. Evid. 201(b)(2); Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006) (courts may take judicial notice of administrative records). The Board's analysis and findings are relevant to EWS's privilege assertions and directly contradict the foundation of its present motion. The Court may take judicial notice of Exhibits A and B, which are public orders of the U.S. Patent and Trademark Office, see Fed. R. Evid. 201(b)(2); Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006).

This pattern—relabeling ordinary, non-confidential information as "trade secret" purely to expand discovery control—is discussed further in Section III below.

## I. LAW AND BACKGROUND

### a. Rule 26 Order

Ironically, the very document EWS has filed with the Court exists to protect parties from "oppression" and "undue burden" - yet EWS seeks to use it as a tool for exactly those purposes against a pro se defendant. *Rule 26(c)(1)*. To accomplish this EWS must show "good cause" and narrow tailoring for any protective order. The burden is on EWS to show "specific prejudice or harm." *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002). EWS has shown neither. The party asserting good cause bears the burden, for each particular document

it seeks to protect, of showing that specific prejudice or harm will result if no protective order is granted. *Philips* at 1210-11.

Rule 26(c)(1) enumerates specific, narrow protections available. Instead, it seeks protections far beyond Rule 26(c)'s authorization, including: - A permanent patent prosecution bar (not enumerated in Rule 26(c)) - Perpetual post-litigation restrictions (exceeding Rule 26(c)'s scope) - Privilege log exemptions (contradicting Rule 26(b)(5)) - Unilateral designation powers (not authorized by Rule 26(c)) - Discrimination against pro se parties (violating Rule 26(c)'s protection from "oppression") Each of these exceeds the Court's authority under Rule 26(c) and must be rejected.

EWS has failed to make the required particularized showing. The only time EWS attempted to identify "trade secrets" with specificity, its list was pared down to nothing more than "many" titles of inventions and Defendant's notes. (Dkt 28 at pg 5-6, Ex. 1 Shah Dec. at ¶5) Further, EWS makes no allegations that the indexes, let alone the titles of inventions or Defendant's personal notes, were disclosed. Importantly, EWS alleges no harm (with the exception of speculative potential harm) caused by the disclosure of the title of invention and Defendant's notes. The record does no support the restrictions offered by EWS's protective Order.

Finally, disclosures that might harm EWS by exposing them to additional liability and litigation are not entitled to the courts' protection. *Nestle Foods,* 129 F.R.D. at 486.

### b. The False Narrative Of "Repeated Disclosures"

On October 1, 2024, in the two separate TTAB filings that gave rise to this litigation, P.A.Z.E., LLC v. Early Warning Services, LLC (TTAB Cancellation No. 92085110 and TTAB Opposition No. 91291526), *two different judges* held that that EWS failed to carry its burden of proving that the Teams chat was protected by attorney-client privilege. The Opposition Judge finding that EWS "fails to show that the Chat is actually a communication regarding specific legal advice from its general

counsel in counsel's capacity as such." (Opposition Order 526, at pg. 9–10.) (true and correct copies attached as Exs. A & B), and the Cancellation Judge finding that "Respondent further fails to show that the Chat is actually a communication regarding specific legal advice from its general counsel." (Cancellation Order 110 at pg. 9 -10)

Although the Board later noted—after this civil action was underway—that it would defer procedural control of sealing to this Court, **that was only a procedural accommodation**. Its substantive analysis remains intact and unrefuted: EWS failed to show the Chat involved legal advice, that I acted under a superior's direction (required for a "mere employee" to create privilege), or that any privilege ever attached.

These findings came two months before the injunction hearing in this Court. EWS knew about them and kept silent. It let this Court proceed—and later condemn me as a "repeated discloser"—while hiding that a federal tribunal had already rejected its privilege claim twice. That concealment is the foundation of every accusation that I have "disclosed confidential information." There has never been a pattern. There has been a single internal chat, already adjudicated as not privileged, and a campaign by EWS to keep that truth buried while labeling every mention of it as misconduct.

This narrative originated in the Court's own early injunction ruling, where the Court stated it was "*convinced* that Johnson is crusading against EWS and will *likely continue to publish* whatever information is in his possession." (Dkt 70 at pg 14 : 9-12) That broad characterization, and definitive conviction that not only was Defendant in possession of EWS information, but that he had disclosed it and will continue to disclose it, is unsupported by any concrete example and has set the stage for EWS to mischaracterize every subsequent procedural misstep as a deliberate disclosure campaign.

The record now shows the opposite: performance reviews that the Court itself later declared "not confidential"; a Teams Chat that has been ruled as not containing legal advice by the TTAB, and ruled "likely not a trade secret" by this Court; and

Defendant's filings sealed at EWS's insistence, only for the Court to reverse itself and then leave the resealing issue unresolved.

Regarding Defendant's performance reviews and other materials, at EWS's request, the Court initially sealed seven years of my reviews, a positive email I wrote to Cheney and other documents (Dkt. 25). Defendant asked for clarification, the Court denied it. (Dkt 54) Defendant later refiled the exact same materials under seal in a motion to strike the fraudulent Cheney Declaration, the Court reversed course and declared there was "no reason to seal these documents" and they were not confidential (Dkt. 137). EWS then filed a motion to reseal the same documents (Dkt. 144), and from the record it appears the judge never ruled on that matter, leaving the issue unresolved. Defendant's performance reviews are not confidential, let alone EWS's confidential information. To the extent other *harmless* disclosures may have happened they were inadvertent and immediately sealed by the court and therefore do not support the Protective Order. *Gomez v. Vernon*, 255 F.3d 1118, 1131 (9th Cir. 2001) (single inadvertent disclosure promptly addressed doesn't justify sanctions). Any disclosure should be characterized at most as Defendant "revealing" confidential information protected by ER 1.6(d) during a lawsuit with a former client.

The Microsoft Teams Chat, correctly ruled likely not a trade secret by this Court and not privileged by the TTAB twice, was disclosed more than two years ago, in the wrongful termination action. (Dkt 75) Defendant had, and still maintains, a good-faith belief that despite the chat being with Cheney (i.e., client) it does not contain legal advice and was not made confidential. *Id.* (Defendant stating "it is just a Teams Chat") Every later reference to it has been immediately sealed, whether in filings or in motions asserting the crime-fraud exception. (Dkt. 163, 89, 93, 100) At most, the Teams Chat was inadvertently included once in an exhibit pack originally made for the motion to strike Cheney's declaration, which was accidently included in its entirety in a motion for Rule 11 sanctions. (Dkt 157) Which was abruptly sealed

and then the motion for sanctions denied the same day Defendant filed it (Dkt 163). See *Gomez.*

Even the so-called "hallway conversation" of the Motion to Disqualify cannot support EWS's narrative (Dkt. 107). Defendant's account of the conversation was not harmful and was meant to be used in defense against a former client, placing it squarely within the Ethical Rule 1.6(d) exception. Notwithstanding, Defendant was not instructed by a superior to seek advice, and there was no intent to maintain confidentiality (Dkt 112). Under the Court's own "mere employee" ruling, privilege could not attach to such a discussion. Yet EWS has managed to spin this into another supposed "disclosure" and an alleged piece of my poor plan to disclose confidential information via lawsuit filings.

In sum, EWS's narrative of 'repeated disclosures' is built on a distorted view of the record. It has not met its burden to show the 'specific prejudice or harm' required by *Phillips*, as the incidents it relies on are either the result of Court orders, good-faith mistakes, or EWS's own litigating positions.

## II. THE PROPOSED ORDER IS PUNITIVE AND SELF-DEFEATING

The Proposed Order is not about protecting legitimate trade secrets. It is a blueprint for unfairness and concealment.

**Paragraph 9** is perhaps the most egregious. It states that NO Trade Secret will be produced until the parties agree to additional terms and the Court enters an addendum. This gives EWS an absolute veto over Trade Secret production—they can simply refuse to agree to any terms and prevent discovery indefinitely. This converts discovery from a right into a privilege EWS can grant or withhold at will. This provision effectively grants EWS a unilateral veto over core discovery, transforming Defendant's right to relevant information into a privilege subject to Plaintiff's whim. This is the antithesis of the broad and liberal discovery envisioned by the Federal Rules and does not protect Defendant from "oppression" or an "undue burden" as required by Rule 26(c)(1).

**Paragraph 11** is a particularly *revealing and shocking* example. It bars anyone "**granted access**" to "Protected Material" from engaging in patent prosecution **indefinitely**, broadly defined to include advising, amending, or maintaining patent claims. Plaintiff has never alleged misuse of patents in this case. **Worse, the clause sweeps so broadly that EWS's own in-house intellectual property counsel, Paras Shah who is already involved in the litigation, would be barred from performing their jobs.** Since Kilpatrick and Bryan Cave are the firms used to file and maintain patents, this clause would be problematic for EWS's outside counsel's ability to maintain and grow the EWS patent portfolio. This is not narrow tailoring—it is a scorched-earth tactic that proves the order is punitive, not protective; and would harm Counsel's client much more than it could ever harm Defendant, potentially malpractice if executed by EWS as written.

Let this be clear: EWS's own counsel, **in their relentless pursuit to harm Defendant by abusing the judicial process**, has drafted a clause that would legally prohibit EWS's own counsel from doing their jobs, functionally dismantling the very asset this lawsuit claims to protect. This is not an accidental oversight; it is a conscious choice to prioritize inflicting maximum harm on a *pro se* defendant over their fundamental duty to their own client. To willingly cripple their client's business operations in pursuit of a litigation advantage is the very definition of malpractice. The Court, by entertaining this motion, becomes complicit in this recklessness. This clause is a testament to the bad faith and tactical desperation that has defined Plaintiff's strategy from the outset and does not serve to protect from "oppression" or "undue burden" but to establish it.

**Paragraphs 13 and 14** give EWS unilateral power to suppress Defendant's filings and provides Defendant no recourse to unseal. Paragraph 13 allows EWS to retroactively designate anything Defendant files as "Confidential" or "Trade Secret." Paragraph 14 then requires that the material remains sealed unless and until the Court rules otherwise. However, paragraph 14 only applies when "receiving documents ro

information designated" to be protected. Therefore, there is no mechanism to unseal wrongly designated material. This is the functional equivalent of giving one party veto power over the other's evidence. It is a due process violation.

**Paragraph 18** contains a "black box" provision that exempts EWS from providing privilege logs for any documents created after the complaint was filed. That exemption makes it impossible to test privilege claims on a going-forward basis. It directly contradicts Rule 26(b)(5), which requires privilege logs so that claims of privilege can be evaluated. This provision is not protection—it is concealment.

The danger of this clause is not abstract. It would erase the paper trail necessary to hold EWS accountable for at least four categories of misconduct:

1. **The Cheney Declaration.** EWS's General Counsel submitted a sworn declaration claiming Defendant secretly forwarded confidential materials, colluded over the course of years with a "high school buddy" to extract money from EWS, fabricated evidence in the form of a wiki style website screen shot, and a false narrative surrounding Defendant's termination. (See Dkt 134, *Motion to Strike Cheney Dec.*) A log is necessary to determine when EWS knew its declaration and the evidence submitted was false and what it withheld from the Court.

2. **Paras Shah's Declarations.** EWS repeatedly submits declarations from Mr. Shah, who has no personal knowledge of the matters he attests to. Defendant hired Mr. Shah as his own replacement after notifying EWS of his intention to leave. Dkt 29 at pg 3-4. Shah's training lasted only 2 months before Defendant's wrongful termination. *Id.* For those 2 months Defendant was Shah's direct supervisor and trainer, giving Defendant firsthand knowledge of exactly what Mr. Shah was and was not exposed to. Without privilege logs, EWS can continue manufacturing "evidence" through witnesses who lack foundation while concealing documents that would expose this fraud.

3. **Vendor Control and Court Communications.** EWS admitted it directs its vendor, refused to disclose the contract, and persuaded the Court to deem the seizure a "private" act. Without logs of what was taken, when, and by whom, there is no way to verify what EWS accessed or conveyed to the Court. The clause would let EWS continue shaping the record off-the-books.

4. **The TTAB Rulings Finding the Teams Chat not Privileged.**

This 'black box' provision is a direct and unjustified contravention of Federal Rule of Civil Procedure 26(b)(5). It is designed specifically to conceal a paper trail and prevent Defendant from challenging assertions of privilege regarding EWS's post-complaint conduct, including the creation of evidence and communications with the Court. The Court should not countenance such an obstruction of the adversarial process.

In sum, the "no-log" clause is a deliberate mechanism to conceal fraud, shield incompetent declarants, and obscure back-channel dealings. Rule 26(b)(5) exists to prevent exactly this type of abuse. The Court should strike Paragraph 18 in its entirety and require complete logging of all withheld materials, regardless of date.

**Paragraph 21** extends the order indefinitely, stating it will survive the termination of the case and remain in effect perpetually. A protective order is supposed to manage discovery in a case; it is not supposed to become a permanent gag order. There is no litigation need for perpetual secrecy.

**The proposed order includes no carve-outs whatsoever**. It treats everything marked as "Protected Material" as if it were permanently owned by EWS, with no exceptions for:

1. **Prior Knowledge or Public Domain.** The order does not allow Defendant to use information Defendant has known for years before EWS filed this action, or information that has since become public. For example, the U.S. Patent Office could not even publish EWS's patent applications if this

order were enforced literally, since Defendant (or Plaintiff) could designate filings as "Protected."

2. **Personal Knowledge and Skills.** The Proposed Order does not allow Defendant to continue using his own knowledge, experience, and skills gained over a career if EWS simply labels it their "protected information." That is an improper restraint on professional practice.

3. **Later Use of Material.** There is no carve-out for using material outside of this litigation, even if it is later published or otherwise stripped of any confidentiality. The order thus becomes a lifetime gag order on facts that are no longer secret.

Protective orders are supposed to preserve confidentiality, not to rewrite the ownership of knowledge and skills or to bar the public disclosure of patent applications. The absence of these standard carve-outs confirms that the order is not tailored for legitimate protection but to suppress my defense and professional livelihood.

**Expert Approval Requirement.** The proposed order also strips Defendant of any realistic ability to use experts. Under Paragraphs 5(b), 6(b), and 7(b), outside experts or consultants can only be retained if they are (i) engaged by outside counsel, (ii) approved by all parties, or (iii) approved by the Court. As a pro se defendant, there is no "outside counsel," which eliminates the first option for Defendant. That leaves only two paths: asking Plaintiff for permission to consult an expert or burdening the Court with repeated motions for approval.

This is not a fair or workable system. It hands EWS a veto over Defendant's access to expert assistance and ensures that every attempt to level the playing field will require additional litigation. Protective orders are meant to facilitate discovery, not obstruct it. By conditioning the use of experts on EWS's consent, the order weaponizes procedure against a pro se party and guarantees that Defendant cannot meaningfully develop a defense.

Finally, **the structure of the order discriminates against a pro se** defendant. Defendant is barred from seeing "Attorneys' Eyes Only" material, even though Defendant has no attorney to represent me. This creates a two-tier system of justice in which EWS's counsel sees everything, and I see nothing. It renders my right to self-representation meaningless. This violates fundamental principles of self-representation. See *Faretta v. California*, 422 U.S. 806, 834 (1975) (right to self-representation); *Bounds v. Smith*, 430 U.S. 817, 823 (1977) (meaningful access to courts). Courts routinely modify protective orders to accommodate pro se parties' need to review all discovery. See, e.g., *Poliquin v. Garden Way, Inc.*, 154 F.R.D. 29, 31 (D. Me. 1994) (pro se plaintiff permitted to view confidential materials).

## III. THE PROTECTIVE ORDER UNLAWFULLY CONVERTS PUBLIC AND LAWFULLY ACQUIRED INFORMATION INTO "TRADE SECRETS"

The most dangerous aspect of EWS's proposed protective order is not only its punitive design, but its capacity to transform information that is *statutorily barred* from trade secret protection into "Protected Material" by mere label. This violates the letter and spirit of both the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839, and the Arizona Uniform Trade Secrets Act ("AUTSA"), A.R.S. § 44-401 et seq.

### A. Domain Names Associated With Published Trademark Applications Are Statutorily Barred From Trade Secret Protection

The DTSA and AUTSA require that a trade secret be information that "derives independent economic value…from not being generally known" and "not being readily ascertainable by proper means." 18 U.S.C. § 1839(3)(B); A.R.S. § 44-401(4)(b). Publicly available information can never qualify. See *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 227 (2010) ("Information that is readily ascertainable by…proper means, such as public sources, is not a trade secret.").

**Domain names associated with a published "intent to use" trademark application are by definition easily ascertainable by anyone who searches the USPTO database and public domain registries.** See 18 U.S.C. § 1839(3)(B);

A.R.S. § 44-401(4)(b) (excluding from trade secret protection information "readily ascertainable by proper means"). The law forbids treating such information as a trade secret.

EWS attempts to sidestep this statutory bar by claiming that "the intention to register the domains was the trade secret, not the domains themselves." (Dkt. 106 at pg 5). But this does not cure the problem. It compounds it. A published **intent-to-use trademark application is itself a definitive indicator** that the applicant has an **intent to register corresponding domain names.** Thus the "intent" sidestep of EWS actually steps that "intent" right into the public domain, easily ascertainable. Courts have long rejected attempts to protect "plans" or "strategies" that are apparent from public filings. See, e.g., *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 227 (2010) (information ascertainable from public sources cannot be a trade secret).

Further, EWS has never identified a specific list of domain names or any non-public method by which its "plan" was devised. Instead, its Complaint attached a list of **155 domain names** collected from public sources, all tied directly to its published application. (Dkt 1 at ¶67) That admission demonstrates that the domains were not secret, and that their supposed "intent" to register them was **easily ascertainable in precisely the way the statute prohibits.**

To allow EWS to designate these public domain names as "trade secrets" under a protective order would unlawfully strip them from the public domain and grant private ownership over information Congress and the Arizona legislature declared cannot be protected.

**B. EWS's Own Relief Request Admits Independent Discovery Is Possible, Which Defeats Secrecy**

EWS's own requested relief concedes the point. In its motion for sanctions, EWS asked the Court to enter a finding that Defendants "did not independently create EWS's trade secrets." (Dkt. 225 at pg 15). That request is self-defeating. If independent development or discovery is possible, then the information is, by

definition, "readily ascertainable by proper means" and outside the scope of trade secret protection. See 18 U.S.C. § 1839(3)(B); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (information independently discoverable is not secret).

By insisting on such a finding, EWS admitted that its claimed trade secrets are independently discoverable, whether they were or not is not relevant to the statutory requirement in finding a trade secret. That concession alone forecloses their designation as trade secrets under both the DTSA and AUTSA. A protective order that permits Plaintiff to designate such information as "confidential" or "trade secret" would invert the statute and reward Plaintiff for conceding away the secrecy requirement.

### C. No Improper Means Were Used To Acquire the Alleged Materials

Even if the materials at issue were confidential, trade secret law requires misappropriation through "improper means." 18 U.S.C. § 1839(5)–(6). "Improper means" includes theft, bribery, misrepresentation, breach of a duty to maintain secrecy, or espionage. It does not include lawful internal use.

Here, no improper means occurred. As EWS's only **Intellectual Property Counsel**, Defendant lawfully had access to indexes and communications that Defendant created. Defendant transferring materials to his personal email is not improper means of acquiring the information under any statute or case law—it is internal handling of materials Defendant was *not only authorized to access, but was the administrator of access for the materials companywide.* Defendant does not publish his emails, neither did he disclose the Indexes by sending his own templates to himself to preserve.

EWS's own Employment Agreement and Handbook confirm the point. Both address the "disclosure" or "dissemination" of confidential information *outside the company*. (Dkt 17-5 at pg 104, *Employee Handbook*, and Dkt 18 at pg 1, *Employee Agreement*) Defendant's act of emailing his index templates to himself is not

disclosure or dissemination. Nor did it breach any duty of secrecy Defendant owed while employed.

Somewhat revealing, the Employment Agreement required "return or destruction of confidential information" at the end of employment. *Id.* That provision shows that possessing Confidential Information outside EWS's walls was contemplated by the agreement, so there is a condition addressing it. Importantly, that provision presupposes ownership by EWS. The indexes at issue were my personal work product, never transferred under the Agreement. EWS cannot bootstrap ownership where none existed.

Accordingly, no "improper means" of acquisition has ever been alleged, let alone proven. For the sake of argument, co-defendant O'Loughlin could not reasonably have believed otherwise if he had ever received any information from Defendant: I was the in-house IP Counsel of record, with actual authority to access exactly these materials.

**D. The Proposed Order Magnifies These Legal Errors Through Labeling**

The proposed order allows EWS to designate virtually anything—including materials in the public domain, materials lawfully accessible to me, and even my own work product—as "Confidential" or "Trade Secret." (Protected Order, ¶1-3) Once stamped, such materials would be removed from Defendant's use and sealed from the public record.

This labeling regime is not protective; it is transformative and does not provide protections from "oppression" or "undue hardship." It rewrites statutory law by converting non-secrets into secrets. To take just two examples:

- **Domain Names.** Publicly available domain registrations tied to published intent-to-use trademark applications could be stripped from the public domain merely by designation.
- **Indexes and Teams Chat.** Defendant's own professional work product—his index templates, and an internal Teams chat already ruled "likely not a trade

secret"—could be expropriated by EWS through a unilateral "Protected Material" stamp.

Courts reject protective orders that sweep beyond the scope of Rule 26(c). See *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210–11 (9th Cir. 2002) (protective orders require specific harm and narrow tailoring). An order that permits a party to reclassify public information or a pro se litigant's own work product is the opposite of narrow tailoring—it is punitive expansion.

## IV. Conclusion

The themes of this litigation are now clear: EWS conceals, pro se defendant gets disadvantaged at any cost, even in the interest of Counsel's own client. The Proposed Order is the culmination of that strategy. It is based on a false narrative of repeated disclosures, drafted with punitive overreach, and designed to prevent a fair fight.

The Court should recognize this Proposed Order for what it is: not a shield for legitimate secrets meant to protect from "oppression" or "undue burden," but a sword to oppress a pro se defendant by making every move an undue burden. Every problematic provision—from the self-defeating patent bar to the perpetual gag order—reveals either recklessness or malice. Neither justifies entry of this order.

For these reasons, the Court should deny the motion for entry of the proposed protective order in its entirety. Alternatively, if the Court enters a protective order, it must be radically modified to remove the punitive provisions, including the patent prosecution bar (¶ 11), the unilateral sealing powers (¶¶ 13–14), the privilege log exemption (¶ 18), the lack of carve-outs, the expert approval requirement, and the indefinite duration clause (¶ 21).

DATED:  October 5, 2025

Respectfully submitted,                                    _

- 16 -

**/s/ Warren V. Johnson**
Warren V. Johnson, Pro Se
215 E 18th St
Lawrence, KS 66044
(208) 931-7168
warrenvjohnson@gmail.com

## Certificate of Service

I, Warren V. Johnson, hereby certify that on October 5, 2025, I electronically filed the foregoing DEFENDANT'S OPPOSITION TO THE MOTION TO ENTER A PROPOSED PROTECTIVE ORDER with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


Respectfully submitted,

/s/Warren V Johnson/

Warren Johnson
215 E 18th St
Lawrence, KS 66044
warrenvjohnson@gmail.com