WARREN VURL JOHNSON
warrenvjohnson@gmail.com
215 E 18th St
Lawrence, KS 66044

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

EARLY WARNING SERVICES, LLC

Plaintiffs,

v.

MR. WARREN V. JOHNSON;
BRANDON O'LOUGHLIN; P.A.Z.E.,
LLC

Defendants.

Case No.: CV24-01587-PHX-SMB

**MOTION FOR RECONSIDERATION, CLARIFICATION, AND CORRECTION OF PRELIMINARY INJUNCTION FINDINGS**

**Motion for Reconsideration, Clarification, and Correction of Preliminary Injunction Findings**

*(Fed. R. Civ. P. 52(b), 54(b), and 60(b)(5)–(6))*

## I. INTRODUCTION AND NATURE OF RELIEF SOUGHT

Defendant Warren Vurl Johnson respectfully moves this Court for reconsideration, clarification, and correction of the Preliminary Injunction Order entered December 4, 2024 (Dkt. 70). This motion is brought under Federal Rules of Civil Procedure 52(b), 54(b), and 60(b)(3)-(6), and seeks relief based on newly discovered evidence of fraud upon the court, material omissions by opposing counsel, and clear factual errors in the Court's findings.

This is not a routine disagreement with the Court's exercise of discretion. Rather, Defendant presents evidence that Early Warning Services, LLC ("EWS") and its counsel obtained the preliminary injunction through a calculated pattern of misrepresentation and omission that denied this Court access to material facts and

- 1 -

adverse legal authority. The integrity of the judicial process itself requires correction when an injunction has been procured through such means.

## II. FACTUAL BACKGROUND: THE FOUNDATION OF THE INJUNCTION

The Court's December 4, 2024 Preliminary Injunction Order rests almost entirely on the Declaration of Tracy Cheney, which the Court cited approximately eighty times throughout its analysis. The Cheney Declaration provided virtually the entire factual foundation for the Court's findings regarding likelihood of success on the merits, irreparable harm, and the balance of equities. Indeed, the opening paragraph of the Court's order adopts nearly verbatim the opening paragraph of EWS's Complaint, which itself parrots Ms. Cheney's declaration.

Since the Court issued its order, three critical problems with this foundation have become apparent. Each independently undermines the injunction. Together, they demonstrate that the order cannot stand.

## III. LEGAL STANDARDS FOR RELIEF

### A. Rule 60(b)(3): Relief from Fraud, Misrepresentation, or Misconduct

Federal Rule of Civil Procedure 60(b)(3) authorizes this Court to relieve a party from a final judgment or order obtained through "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." The Ninth Circuit has made clear that this rule applies where a party was "prevented from fully and fairly presenting his case" due to the opposing party's misconduct. Appling v. State Farm Mut. Auto. Ins. Co., 340 F.3d 769, 780 (9th Cir. 2003). The misconduct need not rise to the level of criminal fraud. Rather, Rule 60(b)(3) encompasses situations where counsel fails in their duty of candor to the tribunal by withholding material adverse authority or making material misrepresentations that affect the court's decision-making process.

### B. Rule 54(b): Reconsideration of Interlocutory Orders

A preliminary injunction is an interlocutory order subject to reconsideration at any time before entry of final judgment. Rule 54(b) expressly provides that "any order

or other decision, however designated, that adjudicates fewer than all the claims... may be revised at any time before the entry of a judgment adjudicating all the claims." The Court therefore retains full authority to reconsider its preliminary injunction order based on new evidence or correction of clear error.

## C. Rule 52(b): Amendment of Factual Findings

Rule 52(b) permits a party to request that the court "amend its findings—or make additional findings—and amend the judgment accordingly." This rule is particularly appropriate where, as here, specific factual findings were clearly erroneous or where the court made findings unsupported by the record.

## D. The Duty of Candor to the Tribunal

Both parties and counsel owe an unwavering duty of candor to the tribunal. This duty, embodied in Model Rule of Professional Conduct 3.3(a)(1), requires lawyers to avoid making false statements of fact or law and to correct any false statements previously made. The Supreme Court has recognized the judiciary's inherent authority to sanction misconduct that abuses the judicial process. Chambers v. NASCO, Inc., 501 U.S. 32, 43-46 (1991).

## IV. ARGUMENT

## A. EWS Obtained the Injunction Through Material Omissions Regarding the Microsoft Teams Chat

At the heart of EWS's request for preliminary injunctive relief lay its claim that Defendant had misappropriated a privileged Microsoft Teams Chat conversation. EWS characterized this Teams Chat as "undoubtedly privileged" attorney-client communication and built its entire narrative of irreparable harm around the alleged disclosure of this supposedly confidential material. The Court's order explicitly relied on the Teams Chat as evidence of likely trade secret misappropriation, irreparable harm, and unethical conduct.

What EWS and its counsel did not tell this Court—what they affirmatively concealed—was that EWS's own privilege claim over this very same Teams Chat had

already been adjudicated and rejected by the United States Patent and Trademark Office's Trademark Trial and Appeal Board ("TTAB") in not one, but two separate proceedings. These adverse rulings were final before EWS sought the preliminary injunction from this Court.

### 1. The TTAB's Prior Rulings on Privilege

In opposition proceedings before the TTAB, EWS asserted privilege over the Microsoft Teams Chat to prevent its use in trademark litigation. The TTAB examined EWS's privilege claims and expressly found that the Teams Chat was not privileged. This finding was memorialized in written decisions in two separate proceedings involving EWS. These decisions were matters of public record available on the USPTO's electronic filing system.

### 2. EWS's Affirmative Misrepresentation to This Court

Rather than disclosing these adverse findings, EWS represented to this Court that the Teams Chat was "undoubtedly privileged" and that Defendant's possession and potential disclosure of it constituted misappropriation of confidential, attorney-client privileged information. EWS's moving papers characterized the Teams Chat as a cornerstone of their irreparable harm showing, arguing that disclosure of this "privileged" material would cause immediate and ongoing injury to EWS.

### 3. Materiality of the Omission

This omission was not peripheral or technical. It went directly to the heart of EWS's claim of likelihood of success on the merits and irreparable harm. Had this Court known that EWS's own privilege assertion over the Teams Chat had already been examined and rejected by a federal administrative tribunal, the Court could not have found that Defendant's possession of the Teams Chat demonstrated likely misappropriation of protected material.

The materiality is evident from the Court's order itself, which repeatedly references the Teams Chat as evidence of wrongdoing and as justification for

emergency equitable relief. Remove the Teams Chat from the analysis, and EWS's showing of irreparable harm becomes substantially weaker, perhaps fatally so.

**4. The Court's "Trade Secret Damages" Finding Rests on a Category of Information It Never Found to Be a Trade Secret.**

The injunction order identifies the $20,000 domain-name payment as EWS's "trade-secret damages." This finding suffers from a fatal internal flaw: **the Court conducted no trade-secret analysis for the domains whatsoever.**

The Court's order expressly limits its trade-secret analysis to two categories: the "Indices" and the "Teams Chat." The domains are not mentioned in that section. EWS's motion similarly failed to argue that domain names—or any "domain-related documents"—satisfied the statutory elements of a trade secret (secrecy, independent economic value, reasonable protection). *See Calisi v. Unified Fin. Servs., LLC*, 232 Ariz. 103, 107 (Ariz. Ct. App. 2013) (trade-secret status must be proved, not presumed).

Therefore, the Court had no legal basis to treat the domain sale as "trade-secret damages." This converts an ordinary commercial transaction into a trade-secret loss by judicial inference, contrary to the evidentiary requirements of the DTSA and AUTSA. This internal inconsistency confirms that the injunction's assessment of harm is speculative and unsupported by its own findings.

**5. Violation of Counsel's Duty of Candor**

EWS's counsel had a continuing obligation under their professional responsibility rules and their duty to this Court to disclose directly adverse legal authority and to correct false statements of material fact. Model Rule 3.3(a)(1)-(3). By remaining silent about the TTAB's privilege rulings while affirmatively characterizing the Teams Chat as "undoubtedly privileged," counsel allowed this Court to rely on a representation they knew—or should have known—was contradicted by an existing adverse ruling.

This is precisely the type of conduct that Rule 60(b)(3) is designed to remedy. A party cannot obtain emergency equitable relief by presenting only one side of the story while concealing material adverse determinations that undermine their core claims.

**6. Defendant's Position at Oral Argument Was Consistent with the TTAB's Analysis—And Defendant's Position Was at Minimum Reasonable**

Even if this Court were to find the TTAB's privilege determinations unpersuasive (though it should not), those determinations are significant for another critical reason: they match nearly verbatim the position Defendant articulated to this Court at oral argument on the preliminary injunction.

At the hearing, Defendant specifically told the Court regarding the Teams Chat: "no legal advice being given" and "it was just a Teams Chat." These statements go directly to the core requirements for attorney-client privilege: the communication must be for the purpose of obtaining or providing legal advice, and it must be intended to be confidential.

The Court's response was limited to noting that the Teams Chat was "with your client." When Defendant attempted to explain further by stating it was "with my boss at the time," the Court interrupted, reiterating "with your client." This exchange demonstrates that the Court's analysis focused primarily—if not exclusively—on whether Tracy Cheney was Defendant's "client" in the employment context, without proceeding to the equally essential questions of whether legal advice was being given and whether the communication was intended to be confidential.

The TTAB, by contrast, conducted the full privilege analysis that is required. The TTAB's decisions addressed:

- **The threshold "client" question**: Whether Ms. Cheney had the authority to create an attorney-client relationship by directing Defendant to provide legal advice. Notably, EWS never established before the TTAB that Ms. Cheney

held a position authorizing her to seek or direct legal services on behalf of the company, or that any superior had instructed her to consult with Defendant in his capacity as counsel.

- **The "legal advice" requirement**: The TTAB got past the threshold client question and proceeded to analyze whether the communication involved the provision or seeking of legal advice. The TTAB found it did not. This is precisely what Defendant told this Court at oral argument: "no legal advice being given."

- **The intent of confidentiality**: The TTAB also examined whether the communication was intended to be confidential, considering the medium used and the company's policies regarding that medium.

The critical point is this: **Defendant's position was not unreasonable, was consistent throughout, and has now been vindicated by a federal tribunal that conducted the complete privilege analysis.** Even if this Court were inclined to reach a different conclusion than the TTAB on the ultimate question of privilege, the fact remains that Defendant's position had substantial support and was not the frivolous or bad-faith position that EWS represented it to be when seeking emergency injunctive relief.

**7. Company Policy Negates Any Expectation of Confidentiality**

There is an additional, independent reason why the Teams Chat cannot be privileged: EWS's own company policy regarding Microsoft Teams communications. That policy explicitly states that Teams Chats have no expectation of privacy and are treated as normal business communications subject to monitoring, retention, and production.

When a company tells its employees that a particular communication medium is not private and may be monitored or disclosed, those employees—including in-house counsel—cannot later claim that communications on that medium were intended to be confidential. The intent to keep communications confidential is an

essential element of the attorney-client privilege. A company cannot simultaneously tell employees "Teams Chats are not confidential" and then claim "this Teams Chat was privileged communication."

This policy alone defeats EWS's privilege claim as a matter of law.

**B. The Cheney Declaration Contained Material Falsehoods That the Court Adopted Wholesale**

The second fundamental problem with the preliminary injunction order is that it rests almost entirely on the Declaration of Tracy Cheney—a declaration containing material factual assertions that are demonstrably false and contradicted by the documentary record.

**1. The Court's Extensive Reliance on the Cheney Declaration**

The Court cited the Cheney Declaration approximately eighty times throughout its order. This count includes both direct citations to the declaration itself and citations to EWS's motion and complaint that directly incorporate and rely upon Ms. Cheney's factual assertions. The Court's factual findings section reads, in many places, as a near-verbatim adoption of Ms. Cheney's characterizations.

This degree of reliance makes the accuracy of the Cheney Declaration not merely important, but dispositive. If the declaration is false in material respects, then the entire factual foundation of the injunction collapses.

**2. The False Assertions About the Indices**

Ms. Cheney's declaration asserted that Defendant's "indices" or "indexes" contained confidential invention disclosures, concept briefs, and proprietary technical information belonging to EWS. These assertions appear repeatedly throughout the declaration and formed the basis for EWS's claim that Defendant had misappropriated valuable trade secrets

The problem is that these assertions are false. Defendant submitted to this Court the actual index templates, complete with metadata and contemporaneous documentation showing what these files actually contained. The indices were simple

administrative tracking tools containing only: (a) publicly available project names, (b) internal reference numbers, (c) administrative status fields, and (d) Defendant's own notes about his work assignments.

The indices did not contain invention disclosures. They did not contain concept briefs. They did not contain proprietary technical specifications. They were, quite simply, the digital equivalent of a to-do list—tracking what projects Defendant was assigned to work on.

### 3. Defendant's Attempts to Correct the Record Were Rejected on Procedural Grounds

Defendant filed a Motion to Strike the Cheney Declaration (Dkt. 134), presenting evidence of its falsity and requesting that the Court not rely on it. The Court declined to address the motion on procedural grounds, finding it untimely under the local rules governing preliminary injunction practice.

The result is an injunction founded on testimony that was never tested, never cross-examined, and never evaluated for truthfulness despite Defendant's presentation of contrary documentary evidence. The Court had no opportunity to assess whether Ms. Cheney's characterizations were accurate because the procedural posture of the preliminary injunction motion meant her declaration was accepted at face value.

### 4. The Consequences of Building an Injunction on False Testimony

When a preliminary injunction rests entirely on unchallenged testimony that is later shown to be false, the appropriate remedy is to vacate or substantially modify the injunction. The Court's findings cannot stand when the evidentiary foundation has crumbled.

This is not a case where reasonable minds might differ about the interpretation of ambiguous evidence. Defendant has presented the actual documents—the indices themselves—that prove Ms. Cheney's characterizations were false. Either the indices contained invention disclosures and concept briefs, or they did not. The documentary evidence establishes that they did not.

**C. EWS's "Trade Secret" Claims Have Proven to Be Without Merit**

Since the preliminary injunction was entered, EWS has been forced through discovery and the progression of this litigation to specify exactly what trade secrets it claims Defendant misappropriated. The answer is revealing: EWS now admits that its alleged trade secrets consist of (1) the titles of inventions, and (2) Defendant's own notes about his work.

**1. Titles of Inventions Are Not Trade Secrets**

The titles of inventions cannot constitute trade secrets as a matter of law when those inventions have been filed with the United States Patent and Trademark Office. Patent applications are published, making their titles public information. Even for unpublished applications, a mere title conveys no protectable technical information and cannot satisfy the statutory requirements for trade secret protection under the Defend Trade Secrets Act or Arizona's Uniform Trade Secrets Act.

**2. Defendant's Own Notes Are Not EWS's Property**

To the extent EWS claims that Defendant's personal notes about his work assignments constitute EWS trade secrets, this claim fails both factually and legally. Defendant created these notes himself. They reflect his own understanding, his own mental processes, and his own organizational methods. They are not confidential information belonging to EWS; they are Defendant's own work product and mental impressions

An employer cannot claim trade secret protection over an employee's personal notes unless those notes contain specific confidential technical information. EWS has not alleged, much less proven, that Defendant's notes contained any such information beyond general project titles and administrative tracking data.

**3. The Collapse of the Trade Secret Theory Undermines the Injunction**

The Court granted the preliminary injunction based on EWS's representation that it possessed valuable, protectable trade secrets that Defendant had misappropriated and was threatening to disclose or use. Now that EWS has specified

what those alleged secrets actually are, it is clear that they do not qualify for trade secret protection.

This collapse of the underlying legal theory is a proper basis for reconsideration under Rule 54(b). The Court issued emergency equitable relief based on the assumption that EWS had demonstrated a likelihood of proving trade secret misappropriation. That assumption has proven false.

**4. EWS's Failure to Allege an Essential Element of Misappropriation.**

The Court's injunction is expressly predicated on the alleged misappropriation of a single category of information: the "indices." To establish a claim for misappropriation under the Defend Trade Secrets Act (DTSA) and Arizona's Uniform Trade Secrets Act (UTSA), a plaintiff must show not just possession, but an actual or threatened "acquisition," "disclosure," or "use." 18 U.S.C. § 1839(5); A.R.S. § 44-401(2). A trade secret sitting in a drawer, or in an attorney's personal email, causes no irreparable harm.

EWS has now moved for, and presumably obtained, default judgments against the only conceivable third-party recipients: co-defendants Brandon O'Loughlin and P.A.Z.E., LLC. Critically, a review of EWS's Complaints and its motions for default judgment reveals that **EWS never once alleged that either co-defendant ever received, accessed, or used the indices or the alleged "titles to inventions."**

This is a fatal, strategic omission. By securing final judgment without alleging this core injunctive fact, EWS has judicially admitted that the very dissemination justifying emergency equitable relief **never occurred**. There is no allegation of transfer, and thus no factual basis for a finding of ongoing or threatened misappropriation.

**5. The Alleged "Misappropriation" Does Not Meet the Statutory or Common-Sense Definition.**

EWS's theory appears to be that Defendant's act of emailing the documents to himself constituted "disclosure." This stretches the term beyond its breaking point.

- 11 -

EWS's own internal policies distinguish between "access" and "disclosure," with the latter involving transmission to an external party. An employee emailing work documents to himself for work purposes, without more, is an act of access or possession, not the kind of "disclosure" to a competitor that trade secret law is designed to prevent. The injunction now restrains conduct that has been revealed to be a legal nullity.

### 6. The Injunction is Now Moot and Constitutionally Defective.

The "ship has sailed." EWS has litigated this case to a point where the only conceivable pathways for misappropriation have been extinguished by its own failure to allege them. The injunction now serves only to restrain Defendant from an act—dissemination to the co-defendants—that EWS itself has formally conceded never happened and is now legally barred from happening by the final judgments.

An injunction cannot stand when the "feared injury" is purely speculative. *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). With no recipient identified and the co-defendant relationship adjudicated, there is no "likelihood of substantial and immediate irreparable injury." The injunction now lacks a valid equitable basis and operates as a prior restraint on lawful activity, violating fundamental due process principles. The Court should vacate it on this basis alone.

### D. The Court Made Findings Not Supported by the Record and Removed Limitations That Were in the Record

In addition to relying on false testimony and concealed adverse authority, the Court's preliminary injunction order includes factual findings that appear nowhere in the pleadings, evidence, or argument submitted by either party. These additions broadened the scope of the injunction and created a factual basis that did not exist in the record.

### 1. Addition of "Invention Disclosures" and "Concept Briefs"

The Court's order states that Defendant's indices "contained invention disclosures and concept briefs." These specific terms—"invention disclosures" and

"concept briefs"—do not appear in EWS's Complaint. They do not appear in the Cheney Declaration. They do not appear in any exhibit submitted by EWS.

What EWS alleged was that the indices tracked proprietary projects. What the Cheney Declaration claimed was that the indices contained information about confidential matters. But neither EWS's pleadings nor its evidence used the specific terms "invention disclosures" or "concept briefs" to describe the contents of the indices.

By introducing these specific terms, the Court's order transformed general allegations about proprietary information into specific findings about identified categories of technical documentation. This transformation materially expanded the perceived seriousness of Defendant's alleged conduct.

Moreover, Defendant submitted the actual indices showing they contained no such documents. The Court's finding that the indices "contained invention disclosures and concept briefs" cannot be reconciled with the documentary evidence Defendant presented.

### 2. Expansion of the Temporal Scope

The Cheney Declaration specifically stated that Defendant "emailed documents between November 2022 and January 2023." This was the only temporal specification in EWS's evidence regarding when the alleged wrongful conduct occurred.

The Court's order, however, found that Defendant "emailed himself documents for an undetermined period of time." This substitution removed the specific date range provided by EWS's own evidence and replaced it with an open-ended finding that could encompass any period of Defendant's employment.

No evidence in the record supports the broader finding. EWS presented evidence only of emails during a three-month window. The Court's order eliminated that limitation, thereby expanding both the perceived scope of Defendant's conduct and the potential justification for broad injunctive relief.

### 3. These Alterations Require Correction Under Rule 52(b)

Federal Rule of Civil Procedure 52(b) exists precisely to address situations where a court's factual findings diverge from the record. When specific findings have no evidentiary support, or when findings materially alter the claims and evidence presented by the parties, those findings must be corrected.

The additions and alterations described above broadened the injunction in ways that favored EWS and that cannot be traced to the actual pleadings and evidence. This Court should clarify its findings to reflect what was actually alleged and proven, rather than allowing the injunction to rest on findings that appeared for the first time in the order itself.

**E. The Combined Effect of These Problems Undermines the Injunction's Integrity**

Each of the problems identified above is independently serious. Together, they demonstrate that the preliminary injunction was obtained through a process so infected with misrepresentation, omission, and factual error that the order cannot stand.

EWS concealed material adverse authority regarding the very documents it claimed were privileged and misappropriated. EWS submitted a declaration containing demonstrably false assertions about what Defendant's files contained. EWS's claimed trade secrets have proven not to be trade secrets at all. EWS's entire theory of confidentiality is legally backwards, seeking to transform non-confidential workplace documents into protected information through post-hoc recharacterization. And the Court's findings included material additions and alterations not supported by the record.

This combination constitutes precisely the kind of misconduct that Rule 60(b)(3) is designed to remedy. When a party obtains emergency equitable relief through a pattern of misrepresentation and omission, and when that relief rests on a factual foundation that has since collapsed, the integrity of the judicial process requires correction.

The Ninth Circuit has recognized that relief under Rule 60(b)(3) is appropriate where the moving party was "prevented from fully and fairly presenting his case" due to the opponent's misconduct. Appling, 340 F.3d at 780. That is exactly what happened here. Defendant could not present a full and fair case regarding the Teams Chat because EWS concealed the TTAB's adverse privilege findings. Defendant could not effectively challenge the Cheney Declaration's factual assertions because the Court declined to address the motion to strike on procedural grounds. And Defendant could not rebut factual findings that EWS never made and that appeared for the first time in the Court's order.

## V. REQUESTED RELIEF

For the foregoing reasons, Defendant Warren Vurl Johnson respectfully requests that this Court:

1. **Correct its factual findings** under Rule 52(b) to reflect that (a) the Microsoft Teams Chat is not privileged and was deemed non-confidential by company policy; (b) the indices contained only administrative tracking data, not invention disclosures or concept briefs; and (c) the alleged misconduct was temporally limited to November 2022–January 2023.

2. **Acknowledge the reasonableness of Defendant's privilege position**, which was consistent with his oral argument and has now been substantiated by the TTAB's rulings.

3. **Recognize that EWS's "backwards" theory of confidentiality**—claiming non-confidential media become protected when information is placed in them—is a fundamental legal error.

4. **Reconsider the injunction's reliance on the Cheney Declaration**, which contained material misrepresentations proven false by the documentary record.

5. **Vacate the preliminary injunction in its entirety** under Rules 54(b) and 60(b)(3), as it was procured through material omissions and rests on a false factual and legal foundation that has now collapsed.

6. **Preserve these objections for appellate review** to ensure a complete record should this Court deny relief.

Defendant seeks not to second-guess the Court's initial discretion, but to correct an order procured through misrepresentation and premised on facts and law proven to be false.

Pursuant to LRCiv 7.2(f), Defendant respectfully requests oral argument on this Motion.

## VI. <u>CONCLUSION</u>

The preliminary injunction was built on concealed adverse authority, demonstrably false testimony, and a legally backwards theory of confidentiality. EWS obtained relief by misrepresenting the Teams Chat as "undoubtedly privileged," falsely claiming the indices contained core technical documents, and arguing that placing information in non-confidential media retroactively makes those media protected. This is not the law.

Correction is required to preserve judicial integrity. The Court relied heavily on a declaration now shown to be false and on privilege claims already rejected by another tribunal. This is not a mere dispute over contested evidence, but a case where equitable relief was obtained through the suppression and distortion of material facts. Defendant respectfully requests that the Court grant the relief sought.

**Dated:** October 5, 2025

**Respectfully submitted,**
/s/ Warren V. Johnson
Warren V. Johnson
215 E 18th St
Lawrence, KS 66044
warrenvjohnson@gmail.com

**Certificate of Service**

I, Warren V. Johnson, hereby certify that on October 5, 2025, I electronically filed the foregoing DEFENDANT'S OPPOSITION TO THE MOTION TO ENTER A PROPOSED PROTECTIVE ORDER with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Respectfully submitted,

  /s/Warren V Johnson/

Warren Johnson
215 E 18th St
Lawrence, KS 66044
warrenvjohnson@gmail.com