# TABLE OF EXHIBITS FOR REPLY IN SUPPORT OF
# RULE 60(b) MOTION

| | |
|---|---|
| Exhibit A | Showing at Least 89% of Injunction is Founded on Fraudulant Cheney Declaration |
| Exhibit B | Analysis of Untrustworthy Cheney Declaration (See Dkt 135 for more) |
| Exhibit C | Underacted KU Termination Letter |
| Exhibit D | CLE Presentation Co-Presented w/ George Chen at Bryan Cave sponsored CLE (2019, available on ACC website, full disclosure of "brand strategy" |
| Exhibit E | CLE Presentation Presented at Bryan Cave sponsored CLE (2022, no IP strategy goes uncovered in full detail) |

# EXHIBIT A

# INJUNCTION'S RELIANCE ON A FALSIFIED CHENEY DECLARATION

# (89% OF ALL CITATIONS)

TOTAL CITATIONS IN INJUNCTION (DKT 70) BY DOCKET NUMBER

| Dkt No. | Description | Cited |
|---------|-------------|-------|
| **Dkt 1** | Complaint (Doc. 1) | **10** |
| **Dkt 16** | Motion for Preliminary Injunction (Doc. 16) | **12** |
| **Dkt 17** | Cheney Declaration (Doc. 17, including Doc. 17-1, 17-2, 17-3, 17-4, and all "Id.") | **41** |
| **Dkt 28** | Reply & Shah Declaration (Doc. 28, Doc. 28-1, Shah Decl., and all "Id.") | **8** |

## DETAILED BREAKDOWN OF CITATIONS

**Dkt 1 (Complaint) – 10 citations**
- Page 1: (Doc. 1 at 1.)
- Page 3: (Doc. 1 at 3 11); (Doc. 1 at 7 30)
- Page 4: (Doc. 1 at 4 11.); (Id. 11.); (Id.); (See Doc. 1.); (See Doc. 1 at 18, 20.)
- Page 8: (Doc. 1 at 10 54-56)
- Page 13: (See Doc. 1)

**Dkt 16 (Preliminary Injunction Motion) – 12 citations**
- Page 1: (Doc. 16)
- Page 5: (Doc. 16 at 5.)
- Page 6: (Doc. 16 at 5.) [block quote]; (Doc. 16 at 12-13)
- Page 7: (Doc. 16 at 13-14)
- Page 8: (Doc. 16 at 14-15.)
- Page 11: (Doc. 16 at 19.)
- Page 12: (Doc. 16 at 19.); (Id. at 20.); (Id. at 20.)
- Page 13: (See Doc. 16)
- Page 14: (Doc. 16 at 20-21.)

**Dkt 17 (Cheney Declaration & exhibits) – 41 citations**
**Page 2** (12):
(Doc. 17 ("Cheney Decl.") 2.); (Id. 3.); (Id. 4.); (Id. 5, 17.); (Id. 8.); (Id.); (Id.); (Id. 5, 17.); (Id. 7.); (Id. 10, 19.); (Id. 10.); (Cheney Decl. 14.)

**Page 3** (13):
(Id. 17.); (Id. 21.); (Id. 22.); (Id.); (Id. 24.); (Id.); (Id. 25-32.); (Id.); (Id.); (Cheney Decl. 27); (Doc. 17-1 at 33.); (Cheney Decl. 28-29.); (Cheney Decl. 40-43.)
**Page 4** (8):
(Id. at 43.); (Doc. 17-2.); (Cheney Decl. 35-37); (Doc. 17-3); (Doc. 17-4); (Cheney Decl. 41.); (Cheney Decl. 39.); (Id. 25, 39.)
**Page 8/9** (5):
(Cheney Decl. 19.); (Cheney Decl. 44.); (Cheney Decl. 47-48); (Id. 49-53); (Id. 55)
**Page 10** (1):
(Cheney Decl. 10)
**Page 11** (2):
(Cheney Decl. 26, 31.); (Id. 42, 43.)
**Dkt 28 (Reply & Shah Declaration) – 8 citations**
- Page 1: (Doc. 28)
- Page 2: (Doc. 28-1 ("Shah Decl.") 10-11.)
- Page 7: (Doc. 28 at 5.) [first]; (Doc. 28 at 5.) [second]; (Shah Decl. 3, 5.)
- Page 10: (Shah Decl. 10-11.)
- Page 13: (Doc. 28 at 13-14.)
- Page 14, n.6: (Doc. 28 at 8-10.)


## OBSERVATIONS

- **Dkt 17 (Cheney Decl.)** is the evidentiary cornerstone, cited **41 times**—nearly four times more than any other docket. It supports nearly every factual allegation in the complaint and motion.

- **Dkt 1** and **Dkt 16** are cited primarily in the factual background and the merits analysis, with **10** and **12** references respectively, and are wholly dependent on the Cheney Decl.

- **Combined Citations Attributable to Cheney Decl.** is 63 out of 71 (89%).

- **Dkt 28** appears **8 times**, mainly through the Shah Declaration and the Reply brief, used to rebut Johnson's arguments and to elaborate on the Teams Chat.

# EXHIBIT B

# MATERIAL FALSEHOODS IN THE CHENEY DECLARATION (Dkt. 17)

## EXHIBIT B - MATERIAL FALSEHOODS IN THE CHENEY DECLARATION (Dkt. 17)

## 1. MESA HIGH SCHOOL: FABRICATED EVIDENCE

**CHENEY'S CLAIM:** "EWS later learned that Johnson and O'Loughlin attended Mesa High School together and both graduated in 1999." (Cheney Decl. ¶32)

## DOCUMENTARY PROOF OF FALSITY:

- Mesa Public Schools General Counsel: "There is no record of Warren V. Johnson's attendance at Mesa High School... at any point." (Dkt. 135-1)

- Johnson's GED Certificate: Idaho, 1999 (Dkt. 135-14)

- Mesa High School 1999 Yearbook: No photo or listing for Warren Johnson (Dkt. 135-19)

- Cheney's "source": old-friends.co—an anonymously-editable website Johnson demonstrably manipulated as a joke (Dkt. 24 at 9)

**MATERIALITY:** This Court opens the injunctive Order with this inflammatory fraud, then references two more times its factual findings. (Dkt. 70 at 1 and 3)

## 2. BONUS "BACKTRACKING": CONTRADICTED BY EWS'S OWN DOCUMENTS

**CHENEY'S CLAIM:** "On November 18, 2022, I presented Johnson with a transition plan... Johnson agreed to this transition plan on the same day, then backtracked and demanded more money." (Cheney Decl. ¶¶12-13)

## DOCUMENTARY PROOF OF FALSITY:

- November 18: Johnson said "I can make your timeline work" in response to Cheney's proposed deadline (Dkt. 135-2)

- November 22: Cheney sent written terms imposing the 1/1/23 resignation date for the first time (Dkt. 135-3)

- November 23: Johnson objected after discovering Cheney reallocated his earned merit bonus into a retention bonus contingent on her deadline: "These

changes everything... I won't stay in a condition for getting what I'm already owed." (Dkt. 135-5)

**TRUTH:** Cheney imposed the deadline unilaterally and made bonuses contingent on it after Johnson's cooperation. No "backtracking" occurred.

## 3. TERMINATION CALL: DELIBERATE TIMELINE MANIPULATION

**CHENEY'S CLAIM:** "Shortly after his termination, Johnson represented to me that the only confidential document he had emailed from his work email account to his personal email account was EWS's Employee Handbook, which he claimed to have deleted." (Cheney Decl. ¶18)

**CONTRADICTION IN EWS'S OWN COMPLAINT:** "On January 19, 2023, Johnson represented to Ms. Cheney that the only confidential document he had emailed to his personal email account was EWS's Employee Handbook, which he **later** claimed to have deleted." (Dkt. 1 ¶54) (emphasis added)

**TRUTH:** Cheney created the "only confidential document" narrative to falsely state Johnson lied during the termination call itself. Then is inconsistent with eh complaint as to when and how these events took place. Johnson's contemporaneous email of the termination call shows this to be a false statement.

## 4. PAZE ROLE: PROVABLY FALSE

**CHENEY'S CLAIM:** "In this role, Johnson was responsible for providing legal advice to EWS on intellectual property issues related to Paze." (Cheney Decl. ¶8)

**DOCUMENTARY PROOF OF FALSITY:**

- The Teams Chat Cheney claims is privileged shows Johnson complained about being excluded from Paze IP advice (Dkt. 135-2)

- Paze service did not launch until 2024—over a year after Johnson's January 2023 departure (Dkt. 135-18)

**TRUTH:** Johnson had no role advising on Paze IP and complained to Cheney about this exclusion.

## 5. TTAB FILINGS: NO CONFIDENTIAL INFORMATION

**CHENEY'S CLAIM:** P.A.Z.E.'s TTAB filings "reflect Johnson's knowledge of EWS's confidential and trade secret information." (Cheney Decl. ¶39)

**DOCUMENTARY PROOF OF FALSITY:**

- Cheney attached the entirety of the TTAB filings as exhibits to her own declaration (Cheney Decl. Exs. 10, 12)

- Review of those filings shows they contain only: public USPTO records, publicly available screenshots, legal citations, and standard trademark arguments

- EWS refused to identify any confidential content when asked (Dkt. 28 at 11)

**TRUTH:** Cheney's own exhibits prove no confidential information was used. The claim is conclusory speculation.

## 6. USER RESPONSIBILITY AGREEMENT: INTENTIONAL MISUSE OF DEFINED TERMS

**CHENEY'S CLAIM:** "Employees must not photograph any restricted or nonpublic data with a device or remove restricted data from the office... Johnson did not have EWS management's approval or authorization to photograph any restricted... EWS data." (Cheney Decl. ¶¶50, 52)

**DOCUMENTARY PROOF OF MANIPULATION:**

- The URA defines "Restricted" (capital R) as a specific, predefined data classification (Dkt. 16 at 17)

- Cheney intentionally used lowercase "restricted" to create false appearance of policy violation

- EWS's Motion for Injunction correctly quotes policy wiht "Restricted" (Dkt. 16 at 17); Cheney's Declaration intentionally did not

**TRUTH:** Cheney substituted undefined lowercase "restricted" for the defined term "Restricted" to manufacture a policy violation where none exists.

## 7. "LEARNING" ABOUT EMAILS: PRETEXTUAL TIMELINE

**CHENEY'S FIRST CLAIM:** "On January 19, 2023, I learned that Johnson had emailed EWS's proprietary and confidential information... I immediately terminated [Johnson]." (Cheney Decl. ¶17)

**CHENEY'S SECOND CLAIM (TWO PARAGRAPHS LATER):** "Shortly after Johnson's termination... An investigation by EWS's Security and IT departments revealed that Johnson had sent a volume of EWS's documents..." (Cheney Decl. ¶19)

**THE CONTRADICTION:** Cheney can't keep her story straight. ¶17: She learned on January 19 and "immediately" fired Johnson. ¶19: She learned "shortly after" termination through an investigation. Which is it—before or after?

**DOCUMENTARY PROOF:** January 19 timeline shows the real trigger:

- 12:36pm: Johnson requests records of EWS's August 2022 investigation (Dkt. 135-2)

- 3:45pm: Johnson sends HR EWS's own "Investigation Procedure" policy (Dkt. 135-2)

- 4:15pm: Cheney terminates Johnson (Dkt. 135-9)

**NO EVIDENCE:** After two years of litigation, EWS has produced zero forensic reports, zero server logs, zero list of exfiltrated documents. The sworn "investigation by EWS's Security and IT departments" is unsupported by a single document.

**TRUTH:** Termination was retaliation for requesting investigation records. The contradictory paragraphs reveal a cover story Cheney couldn't maintain for three paragraphs of her own declaration.

## 8. PATTERN: "REFLECTS" AS EVIDENCE MANUFACTURE

**SYSTEMATIC MISUSE:** Cheney uses "reflects" or "reflected" 56 times throughout the declaration to transform absence of evidence into sworn fact:

- "The Chat reflects Johnson's knowledge..." (Cheney Decl. ¶25)—never identifies what knowledge

- "The indices reflected trade secrets..." (Cheney Decl. ¶31)—92.86% of index data is public

- "The TTAB filings reflect confidential information..." (Cheney Decl. ¶39)—her own exhibits prove otherwise

**PATTERN:** "Reflects" signals speculation masquerading as fact. Where Cheney lacks evidence, she claims documents "reflect" what she needs them to say.

**CONCLUSION:**

These are not inadvertent errors. They are systematic falsehoods in the sole evidentiary foundation for the preliminary injunction. Each false statement was material to this Court's findings. Each was provably contradicted by documentary evidence. And each demonstrates Cheney's willingness to manufacture evidence through fabrication, manipulation, and speculation.

This Court relied on the Cheney Declaration twenty-five times in its preliminary injunction order. (Dkt. 70). That foundation has collapsed.

# EXHIBIT C

# KU TERMINATION LETTER, UNREDACTED FIRST TWO PARAGRAPHS

**THE UNIVERSITY OF**
**KU KANSAS**
**Medical Center**

September 9, 2025

***VIA EMAIL AND HAND DELIVERY***

Warren Johnson
2406 Alabama St
Unit 7C
Lawrence, KS 66046
warrenvjohnson@gmail.com

Dear Warren:

This letter is a follow up to your conversation today with Cliff Michaels, where he communicated to you that the University has lost confidence in your ability to effectively perform your role as a Senior Licensing Associate for the KU Center for Technology Commercialization. Your involvement in extensive litigation related to your former employment has resulted in you being distracted from your role with KUCTC, and the outside litigation could negatively impact the reputation and credibility of the University and KUCTC. Your role with KUCTC requires that you safeguard the University's confidential information. The University is concerned by the court's determination that your prior employer will likely succeed on its claim that you misappropriated confidential information as well as the court's decision to sanction you for your litigation conduct. Accordingly, KUCTC leadership has recommended termination of your employment, and Human Resources is supportive of the recommendation.

Effective today, September 9, 2025, you are being placed on paid administrative leave, with all benefits intact, and you should not perform any further work for the university. During your leave you will not have access to the University's electronic systems, and you should not be present at University facilities and/or KUCTC offices unless specifically provided with permission to do so.





Sincerely,

Chari J. Young
Chief Human Resources Officer and Senior Vice Chancellor
University of Kansas

# EXHIBIT D

EWS BRANDING STRATEGY
PRESENTATION FROM BRYAN
CAVE CLE - CO-PRESENTED WITH
GEORGE CHEN AND PUBLICLY
AVAILABLE

https://www.acc.com/sites/default/files/2019-04/CLE%20Materials%2004.04.19%20Brand%20Protection.pdf





# Brand Protection Strategies



## April 4, 2019

## George Chen
(602) 364-7367
George.Chen@BCLPlaw.com

## Warren Johnson
(480) 426-2115
Warren.Johnson@EarlyWarning.com

 

# Brand Protection Strategies



April 4, 2019

**George Chen**
(602) 364-7367
George.Chen@BCLPlaw.com

**Warren Johnson**
(480) 426-2115
Warren.Johnson@EarlyWarning.com

---

# Agenda

- Introductions

- What Is a Brand?

- Preparing to Protect the Brand

- Strategies to Protect the Brand

- Implementing Protections for the Brand

- Q&A

 

2

# Agenda

- Introductions
- What Is a Brand?
- Preparing to Protect the Brand
- Strategies to Protect the Brand
- Implementing Protections for the Brand
- Q&A





3

# What Is a Brand?

To *protect* anything you must understand it.

- So let's understand a "brand"... Sounds simple enough
  - But is it...?
- The definition will provide the framework for what we are protecting in the first place.
- Of course the ultimate goal is protect a particular brand
  - Not all brands, just *your/my/our* brand



4

## What Is a Brand?

- A "Brand" in general – <u>the good and the bad</u>
  - Is a subjective impression that lives in the mind of consumers
  - Is *portrayed, communicated, and established* by the goods and services originating from a source ("Providers") , **but...**
  - Is <span style="color:red">actually created</span>, often unknowingly, in the mind of consumers who:
    - see the portrayals,
    - hear the communications, and
    - receive goods and services from the Providers. (arguably most important)

- THE BRAND IS IN THE EYE OF THE BEHOLDER



5

## "My" Brand

- To a **Brand Owner** the **Brand Identity** is:
  - a promise to a Consumer
    - the insurance policy for when that promise is broken.
  - something protected over time through differentiation and consistent use by the Brand Owner.
  - the first chance at getting a consumer to identify and chose the Brand's service/product over others.
  - The physical and mental availability of the Consumer while shopping –

<u>Branding is the experience made to win a piece of the Consumer's limited mental availability – Zero Sum Game if you will</u>





6

*3*



## "Their" Brand

- To a **Consumer,** the **Brand** is:
  - an identifier and source of loyalty.
  - the indicator of a strong bond the supersedes the customer merchant relationship.
  - the differentiator of one Source of goods and services from others.
  - the first impression of the quality or desirability of a product or service.
  - fairly static and requires great interaction and contemplation to build and/or change
  - a shortcut to predicting how an offered good or service will perform.

  WHERE A SATISFIED CUSTOMER MAY LEAVE, A LOYAL CUSTOMER WILL
  STAY AND REMAIN INTO THE FUTURE





8



# Brand  Trademark

- While a trademark is not a brand, it can represent one
- A trademark creates efficacy for Providers to identify a Brand
- A trademark tells a consumer the source of a good or service
- If you learn nothing else, underline this:

or more specific to our purpose

TRADEMARKS EXIST TO PROVIDE CONSUMERS A "SHORT CUT" FOR LINKING A BRAND TO A PROVIDER OF GOODS AND SERVICES

10

# Agenda

- Introductions
- What Is a Brand?
- **Preparing to Protect the Brand**
- Strategies to Protect the Brand
- Implementing Protections for the Brand
- Q&A

BRYAN
CAVE
LEIGHTON
PAISNER 

Zelle
THIS IS HOW MONEY MOVES.
EARLY WARNING

11

# Why Protect the Brand at All?

## Production in the 21st century – a growing smile

Value added

2017

1970

R&D
Design | Manufacturing | Branding
After-sales
services

Stage of production

BRYAN
CAVE
LEIGHTON
PAISNER

WORLD INTELLECTUAL PROPERTY REPORT 2017
https://www.wipo.int/edocs/pubdocs/en/wipo_pub_944_2017.pdf

Zelle
THIS IS HOW MONEY MOVES.
EARLY WARNING

12



## Country of Brands



13

---

## Preparing to Protect

- The life a Brand begins before any product or service is provided.
  - AND SO SHOULD THE PROTECTION
- To Protect a Brand is to Protect the Consumer...
- Brand protection *must* include: (normally from in-house
  - TRAINING EMPLOYEES
  - RESEARCHING THE MARKET AND COMMERCE CHANNELS
  - PRIORITIZING MARKS TO BEST PROTECT THE BRAND



14

7

## Preparing to Protect – "Best Practice"

<u>Note:</u> In reality in-house counsel may not be at the front line when it comes to releasing new Brand planning

- Nevertheless a Brand will need protection

Best Practice: (the easy way, the fairy tale way, the Disney® way [literally?])

- Trademarks – have a supply of allowed 1(b) trademark applications to chose a Brand identifier.
- Agreed upon and strategic name, logo, tagline, look and feel (Brand Identity).
- Trade Dress vs Design Patent protection decided.





15

## Preparing to Protect – "Best Practice"

- Best Practice: *(Let's keep this fantasy going)*
  - Clearance on the name is completed and the name is clear
  - Domain Names have been registered
  - Social Media handles secured
  - Whether licensing will take place has been addressed
  - Marketing portal w/ pre-designed material available for public
  - Will brand be a conglomerate or become a standard





16

8

## Prioritizing to Protect – REAL Practice

### NEVERMIND ALL THAT NOW..

### IT'S OKAY TO LAUGH AT THE "BEST PRACTICES" SLIDES... IT CAN BE FUN TO DREAM...





17

## Prioritize to Protect – REAL Practice

### WE INTERUPT YOUR FANTASY TO BRING YOU THIS FROM REALITY

WHISPERS -> "Best Practice" may as well be a law school course

Oh wait, it is!!!

TRUTH- There are constraints on our abilities such as time and space.

- Best Practice is the practice of *PRIORITIZING*.
  - Choice of mark is top priority
  - Counsel is needed to understand:
    - How the trademark will be used proper trademark use
    - Always get multiple name options from marketing (6 is good number)
    - Run searches, clearance, and register as quickly as good judgement allows





18

## Prioritize to Protect – REAL Practice

- BACK TO REALITY

Best Practice is the practice of *prioritizing*.

- Next priority is channels…. All of them: <u>INTERNAL AND EXTERNAL</u>
  - Channels/mediums of commerce for Branded good/service
    - Internet, geographic regions, store shelves, third parties, subscriptions, etc.
  - Channel of communication w/ consumers
  - Channels of inter-company communication
    - Marketing
    - Product teams
    - Communications





19

## Prioritize to Protect – REAL Practice

TRUTH - Best Practice is the practice of *prioritizing*.

- Overall Brand Protection Strategy
  - After the bare necessities of communication and identification take a step back and get organized
  - Decide on
    - House Marks being used or Sub-Marks
    - Jurisdictions to file in outside home country
    - Tagline protection
    - Domains, domains, domains, domains  - MUST HAVE A STRATEGY
    - Copyright Registrations

      BRING IT ALL TOGETHER





20

*10*

## Training to Protect – At Least 2

• There should be two mandatory trainings for any major Brand

New Employee Training
• Introduce the Brand(s), their value, and the protections used.
• Give basic Branding Guidelines and summarize why.
  • Company Values, Trademark Law, Marketing Strategy
• The Brand is sacred.
• Last but not least: the golden rule of branding.
  • TREAT OTHER'S BRANDS AS YOU WOULD WANT YOURS TREATED





21

## Training to Protect - At Least 2

• There should be two mandatory trainings for any major Brand

Heavy Training as these are the vessels through which consumers will receive the Brand Identity
  • Strict guidelines on trademark usage
  • Trademark clearance and the process of registration
  • Trademarks are to protect consumers and the brand they maintain
  • Licensing of Marks, Quality control, Approved Public facing materials
  • Exceptions are a dangerous path. Stick to the Guidelines
  • CULTURE OF CONFIDENTIALITY





22

*11*

## Research to Protect

Knowledge is your best friend for *Prioritizing*, so research

- EXTERNAL RESEARCH
  - The product/service tied to the Brand
  - Sales geography
  - Top Level Domains
  - Competing Brands
    - Copying is the most flattering... whatever. Take ideas where you can get them.
  - Technology, patents, innovation maps, current patent litigation.





23

## Research to Protect

Knowledge is your best friend for *Prioritizing*, so research

- <u>INTERNAL RESEARCH</u> is just as important if not more so.
  - Understand the overall scheme from all departments to the best of your abilities.
  - Become a liaison between technology, sales, marketing, communications, executives, and accounting.
  - Have representation in as many meetings as possible.

**THIS IS WHERE YOUR TRAINING PAYS OFF. COWORKERS CAN'T CALL UPON YOU IF THEY DON'T KNOW WHEN OR HOW.**





24

*12*

# Preparing to Protect

- Brand vs. Trademark

- Trademark
  - Anything that (1) identifies a source of products or services and (2) distinguishes the source from another source

  - Does not identify a product or service
  - Does not protect a business itself
  - Does not protect against all uses of the trademark





25

# Preparing to Protect

- Examples of trademarks
  - Words
  - Tag lines
  - Logos / designs
  - Colors
  - Sounds
  - Smells





26

# Agenda

- Introductions
- What Is a Brand?
- Preparing to Protect the Brand
- **Strategies to Protect the Brand**
- Implementing Protections for the Brand
- Q&A





27

# Strategies to Protect

BEFORE WE GET STARTED:
NEVER FORGET, AND DO NOT LET OTHERS
THAT YOU COUNSEL FORGET:

TO PROTECT YOUR BRAND IS
TO PROTECT YOUR CONSUMERS…
ALWAYS





28

*14*

## Strategies to Protect

- Referencing the *Prioritizing* section:

  - Corporate/Primary Brand Identity = House Mark/*Primary Mark*
    - Not necessary, different than a corporate/legal name
    - Most important in some cases
    - May be somewhere inbetween

  - Product/Secondary Brand Identity = Sub Brand/*Secondary Mark*
    - May be more important than the Parent





29

## Strategies to Protect - BRANDS

- Referencing the *Primary* versus *Secondary* Brands:
  - Maximum Protection
    - Every channel addressed
    - Every Protection Mechanism Used
    - Every Jurisdiction Goods and Services are Offered.

  - Secondary Protection
    - Most popular Channels
    - Strongest Mechanisms – lockups with Primary Brand Identifiers
    - Incorporated, Manufacturing, some sales areas





30

*15*

# Strategies to Protect - MARKS

- Primary Mark
  - Branding Guidelines
    - Created Clear and Enforced internally and externally
    - <u>LET THE LEGAL REQUIREMENTS OF UNFAIR COMPETITION LAW BE THE BASELINE</u>
    - MARKETING AND PRODUCT GROUPS CAN START WITH THAT AS A MINIMUM
  - Any License granted to use a Primary Mark is a lending of your Primary Brand and *consumer protection* must be accounted for… ALWAYS.
    - *must* include adherence to the Branding Guidelines
    - *must* include quality controls and oversight – review of any public facing collateral
    - *must* have consideration/value in return – don't allow use for free
- Secondary Mark





31

# Agenda

- Introductions
- What Is a Brand?
- Preparing to Protect the Brand
- Strategies to Protect the Brand
- Implementing Protections for the Brand
- Q&A





32

*16*

# Implementing Protections

- Trademark
  - Anything that (1) identifies a source of products or services and (2) distinguishes the source from another source



The Trademark Spectrum

Generic
Generic terms can't function as trademarks

Descriptive    Suggestive    Fanciful / Arbitrary

Weak    Strong

33

---

# Implementing Protections

- Trademark
  - Anything that (1) identifies a source of products or services and (2) distinguishes the source from another source

- Avoid
  - Confusion with a 3rd party trademark
  - Dilution of a 3rd party trademark
  - Suggestion of a false affiliation with a 3rd party

- Trademark searches





34

*17*

## Implementing Protections

- Federal trademark registrations
  - 15 U.S.C. § 1051 et. seq.
- State trademark registrations
  - A.R.S. § 44-1441 et. seq.
- Foreign trademark registrations
- Trademark classifications
- Trademark families





35

## Implementing Protections

- Design patents
  - Protects ornamental appearance of a product
  - 35 U.S.C. § 171 et. seq.
- Copyrights
  - Protects an original work of authorship
  - 15 U.S.C. § 101 et. seq.
- Trade dress
  - Protects the "look and feel"
  - *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992).





36



## Implementing Protections

- Domain name registrations
  - New top level domains
    - BannerHealth.info
    - ASM.biz
    - ASU.university
  - Typosquatting
    - BestWestrn.hotels
    - Carvanna.cars
  - Country codes
  - XYZsucks.com




38

## Implementing Protections

• Social media

   





39

## Implementing Protections

• Policing
  • Watch notices
  • Online search engine key words

• Licensing
  • Brand guidelines
  • Naked licensing

• Enforcing
  • Trademark oppositions
  • UDRP (Uniform Domain-Name Dispute-Resolution Policy)
  • U.S. Customs registrations
  • Litigation





40

## Implementing Protections

- Minimum advertised prices (MAP)
- Authorized dealer programs





41

## Agenda

- Introductions
- What Is a Brand?
- Preparing to Protect the Brand
- Strategies to Protect the Brand
- Implementing Protections for the Brand
- Q&A





42

*21*

# Questions?

## George Chen

602.364.7367
George.Chen@BCLPlaw.com
www.LinkedIn.com/in/ChenGeorge

Bryan Cave Leighton Paisner LLP
Two North Central Avenue, Suite 2100
Phoenix, Arizona  85004

## Warren Johnson

(480) 426-2115
Warren.Johnson@EarlyWarning.com
www.linkedin.com/in/warrenvjohnson

Early Warning Services, LLC
16552 N. 90th Street, Suite 100
Scottsdale, AZ 85260





43