**WARREN V. JOHNSON**
215 E 18th St
Lawrence, KS 66044
warrenvjohnson@gmail.com
(208) 317-1686
Defendant/Counter-Claimant, Pro Se


WARREN VURL JOHNSON
warrenvjohnson@gmail.com
215 E 18th St
Lawrence, KS 66044


**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| EARLY WARNING SERVICES, LLC<br><br>              Plaintiffs,<br>      v.<br><br>MR. WARREN V. JOHNSON;<br>BRANDON O'LOUGHLIN; P.A.Z.E.,<br>LLC<br><br>              Defendants. | Case No.: CV24-01587-PHX-SMB<br><br>**DEFENDANT WARREN JOHNSON'S EMERGENCY MOTION TO SET ASIDE DEFAULT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 55(c)** |

**DEFENDANT WARREN JOHNSON'S EMERGENCY MOTION
TO SET ASIDE DEFAULT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 55(c)**

(With Supporting Declaration of Warren V. Johnson)


## I. INTRODUCTION

Defendant Warren Vurl Johnson ("Johnson") respectfully moves this Court pursuant to Federal Rule of Civil Procedure 55(c) to set aside the default entered against him on April 22, 2026 (Dkt. 380), which struck Johnson's Answer to Complaint (Dkt. 58) and permitted Plaintiff to proceed by default. Johnson further requests that this Court restore his Answer, rule on his pending dispositive motions,

and permit this case to proceed on the merits. This motion is supported by the concurrently filed Declaration of Warren V. Johnson ("Johnson Decl.").

The default was entered because Johnson—an indigent pro se litigant residing in Lawrence, Kansas, approximately 1,200 miles from this Court—was physically and financially unable to appear at a show cause hearing in Phoenix, Arizona. Johnson informed this Court of his inability to travel and requested remote participation, which was denied without substantive ruling. See Johnson Decl. ¶¶ 3–5, Ex. A. At the time of the hearing, Johnson was subject to cumulative contempt fines of approximately $207,000 at the rate of $1,000 per day (Dkt. 243)—fines that had systematically eliminated any financial capacity he might have possessed to arrange cross-country travel. The Court imposed daily financial penalties that drained Johnson's resources, denied a routine remote appearance request, and then struck his Answer because he could not appear in person. That outcome is constitutionally untenable.

Johnson has vigorously defended this action for nearly two years across over 380 docket entries. He possesses not merely "at least some merit" in his defenses—he possesses fourteen independently meritorious defenses that collectively and individually destroy every element of Plaintiff's claims. The Ninth Circuit's strong policy favoring resolution on the merits requires that this default be set aside. *Falk v. Allen*, 739 F.2d 461, 463 (9th Cir. 1984).

## II. FACTUAL BACKGROUND

### A. Johnson's Extensive Participation in This Litigation

Johnson has been among the most active litigants on this docket. He filed an Answer (Dkt. 58), a detailed opposition to Plaintiff's Motion for Preliminary Injunction with a supporting declaration and twelve exhibits (Dkts. 24, 24-1, 24-2), a Motion for Summary Judgment, a Rule 60(b) motion, a Crime-Fraud Exception motion (Dkt. 272), a Motion to Strike the Cheney Declaration, a Motion to Disqualify Plaintiff's Counsel, a Motion for Clarification (Dkt. 53), and numerous other

substantive filings. The docket reflects over 380 entries. Johnson has consistently responded to every substantive motion.

### B. The Show Cause Hearing and Its Context

The April 22, 2026 show cause hearing (Dkt. 372) was set to address Johnson's non-compliance with a forensic imaging injunctive order requiring surrender of all digital electronic devices for imaging by Plaintiff's vendor. Johnson objected on multiple substantive grounds: **one being that the order would grant a *potential* corporate target of an active DOJ antitrust investigation (*United States v. Visa Inc.*, No. 1:24-cv-07877 (S.D.N.Y.)) unmediated access to a whistleblower's communications with federal investigators, without the protection of a Special Master or taint team**; that Plaintiff has acknowledged it does not know what trade secrets it is searching for or what it is looking for; and that the imaging order lacks search terms, protocols, or any limiting principle. Johnson is currently pursuing a contempt appeal raising these constitutional objections. The hearing thus concerned a contested legal dispute over the constitutionality of an overly broad injunctive order, not Johnson's refusal to participate in litigation.

### C. The $1,000/Day Contempt Fine and Financial Incapacitation

Since September 27, 2025, Johnson has been subject to daily contempt fines of $1,000 (Dkt. 243). By April 22, 2026, these fines had accumulated to approximately $207,000. Johnson is unemployed—the preliminary injunction (Dkt. 70) has prevented him from practicing his profession, of which this Court is aware. Johnson's financial inability to travel to Phoenix is documented in his Declaration. Johnson Decl. ¶¶ 4–6. Despite a filing freeze in this case, Johnson requested permission to appear remotely via email to the Court's deputy, and received a response on the record that did not address the substance of the request. Johnson Decl. ¶ 5, Ex. A.

This Court imposed daily financial penalties that drained Johnson's resources, denied his remote appearance request, and then struck his Answer because he could not appear in person. The Supreme Court has held that due process requires

meaningful access to the courts regardless of financial status. *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971). The Ninth Circuit has held that sanctions for inability to comply—as opposed to willful refusal—violate due process.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 55(c) provides that a court "may set aside an entry of default for good cause." The standard is liberal, and discretion is "especially broad" where no default judgment has been entered. *Westchester Fire Ins. Co. v. Mendez*, 585 F.3d 1183, 1189 (9th Cir. 2009). The Ninth Circuit applies a disjunctive three-factor test: (1) culpable conduct; (2) meritorious defense; (3) prejudice to plaintiff. The default may be set aside if any single factor favors the defendant. *United States v. Signed Pers. Check No. 730*, 615 F.3d 1085, 1091 (9th Cir. 2010).

Because the Court struck Johnson's Answer as a sanction, it must also evaluate the five *Malone* factors: (1) public interest in expeditious resolution; (2) docket management; (3) prejudice to opposing party; (4) merits preference; and (5) availability of less drastic alternatives. *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 130 (9th Cir. 1987). The fifth factor is decisive and must be expressly considered. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007).

## IV. ARGUMENT

### A. Johnson's Conduct Was Not Culpable

Culpable conduct requires "willfulness, bad faith, or fault." *TCI Grp. Life Ins. Plan v. Knoebber*, 244 F.3d 691, 697 (9th Cir. 2001). Johnson did not willfully refuse to appear. He is indigent, resides 1,200 miles from the courthouse, was subject to approximately $207,000 in cumulative contempt fines, had his employment capacity destroyed by the preliminary injunction order from this Court, requested remote participation, and has actively litigated this case for two years: *even being sanctioned for multiplying the proceedings by this Court*. His failure to appear was the product of financial and logistical impossibility, not defiance. *Brandt v. Am. Bankers Ins. Co. of*

*Fla.*, 653 F.3d 1108, 1112 (9th Cir. 2011) (inability to comply is not culpable conduct). Johnson Decl. ¶¶ 3–6.

The sealed order at Dkt. 123 found Johnson improperly disclosed confidential communications, referred him to the Arizona State Bar, and issued admonishments that crippled his professional standing.[1] The economic and professional consequences of that ruling contributed to the inability of Johnson to travel to the April 22, 2026 hearing.

The referral rested on a single premise: that the communications Johnson disclosed were "legal advice" and therefore privileged. That premise is now conclusively disproven. The same "legal advice" — EWS's trade secret identification process, indexing of inventions— had already been publicly taught by Johnson and attorneys from Bryan Cave Leighton Paisner LLP, EWS's own litigation counsel, in a CLE program publicly available through the ACC website. Johnson Decl. ¶ 15; Ex. E (General IP CLE, co-presented by Johnson and Cory Smith of Bryan Cave).

Before the bar referral, Johnson argued he had "**discussed the strategy of no trade secret indexing during a CLE presentation he made with Bryan Cave. Johnson however does not have access to those materials**." ([SEALED] Dkt 112 at pg 9 FN4) He did not yet possess the CLE exhibit, only finding those in the public domain January 2026. He was arguing from personal knowledge. He was right.

George C. Chen, whose name appears on the Cheney Declaration in this case (Dkt. 17 at 16), submitted a declaration asserting the conversation constituted

---

[1] The sealed order stated Johnson's conduct was "a dereliction of his duties," accused him of treating litigation as a "game," of "gamesmanship and other forms of underhanded strategy," and warned of a "zero-tolerance policy." [SEALED] Dkt. 123 at 9. The Court further described Johnson's admissions as "quite striking" and his decision to share information as disqualifying professional conduct. That language now rests on a premise the CLE destroys. Sharing publicly what one publicly taught with EWS's own outside counsel is not a dereliction of duty. It is exactly what Johnson said he was doing.

confidential legal advice. ([SEALED] Dkt 115-2) That declaration was false. Bryan Cave's own firm publicly distributed CLE materials covering the same subject matter Johnson was referred to the bar for discussing.

A litigant who tells the truth before he has the documentary proof, and finds the proof later, has not acted in bad faith. He has been the only honest person in the room. The bar referral and its cascading consequences — unemployment, inability to retain counsel, financial incapacity to travel — trace directly to a ruling built on a false sworn declaration. That is the context in which Johnson missed one hearing. It is not the conduct of a defiant litigant. *TCI Grp.*, 244 F.3d at 697.

### B. Johnson Has Multiple Independently Meritorious Defenses

The standard for setting aside a default under Rule 55(c) is modest: the moving party need only demonstrate "at least some merit" to a single defense. *See United States v. Signed Pers. Check No. 730 of Yubran S. Mesle*, 615 F.3d 1085, 1091 (9th Cir. 2010). Johnson presents numerous defenses that far exceed that threshold. EWS's seven-count complaint rests on a foundation that EWS itself has dismantled—in sworn discovery responses, in publicly filed CLE materials co-authored by EWS's own current counsel, and in years of performance reviews authored by its General Counsel. The Court need find merit in only one of the defenses below; the record supports every one.

### 1. Defenses to the Trade Secret Misappropriation Claims (Counts I & II – DTSA and AUTSA)

The existence of a protectable trade secret is the essential element of both federal and Arizona trade secret claims. 18 U.S.C. § 1839(3); A.R.S. § 44-401(4). Johnson's defenses demonstrate that EWS cannot establish this element—or the elements of misappropriation, reasonable measures, or damages—for any of the information it has identified. Because these two claims are the gravitational center of the entire lawsuit, defeating them alone would strip EWS of its core theory.

### a. EWS Has Confessed in Discovery That the Documents Are Not Trade Secrets, and the "Strategies" That Remain Were Publicly Taught by EWS's Own Counsel

In sworn responses to Johnson's First Set of Interrogatories, EWS identified its alleged trade secrets and then expressly disclaimed trade secret protection *in the very documents* that the Complaint and the Cheney Declaration repeatedly call the secrets:

> *"For the avoidance of doubt, EWS does not claim trade secret protection in the form of any of the aforementioned documents, but rather the underlying brand protection and business strategies reduced to writing within those documents."* EWS Resp. to Interrog. No. 1(a).

The "aforementioned documents" EWS disclaimed are the Indexes, the trademark and domain-name documents, the contracts, and the Microsoft Teams Chat—every document the Complaint and Cheney Declaration identified as misappropriated. *Compare* Compl. ¶¶ 53–55, 60–66, 73, 89–95 and Cheney Decl. ¶¶ 19, 20, 39, 45–48 *with* EWS Resp. to Interrog. No. 1(a). By its own admission, EWS's case has been reduced to undefined "underlying strategies", all of which were the product of Johnson's own expertise and knowledge, and none of which EWS may lay claim to as trade secrets.

Notwithstanding, those strategies are not secrets. On October 11, 2019, Johnson co-presented a public Continuing Legal Education program titled "Brand Protection" with George C. Chen of Bryan Cave Leighton Paisner LLP—the same George C. Chen who is counsel of record for EWS in this litigation and whose name appears on the signature block of the Cheney Declaration. Cheney Decl. (Dkt. 17) at 16. The CLE slides that Johnson and Chen jointly authored taught the audience that brand owners must "[h]ave a supply of allowed 1(b) trademark applications," that "Domain Names have been registered" as part of brand protection, and that "Domains, domains, domains, domains – MUST HAVE A STRATEGY," with discussion of typosquatting, new top-level domains, and protective registrations. 2019 CLE Slides 9, 11, 20 (Johnson Decl. Ex. E). **That CLE Is one of the most comprehensive**

**accounts of the EWS brand strategy, and Johnson's brain child while working at EWS, in existence.**

When EWS's own current counsel has publicly taught the very "underlying strategies" that EWS now claims are secret, those strategies cannot, as a matter of law, be trade secrets under 18 U.S.C. § 1839(3)(B) or A.R.S. § 44-401(4)(b). And under 18 U.S.C. § 1836(b)(3)(A)(i), no injunction may issue "merely on information the person knows"—which is all that "underlying strategies" remain once the documents are disclaimed. Both the discovery answer and the CLE are independently dispositive; together, they end the trade secret case.

### b. The Indexes Johnson's Personal Work Product and Were Never Treated as Trade Secrets

The "indices of concept briefs, invention disclosures, and trademark matters" that EWS repeatedly points to (Compl. ¶¶ 53–55; Cheney Decl. ¶ 19) are Johnson's own organizational tools. Johnson built them prior to coming to EWS, and has provided the email with the templates attached as contemporaneous evidence. (Dkt 24-2, Ex. 4) His 2014 performance review—signed by Cheney—states: "1. The indexes are created and are functioning. There is a Concept Brief Index, an Invention Disclosure Index, and a EWS Patent Index. They are located on SharePoint and tracking the inventions from all departments." (Performance Review [SEALED], Dkt 24-2, at p. 22). Every subsequent review confirms that Johnson alone maintained the indexes; Cheney herself described him as a "one man show" for IP at EWS. ([SEALED], 2019 Focal Review, *Id.* at p. 12.

Johnson holds Copyright Registrations Nos. TXu 2-519-256 and TXu 2-520-557 in the source code underlying the Indexes—prima facie evidence of ownership under 17 U.S.C. § 410(c). One cannot misappropriate works to which one holds the registered copyright, nor can one breach a fiduciary duty by retaining one's own work product.

The Indexes were never treated as company trade secrets under EWS's own internal procedures. The Innovation Incentive Policy that Johnson himself designed required that any trade secret be formally "harvested and approved," triggering a mandatory $800 "Stealth Award" and a "Trade Secret Procedures" meeting. ([SEALED] Dkt. 320 at 2; [SEALED] Dkt. 310). No such award was ever paid for the Indexes, and no meeting was ever held—conclusive proof that the company never considered them trade secrets. The misappropriation element also fails because the Complaint alleges only that Johnson emailed the Indexes to himself. Self-emailing of one's own copyrighted work product, with no further disclosure to any other person, is not "acquisition," "disclosure," or "use" by another within the meaning of 18 U.S.C. § 1839(5) or A.R.S. § 44-401(2). EWS has produced zero evidence that O'Loughlin, P.A.Z.E., or any third party ever acquired or used the Indexes.

**Shah's Declaration about the Indexes is wrong on every factual claim**: (1) filling in the indexes was not anyone's job duty, Johnson's personal tools, copyright-registered(Dkt 27-1 at ¶1); (2) they contained 92% public data, directly contradicting "much of it is confidential" (*Id.* at ¶4); (3) even if true, Shah's description that "some titles reflect trade secrets" fails the *InteliClear*[2] standard; and (4) the password was Johnson's own transparency design allowing "read only" access to anyone, not their security measure. (Dkt 24-1) Furthermore, Shah claims the "working titles of inventions**…** can disclose aspects of the underlying inventions." (Dkt 27-1 ¶5) However there were zero control measures on invention titles — the inventor came up with the title, put it on the disclosure form, and those titles appeared in reports and presentations shown broadly internally. No restricted access, no confidentiality protocol, no reasonable measures specific to titles.

---

[2] *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653 (9th Cir. 2020) expressly holds that "a claim that trade secrets are "reflected" somewhere within pages and pages of data is insufficient as a matter of law."

### c. The "Documents Relating to Domain Names" Are Overbroad and the So-Called Strategy Is Publicly Ascertainable

EWS's Complaint and Cheney Declaration use the phrase "documents relating to EWS's domain names" (Compl. ¶ 55) as a catch-all. This category is impermissibly vague—the DTSA requires identification of trade secrets with "reasonable particularity," and a generic reference to an entire class of documents, most of which involve publicly available information, does not satisfy that standard. Over the course of litigation, EWS has tried to refine this amorphous category into "marketing strategies" and "the intention to register particular domains." Cheney Decl. ¶¶ 9, 44. That refinement cannot save the claim because the underlying "strategy" is an industry-standard practice that Johnson himself taught publicly.

The exact defensive registration plan EWS calls a trade secret was presented in the 2019 CLE Johnson co-taught with George Chen. Brand Protection CLE, slides 9, 11, 20. Johnson's empirical analysis of **12,088** domain registrations linked to **2,938** Class 036 (financial services) trademarks shows that **55.4%** of industry participants register brand-plus-descriptive-term domains—precisely what EWS says was secret. Dkt. 309, ¶¶ 11–15 [SEALED]. The FDIC instructs financial institutions to acquire defensive domains. *Id.* ¶ 15, Ex. J [SEALED]. And the domain names EWS claims were secret were drawn from EWS's own published "intent to use" trademark application, making them ascertainable by anyone searching the USPTO database. Opp'n to Protective Order, Dkt. 253 at 12–14. EWS's own Complaint admits it collected 155 domain names "from public sources." Compl. ¶ 67.

EWS has also conceded the point in its own motion practice. Its Motion for Sanctions sought a finding that defendants "did not independently create EWS's trade secrets." Dkt. 225 at 15. If independent creation is possible—and EWS asked the Court to find it was not—then the information is necessarily "readily ascertainable by proper means" and outside the statutory definition of a trade secret. 18 U.S.C. § 1839(3)(B); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir.

1993). EWS's discovery responses further admit the domains are "knowledge of domain names," not trade secrets. And the publicly taught CLE, the published ITU application, and the industry data all independently prove that no secret exists.

### d. EWS Cannot Identify a Single Document That Designated Any Asserted Trade Secret

A trade secret requires "reasonable measures" to maintain secrecy. 18 U.S.C. § 1839(3)(A); A.R.S. § 44-401(4)(a). EWS has admitted it took none specific to the materials at issue. In discovery, EWS stated that "trade secrets are designated as such from their inception" by "company policy … automatically by virtue of their content," and that "no specific individuals are responsible for first 'designating' a trade secret as such." EWS Resp. to Interrog. No. 1(b). When asked to identify the persons responsible for designating information as trade secrets between September 8, 2014 and January 19, 2023, EWS left the response space blank. EWS Resp. to Interrog. No. 3(a). No statute permits trade-secret status by automatic designation. *See Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.*, 923 F. Supp. 1231, 1253–54 (N.D. Cal. 1995). A blanket rule that everything is a secret is the opposite of the "reasonable measures" the law demands.

For the record, Johnson was the person who created the trade secret intake process, oversaw it, and identified trade secrets. Johnson Dec. ¶

The single written designation EWS points to is a clause from a redacted 2017 IP Policy stating "[t]he patent database maintained by the Legal department is considered Trade Secret." EWS Resp. to Interrog. No. 2; Dkt. 28-2 at 5. EWS calls this "operative." It was not. Johnson's performance reviews, signed by Cheney each year, establish that Johnson completely redrafted the IP Policy in 2018 and authored separate, more particularized policies for trademarks, trade secrets, and domains in 2018 and 2019. See 2018–2019 Performance Reviews (Dkt 24-2, Exhibit 12 and 7 [SEALED]) (objective: "Through collaboration develop, publish, deploy, and train

EWS employees on Trade Secret Procedures and Policy.... Finalize the draft Trade Secret Policy."). By January 19, 2023, the 2017 policy was five generations stale.

Even if the 2017 clause were operative, it designates only "the patent database"—a term EWS has never defined and which predates Johnson's tenure. The Complaint and Cheney Declaration identify *five* separate tracking systems Johnson built: a Concept Brief Index, an Invention Disclosure Index, a Patent Index, a Trademark Index, and a Domain Name Index. Four of these—the Concept Brief, Invention Disclosure, Trademark, and Domain Name Indexes—have nothing to do with patents and cannot, by any reading, be a "patent database." The fifth, the Patent Index, is composed of 100% publicly available USPTO docketing information. [SEALED] Dkts. 308, [SEALED] 309. The 2017 clause designates nothing relevant: it does not cover the Teams Chat, the "underlying strategies," the trademark or domain documents, or four of the five Indexes. EWS's only written designation document, taken at face value, fails to designate the trade secrets EWS asserts. That failure is fatal to both the DTSA and AUTSA claims.

### e. The Teams Chat Is Public, Not Privileged, and Already Adjudicated Not to Be a Trade Secret

This Court has already found that "[t]he Teams Chat is undoubtedly privileged, however, it is unlikely that EWS will prove its status as a trade secret," and that "[t]he disclosure of the Teams Chat is too speculative to support finding irreparable harm … The Teams Chat does not contain trade secrets." Dkt. 70 at 10, 14 n.6. The Trademark Trial and Appeal Board, on October 1, 2024, twice ruled that EWS failed to establish privilege over the Chat. Opp. No. 91291526; Cancellation No. 92085110. Separately, the Chat has been publicly accessible on the Internet Archive's Wayback Machine since at least April 7, 2024—a fact authenticated by EWS's own exhibits to the Cheney Declaration. Cheney Decl. Ex. 14 (TTAB filing noting public availability); Ex. 16 (screenshot captured by EWS's counsel from the public website on July 10, 2024). EWS submitted takedown requests to Twitter, LinkedIn, and a

website's ISP, but never to the Internet Archive. Cheney Decl. ¶ 43. Information that has been publicly archived for years and that the owner never attempted to remove from the most accessible repository is "readily ascertainable by proper means" under 18 U.S.C. § 1839(3)(B) and A.R.S. § 44-401(4)(b). Any privilege is waived. *See Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172 (9th Cir. 2006).

Because the Chat is neither secret nor privileged, and because this Court has already so found, it cannot support the trade secret claims or any ancillary theory of harm.

### f. No Improper Means and No Damage from the Alleged Misappropriation

Johnson was EWS's sole IP counsel and the administrator of the very SharePoint systems he built. Emailing one's own work materials to a personal account, without further dissemination, is not "improper means" of acquisition under the DTSA or AUTSA. Moreover, EWS has identified no concrete harm resulting from Johnson's retention of the documents—only "speculative potential harm," which cannot satisfy the damages element. Dkt. 253 at 14; *see* 18 U.S.C. § 1836(b)(3)(B) (requiring proof of actual loss or unjust enrichment). The misappropriation claims fail for this additional, independent reason.

### 2. Defenses to the Remaining Claims

**Count III – Breach of Fiduciary Duty:** A fiduciary does not breach his duty by retaining work product that the principal directed him to create. The Indexes, including the matter-tracking list, fall squarely into that category. Moreover, because the core "trade secrets" are not protectable—for all the reasons stated above—Johnson owed no duty to keep that information secret. An employee is also entitled to retain his general skill, knowledge, and pre-existing work product. *Restatement (Third) of Agency* § 8.05. Johnson's retention and use of publicly taught strategies and his own copyrighted organizational tools cannot constitute a breach.

**Count V – Unjust Enrichment Is Preempted by AUTSA:** The Arizona Uniform Trade Secrets Act expressly "displaces conflicting tort, restitutionary, and other laws … providing civil remedies for misappropriation of a trade secret." A.R.S. § 44-407(A). EWS's unjust enrichment claim rests entirely on the same alleged misappropriation of trade secrets and cybersquatting that underlie Counts I, II, and IV. Compl. ¶ 133. This Court has already recognized that the unjust enrichment claim is "based on the same nucleus of facts" as the trade secret claims. Dkt. 141 at 12. Under controlling Arizona law, the claim is preempted and must be dismissed. *Orca Commc'ns Unlimited, LLC v. Noder*, 337 P.3d 545, 547–48 (Ariz. 2014).

**Count VI – Declaratory Judgment of Non-Infringement Lacks a Controversy:** EWS seeks a declaration that its PAZE and Z-logo marks do not infringe P.A.Z.E.'s alleged marks. But Johnson is not a party to the TTAB proceedings; P.A.Z.E., a separate entity, is. Johnson's alleged authorship of some TTAB filings does not create a "case or controversy" under Article III between EWS and Johnson individually over trademark rights. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91–92 (2013). Moreover, TTAB proceedings alone do not create the reasonable apprehension of an infringement suit necessary to sustain a declaratory judgment action. *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1162 (9th Cir. 2007); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Count VI fails for want of a justiciable controversy as to Johnson.

**Count VII – Breach of Contract Fails and Is Barred by the Settlement Release:** The breach of contract claim is premised on Johnson's alleged violation of the Intellectual Property and Confidentiality Agreement, the User Responsibility Agreement, and the Settlement Agreement, based on the same core conduct—emailing "confidential" materials to himself. Compl. ¶¶ 156–160. For the reasons stated above, the materials at issue are either not confidential (the publicly taught strategies, the publicly available Teams Chat, the readily ascertainable domain information) or are Johnson's own work product. No breach occurred.

Moreover, the Settlement Agreement that resolved Johnson's 2023 wrongful-termination action released all claims EWS had or might have had as of its effective date, August 24, 2023. Settlement Agreement, Cheney Decl. Ex. 3. EWS's own discovery confirms that it was aware of the allegedly improper emails and the domain registrations before that date. Johnson had already informed Cheney of the emails on January 19, 2023, and EWS's investigation was underway. The release therefore independently bars this claim.

### 3. The Foundation of EWS's Case—the Cheney Declaration—Is Demonstrably False

EWS's complaint and every significant motion filed to date rest on the declaration of its General Counsel, Tracy Cheney. That declaration is impeached by Cheney's own signed business records. The table below maps several of the most critical false statements to the Complaint paragraphs they support and the evidence that refutes them:

| Cheney Decl. ¶ | Complaint ¶ Supported | Refutation (Source) |
|---|---|---|
| ¶¶ 25, 32 (Johnson and O'Loughlin attended Mesa High School together) | ¶¶ 25–32 (revenge conspiracy narrative) | Written confirmation from Mesa Public Schools General Counsel that Johnson never attended Mesa High. Dkts. 135, 258. |
| ¶¶ 8, 9 (Johnson "responsible for" Paze IP advice) | ¶¶ 50, 90 | Paze did not launch until 2024, over a year after termination. The Teams Chat itself shows Johnson complaining about being excluded from Paze matters. Dkt. 135 § III.g. |
| ¶¶ 45, 46, 48 ("certain individuals"; "one of those individuals"; Johnson "enjoyed" access to a secure database) | ¶¶ 50, 60, 90, 92 (ownership and reasonable measures) | Cheney's own performance reviews call Johnson a "one man show"; the 2014 review proves Johnson built the SharePoint database and administered the security architecture. Dkt. 135 § V.e. |

| Cheney Decl. ¶ | Complaint ¶ Supported | Refutation (Source) |
|---|---|---|
| ¶¶ 50, 52 ("Restricted" data under User Responsibility Agreement) | ¶¶ 56, 92, 156–160 (Count VII URA breach) | Cheney substituted a lowercase "restricted" for the defined term "Restricted" to create an appearance of coverage. The Employee Handbook expressly disclaims any expectation of privacy in Teams chats. Dkt. 135 § III.i. |
| ¶¶ 14, 15 (CSC report, marketing correspondence about domains) | ¶¶ 14–17 | No record evidence supports these conclusory assertions. Dkt. 135 § IV.b. |
| ¶ 17 ("immediately terminated" upon discovering emails) | ¶¶ 51–53 | Cheney's "discovery" of the emails post-dated her termination decision *and pre dated it*. She references this happening twice Dkt. 135 § III.f. |
| ¶ 39 (TTAB filings "reflect" trade secrets) | ¶¶ 71–74 | The TTAB filings contain only public USPTO records, public-domain screenshots, and legal citations. Dkt. 135 § III.h. |

When the declarant's own contemporaneous records refute the central factual allegations—about ownership, reasonable measures, and the very nature of the alleged secrets—no element of EWS's case can stand.

**4. Johnson Need Only Establish One Meritorious Defense**

The foregoing demonstrates that Johnson has not one, but multiple independent, meritorious defenses to every claim EWS has asserted. Each defense alone satisfies the "at least some merit" standard under Rule 55(c). Together they establish that EWS cannot succeed on any element of any claim, that the foundational declaration on which the Court has built every order in this case is contradicted by the declarant's own signed records, and that EWS has confessed in sworn discovery that its case has been reduced to undefined "underlying strategies" that Johnson taught

publicly with EWS's own current counsel. The default should be set aside, and the case allowed to proceed on the merits.

### C. Plaintiff Would Not Be Prejudiced

Prejudice requires more than delay; it requires that the plaintiff's ability to pursue its claim will be meaningfully hindered. *TCI Grp.*, 244 F.3d at 701. Plaintiff is a multi-billion-dollar financial technology consortium represented by two major law firms. Discovery is complete. Johnson's summary judgment motion is fully briefed and pending. The case is positioned for merits resolution. The only "prejudice" Plaintiff would suffer is the requirement to prove its case on the law and the facts. That is not a cognizable harm.

If the default stands, Johnson's fourteen meritorious defenses are extinguished, his pending dispositive motions are mooted, and a multi-billion-dollar corporation obtains a judgment against an indigent pro se litigant without ever confronting the evidence that its own exhibits prove its "trade secrets" are public, its own General Counsel's declaration contains material falsities, a coordinate federal tribunal has rejected its privilege claims, and it has never submitted to a privilege examination for any of the 22 sealing orders it has obtained in this case.

### D. The Court Failed to Consider Less Drastic Alternatives

The Ninth Circuit requires express consideration of less drastic alternatives before imposing a terminating sanction. *Conn. Gen. Life Ins. Co.*, 482 F.3d at 1096. The minute entry of April 22, 2026 (Dkt. 380) contains no findings on any *Malone* factor. It does not explain why the Court struck Johnson's Answer rather than: permitting Zoom appearance (routinely used in this district under its Video Teleconferencing Policy); continuing the hearing to allow for remote arrangements; accepting a written response; imposing a lesser monetary sanction; or setting a new hearing date. The failure to consider any alternative to the ultimate sanction of striking a defendant's answer is, by itself, an abuse of discretion. *Malone*, 833 F.2d at 130.

The minute entry also simultaneously lifted the stay ordered on March 19, 2026 (Dkt. 372), permitting Plaintiff to proceed to a default prove-up without adjudicating Johnson's pending Motion for Summary Judgment, Rule 60(b) motion, Crime-Fraud motion (Dkt. 272 [SEALED]), and Motion to Disqualify Counsel for Taint. The Court has ended a case via default while five substantive motions—each capable of resolving the case or significantly altering its trajectory—remain unruled.

## V. CONCLUSION

Johnson has actively litigated this case for two years across 380-plus docket entries. He possesses fourteen independently meritorious defenses, each supported by evidence already in the record or by rulings of coordinate federal tribunals. Five pending dispositive motions—including a Motion for Summary Judgment nine months without ruling—stand ready to resolve this case on the merits. A coordinate federal tribunal has rejected Plaintiff's privilege claims. Plaintiff's own exhibits prove its "trade secrets" are publicly available. The foundational declaration of this case contains documented material falsities. This Court has entered 22 sealing orders without conducting a single privilege examination.

Johnson missed one hearing because he is indigent, resides 1,200 miles away, the Court denied his request for remote participation, and the Court's own $1,000/day contempt fines had eliminated any financial capacity to travel. The minute entry contains no findings, no *Malone* analysis, and no consideration of less drastic alternatives. Default is the most severe sanction available in civil litigation. It is not warranted here.

**WHEREFORE, Defendant Warren Johnson respectfully requests that this Court:**

1. Set aside the entry of default (Dkt. 380);

2. Reinstate Defendant's Answer to Complaint (Dkt. 58);

3. Rule on Defendant's pending Motion for Summary Judgment, Rule 60(b) Motion ([SEALED] Dkt 308, 309, 309-1), Crime-Fraud Motion ([SEALED] Dkt. 272), and Motion to Disqualify Plaintiff's Counsel.

4. Vacate or modify the $1,000/day contempt fine in light of Defendant's demonstrated indigency;

5. Permit Defendant to appear remotely at all future hearings; and

6. Grant such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 28th day of April, 2026.


/s/ Warren V. Johnson

**Warren V. Johnson**
215 E 18th St
Lawrence, KS 66044
(208) 317-1686
warrenvjohnson@gmail.com
*Defendant/Counter-Claimant, Pro Se*

**Certificate of Service**

I, Warren V. Johnson, hereby certify that on October 5, 2025, I electronically filed the foregoing DEFENDANT'S OPPOSITION TO THE MOTION TO ENTER A PROPOSED PROTECTIVE ORDER with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Respectfully submitted,

   /s/Warren V Johnson/

Warren Johnson
215 E 18th St
Lawrence, KS 66044
warrenvjohnson@gmail.com