# EXHIBIT A

# EMAIL TO DEPUTY CLERK REQUESTING REMOTE APPEARANCE

 **Gmail**

**Warren Johnson <warrenvjohnson@gmail.com>**

## Case No. CV-24-01587-PHX-SMB — Request for Remote Appearance at April 22 Hearing

1 message

**Warren Johnson** <warrenvjohnson@gmail.com>                      Mon, Apr 13, 2026 at 2:42 PM
To: Elaine Garcia <Elaine_Garcia@azd.uscourts.gov>

Dear Courtroom Deputy for Judge Brnovich,

Pursuant to the Court's filing restriction at Doc. 372, Defendant submits this administrative request for remote appearance, which does not seek substantive relief and does not constitute a motion.

I am writing to respectfully request leave to appear by video or telephone at the April 22, 2026 show cause hearing in the above-captioned case. I have been granted in forma pauperis status by both the Ninth Circuit (Case No. 25-6052, DktEntry 18.1, March 23, 2026) and the Arizona state appellate court, each independently confirming my inability to pay ordinary court costs. I reside in Lawrence, Kansas and cannot afford air travel or the multi-day drive to Phoenix. The Court's order also requires me to transport all digital electronic devices, which presents additional logistical difficulty. I respectfully ask that the Court accommodate a remote appearance.

Thank you for your time.

Warren V. Johnson

215 E 18th St

Lawrence, KS 66046

(208) 317-1686

warrenvjohnson@gmail.com

# EXHIBIT B

# LETTER FROM MESA SCHOOL DISTRICT



Legal Services
63 East Main Street #101
Mesa, Arizona 85201-7422

(480) 472-0208 | fax (480) 472-0489
www.mpsaz.org/legal

Kacey King
GENERAL COUNSEL

klking@mpsaz.org

April 29, 2025

To Whom It May Concern,

This letter is to formally confirm that there is no record of Warren V. Johnson's attendance at Mesa High School, and to verify that according to our records he did not attend Mesa High School between 1996-1999 or at any other point.

If you require any additional information, please feel free to contact me.

Sincerely,

Kacey King
General Counsel

# EXHIBIT C

# BRANDING CLE PRESENTATION FROM ACC WEBSITE





# Brand Protection Strategies



April 4, 2019

## George Chen
(602) 364-7367
George.Chen@BCLPlaw.com

## Warren Johnson
(480) 426-2115
Warren.Johnson@EarlyWarning.com

 

# Brand Protection Strategies



April 4, 2019

**George Chen**
(602) 364-7367
George.Chen@BCLPlaw.com

**Warren Johnson**
(480) 426-2115
Warren.Johnson@EarlyWarning.com

---

# Agenda

- Introductions
- What Is a Brand?
- Preparing to Protect the Brand
- Strategies to Protect the Brand
- Implementing Protections for the Brand
- Q&A

 

2

*1*

# Agenda

- Introductions
- **What Is a Brand?**
- Preparing to Protect the Brand
- Strategies to Protect the Brand
- Implementing Protections for the Brand
- Q&A





3

# What Is a Brand?

To *protect* anything you must understand it.

- So let's understand a "brand"… Sounds simple enough
  - But is it…?
- The definition will provide the framework for what we are protecting in the first place.
- Of course the ultimate goal is protect a particular brand
  - Not all brands, just *your/my/our* brand





4

*2*

## What Is a Brand?

- A "Brand" in general – <u>the good and the bad</u>
  - Is a subjective impression that lives in the mind of consumers
  - Is *portrayed, communicated, and established* by the goods and services originating from a source ("Providers") , **but...**
  - Is **actually created**, often unknowingly, in the mind of consumers who:
    - see the portrayals,
    - hear the communications, and
    - receive goods and services from the Providers. (arguably most important)

- THE BRAND IS IN THE EYE OF THE BEHOLDER



Zelle
THIS IS HOW MONEY MOVES .
EARLY WARNING®

5

## "My" Brand

- To a **Brand Owner** the **Brand Identity** is:
  - a promise to a Consumer
    - the insurance policy for when that promise is broken.
  - something protected over time through differentiation and consistent use by the Brand Owner.
  - the first chance at getting a consumer to identify and chose the Brand's service/product over others.
  - The physical and mental availability of the Consumer while shopping –

<u>Branding is the experience made to win a piece of the Consumer's limited mental availability – Zero Sum Game if you will</u>





Zelle
THIS IS HOW MONEY MOVES .
EARLY WARNING®

6

*3*



## "Their" Brand

- To a **Consumer**, the **Brand** is:
  - an identifier and source of loyalty.
  - the indicator of a strong bond the supersedes the customer merchant relationship.
  - the differentiator of one Source of goods and services from others.
  - the first impression of the quality or desirability of a product or service.
  - fairly static and requires great interaction and contemplation to build and/or change
  - a shortcut to predicting how an offered good or service will perform.

  WHERE A SATISFIED CUSTOMER MAY LEAVE, A LOYAL CUSTOMER WILL STAY AND REMAIN INTO THE FUTURE





8

*4*



# What Your Brand Really is...

---

# Brand  Trademark

- While a trademark is not a brand, it can represent one
- A trademark creates efficacy for Providers to identify a Brand
- A trademark tells a consumer the source of a good or service
- If  you learn nothing else, <u>learn this</u>:

or more specific to our purpose

<u>TRADEMARKS EXIST TO PROVIDE CONSUMERS A "SHORT CUT" FOR LINKING A BRAND TO A PROVIDER OF GOODS AND SERVICES</u>

# Agenda

- Introductions
- What Is a Brand?
- Preparing to Protect the Brand
- Strategies to Protect the Brand
- Implementing Protections for the Brand
- Q&A



11

# Why Protect the Brand at All?

**Production in the 21st century – a growing smile**

Value added

2017
1970

R&D Design | Manufacturing | Branding After-sales services

Stage of production

WORLD INTELLECTUAL PROPERTY REPORT 2017
https://www.wipo.int/edocs/pubdocs/en/wipo_pub_944_2017.pdf

12



## Preparing to Protect

- The life a Brand begins before any product or service is provided.
  - AND SO SHOULD THE PROTECTION
- To Protect a Brand is to Protect the Consumer...
- Brand protection *must* include: (normally from in-house
  - TRAINING EMPLOYEES
  - RESEARCHING THE MARKET AND COMMERCE CHANNELS
  - PRIORITIZING MARKS TO BEST PROTECT THE BRAND





## Preparing to Protect – "Best Practice"

<u>Note:</u> In reality in-house counsel may not be at the front line when it comes to releasing new Brand planning

- **Nevertheless a Brand will need protection**

Best Practice: (the easy way, the fairy tale way, the Disney® way [literally?])

- Trademarks – have a supply of allowed 1(b) trademark applications to chose a Brand identifier.
- Agreed upon and strategic name, logo, tagline, look and feel (Brand Identity).
- Trade Dress vs Design Patent protection decided.





15

## Preparing to Protect – "Best Practice"

- Best Practice: *(Let's keep this fantasy going)*
  - Clearance on the name is completed and the name is clear
  - Domain Names have been registered
  - Social Media handles secured
  - Whether licensing will take place has been addressed
  - Marketing portal w/ pre-designed material available for public
  - Will brand be a conglomerate or become a standard





16

*8*

## Prioritizing to Protect – REAL Practice

# NEVERMIND ALL THAT NOW..

# IT'S OKAY TO LAUGH AT THE "BEST PRACTICES" SLIDES… IT CAN BE FUN TO DREAM…





17

---

## Prioritize to Protect – REAL Practice

### WE INTERUPT YOUR FANTASY TO BRING YOU THIS FROM REALITY

WHISPERS -> "_Best Practice_" may as well be a law school course
Oh wait, it is!!!

<u>TRUTH-</u> There are constraints on our abilities such as time and space.

- Best Practice is the practice of _PRIORITIZING_.
  - Choice of mark is top priority
  - Counsel is needed to understand:
    - How the trademark will be used proper trademark use
    - <u>Always</u> get multiple name options from marketing (6 is good number)
    - Run searches, clearance, and register as quickly as good judgement allows





18

9

# Prioritize to Protect – REAL Practice

- BACK TO REALITY

Best Practice is the practice of *prioritizing.*
- Next priority is channels…. All of them: <u>INTERNAL AND EXTERNAL</u>
  - Channels/mediums of commerce for Branded good/service
    - Internet, geographic regions, store shelves, third parties, subscriptions, etc.
  - Channel of communication w/ consumers
  - Channels of inter-company communication
    - Marketing
    - Product teams
    - Communications





19

# Prioritize to Protect – REAL Practice

TRUTH - Best Practice is the practice of *prioritizing.*
- Overall Brand Protection Strategy
  - After the bare necessities of communication and identification take a step back and get organized
  - Decide on
    - House Marks being used or Sub-Marks
    - Jurisdictions to file in outside home country
    - Tagline protection
    - Domains, domains, domains, domains  - MUST HAVE A STRATEGY
    - Copyright Registrations

    **BRING IT ALL TOGETHER**





20

*10*

## Training to Protect – At Least 2

- There should be two mandatory trainings for any major Brand

New Employee Training
- Introduce the Brand(s), their value, and the protections used.
- Give basic Branding Guidelines and summarize why.
  - Company Values, Trademark Law, Marketing Strategy
- The Brand is sacred.
- Last but not least: the golden rule of branding.
  - TREAT OTHER'S BRANDS AS YOU WOULD WANT YOURS TREATED





21

## Training to Protect - At Least 2

- There should be two mandatory trainings for any major Brand

Heavy Training as these are the vessels through which consumers will receive the Brand Identity
  - Strict guidelines on trademark usage
  - Trademark clearance and the process of registration
  - Trademarks are to protect consumers and the brand they maintain
  - Licensing of Marks, Quality control, Approved Public facing materials
  - Exceptions are a dangerous path. Stick to the Guidelines
  - CULTURE OF CONFIDENTIALITY





22

*11*

## Research to Protect

Knowledge is your best friend for *Prioritizing*, so research

- EXTERNAL RESEARCH
  - The product/service tied to the Brand
  - Sales geography
  - Top Level Domains
  - Competing Brands
    - Copying is the most flattering… whatever. Take ideas where you can get them.
  - Technology, patents, innovation maps, current patent litigation.





23

## Research to Protect

Knowledge is your best friend for *Prioritizing*, so research

- <u>INTERNAL RESEARCH</u> is just as important if not more so.
  - Understand the overall scheme from all departments to the best of your abilities.
  - Become a liaison between technology, sales, marketing, communications, executives, and accounting.
  - Have representation in as many meetings as possible.

**THIS IS WHERE YOUR TRAINING PAYS OFF. COWORKERS CAN'T CALL UPON YOU IF THEY DON'T KNOW WHEN OR HOW.**





24

*12*

# Preparing to Protect

- Brand vs. Trademark

- Trademark
  - Anything that (1) identifies a source of products or services and (2) distinguishes the source from another source

  - Does not identify a product or service
  - Does not protect a business itself
  - Does not protect against all uses of the trademark





25

# Preparing to Protect

- Examples of trademarks
  - Words
  - Tag lines
  - Logos / designs
  - Colors
  - Sounds
  - Smells





26

*13*

# Agenda

- Introductions
- What Is a Brand?
- Preparing to Protect the Brand
- **Strategies to Protect the Brand**
- Implementing Protections for the Brand
- Q&A





27

---

## Strategies to Protect

<u>BEFORE WE GET STARTED:
NEVER FORGET, AND DO NOT LET OTHERS
THAT YOU COUNSEL FORGET:</u>

TO PROTECT YOUR BRAND IS
TO PROTECT YOUR CONSUMERS…
ALWAYS





28

*14*

## Strategies to Protect

- Referencing the *Prioritizing* section:

  - Corporate/**Primary Brand** Identity = House Mark/***Primary* Mark**
    - Not necessary, different than a corporate/legal name
    - Most important in some cases
    - May be somewhere inbetween

  - Product/**Secondary Brand** Identity = Sub Brand/***Secondary* Mark**
    - May be more important than the Parent





29

## Strategies to Protect - BRANDS

- Referencing the *Primary* versus *Secondary* Brands:
  - **Maximum Protection**
    - Every channel addressed
    - Every Protection Mechanism Used
    - Every Jurisdiction Goods and Services are Offered.

  - **Secondary Protection**
    - Most popular Channels
    - Strongest Mechanisms – lockups with Primary Brand Identifiers
    - Incorporated, Manufacturing, some sales areas





30

*15*

## Strategies to Protect - MARKS

- Primary Mark
  - Branding Guidelines
    - Created Clear and Enforced internally and externally
    - <u>LET THE LEGAL REQUIREMENTS OF UNFAIR COMPETITION LAW BE THE BASELINE</u>
    - MARKETING AND PRODUCT GROUPS CAN START WITH THAT AS A MINIMUM
  - Any License granted to use a Primary Mark is a lending of your Primary Brand and *consumer protection* must be accounted for… ALWAYS.
    - *must* include adherence to the Branding Guidelines
    - *must* include quality controls and oversight – review of any public facing collateral
    - *must* have consideration/value in return – don't allow use for free
- Secondary Mark





31

## Agenda

- Introductions

- What Is a Brand?

- Preparing to Protect the Brand

- Strategies to Protect the Brand

- **Implementing Protections for the Brand**

- Q&A





32

*16*



# Implementing Protections

- Trademark
  - Anything that (1) identifies a source of products or services and (2) distinguishes the source from another source

**The Trademark Spectrum**

Generic — Descriptive — Suggestive — Fanciful / Arbitrary

Generic terms can't function as trademarks

Weak ← → Strong

33

---

# Implementing Protections

- Trademark
  - Anything that (1) identifies a source of products or services and (2) distinguishes the source from another source

- Avoid
  - Confusion with a 3rd party trademark
  - Dilution of a 3rd party trademark
  - Suggestion of a false affiliation with a 3rd party

- Trademark searches

34

*17*

## Implementing Protections

- Federal trademark registrations
  - 15 U.S.C. § 1051 et. seq.
- State trademark registrations
  - A.R.S. § 44-1441 et. seq.
- Foreign trademark registrations
- Trademark classifications
- Trademark families





35

## Implementing Protections

- Design patents
  - Protects ornamental appearance of a product
  - 35 U.S.C. § 171 et. seq.
- Copyrights
  - Protects an original work of authorship
  - 15 U.S.C. § 101 et. seq.
- Trade dress
  - Protects the "look and feel"
  - *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992).





36

*18*



## Implementing Protections

- Domain name registrations
  - New top level domains
    - BannerHealth.info
    - ASM.biz
    - ASU.university
  - Typosquatting
    - BestWestrn.hotels
    - Carvanna.cars
  - Country codes
  - XYZsucks.com




*19*

## Implementing Protections

- Social media

   





39

## Implementing Protections

- Policing
  - Watch notices
  - Online search engine key words
- Licensing
  - Brand guidelines
  - Naked licensing
- Enforcing
  - Trademark oppositions
  - UDRP (Uniform Domain-Name Dispute-Resolution Policy)
  - U.S. Customs registrations
  - Litigation





40

*20*

## Implementing Protections

- Minimum advertised prices (MAP)
- Authorized dealer programs





41

## Agenda

- Introductions
- What Is a Brand?
- Preparing to Protect the Brand
- Strategies to Protect the Brand
- Implementing Protections for the Brand
- Q&A





42

*21*

# Questions?

### George Chen

602.364.7367
George.Chen@BCLPlaw.com
www.LinkedIn.com/in/ChenGeorge

**Bryan Cave Leighton Paisner LLP**
Two North Central Avenue, Suite 2100
Phoenix, Arizona  85004



### Warren Johnson

(480) 426-2115
Warren.Johnson@EarlyWarning.com
www.linkedin.com/in/warrenvjohnson

**Early Warning Services, LLC**
16552 N. 90th Street, Suite 100
Scottsdale, AZ 85260



43

*22*

# EXHIBIT D

# GENERAL IP CLE PRESENTAION FROM ACC WEBSITE

# EXHIBIT E

CLE PRESENTATION GIVEN BY DEFENDANT WITH BRYAN CAVE - PUBLICLY AVAILABLE VIA ACC WEBSITE

https://www.acc.com/sites/default/files/2023-01/CLE%20Materials%20Genersl%20Issues%20in%20IP.pdf



# General Issues in IP:
# Trade Secrets, Patents,
# Trademarks & Copyrights


Association of Corporate Counsel

## August 30, 2022

| Cory Smith | Warren Johnson |
|---|---|
| **BCLP** | **Early Warning Services** |
| (602) 364-7442 | (480) 426-2115 |
| Cory.Smith@BCLPlaw.com | Warren.Johnson@EarlyWarning.com |

© 2022  Bryan Cave Leighton Paisner LLP.  All Rights Reserved.

# When IP?

- TWO MAIN AREAS OF *EVERY* BUSINESS WHERE IP CAN BE MOST EFFECTIVE:
  - THE BRAND – "Branding is an ongoing process of looking at your company's past and present…and then creating a cohesive personality for the company and its products going forward."
    **\*ONE OF MANY DEFINITIONS OF THE "BRAND"**

  - INNOVATIONS AND TECH – NEW METHODS, IDEAS OR PRODUCTS; INTERNAL OR CONSUMER FACING; SLIGHT IMPROVEMENTS TO CURRENT PRODUCTS/SERVICES, R&D, ETC.

- INTELLECTUAL PROPERY PAYS OFF IN THE LONG RUN, IT PROTECTS THE ADVANTAGES CREATED BY ALL THE WORK AND EFFORT PUT INTO THE ABOVE…. LET ME SHOW YOU.

© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.

# Who Doesn't Like a Matrix



© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.



© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.



© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.

# Definitions

1. **TRADE SECRET** – any information used in business that gives a competitive advantage over those who do not know the information, and that the owner has taken reasonable steps to keep secret.

2. **PATENT** – the right to exclude others from making, using, selling, and importing your claimed invention.

3. **COPYRIGHT** – the right of an author of a work to control the copying, modifying, distributing, publicly displaying, and publicly performing of the work.

4. **TRADEMARK** – a name or symbol (or domain name) used to identify the source for goods or services.

BRYAN CAVE LEIGHTON PAISNER **BLP**

© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.

# Intellectual Property

TRADEMARKS

PATENTS

COPYRIGHTS

TRADE SECRETS

**Confidential Proprietary Top Secret**

BRYAN CAVE LEIGHTON PAISNER **BLP**

© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.

## Scope

A "TRADE SECRET" is:

1) **any information** (including a formula, pattern, compilation, program, device, method, technique, or process),

2) **used** in one's business,

3) that provides a **competitive advantage** over those who do not know the secret(s), and

4) the owner has taken **reasonable measures** to keep secret.



© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.   10

---

## Trade Secrets

- Can last forever if kept secret
- Examples
  - Customer lists
  - Supplier lists
  - Product formulas
  - Process of formulating test questions
  - A set of pre-packaged software modules and graphics from specific vendors
  - Computer troubleshooting manuals
  - Manufacturing processes
  - Software sub-routines
  - Pricing methods



© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.   11

# How to Commit Trade Secret Misappropriation

Types of Trade Secret Misappropriation:

1. Acquired through "improper means"
2. Unauthorized use or disclosure
3. Use or disclosure with <u>knowledge</u> that secret was:
   - Acquired by improper means,
   - Disclosed in violation of a duty to keep secret, OR
   - Acquired by accident or mistake.

"Improper means" include theft, bribery, misrepresentation, electronic espionage, *etc.*, but does NOT include independent invention, reverse engineering, or observing public use, display, or publication.

© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.

BRYAN CAVE LEIGHTON PAISNER

12

# How to Commit Trade Secret Misappropriation



© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.

13

BRYAN CAVE LEIGHTON PAISNER

# How to Protect Trade Secrets

- Identify and Mark Trade Secrets
  - Identify particular types of information that give a competitive advantage
  - Mark documents with confidential legend on each page in header/footer
  - Catalog trade secrets



© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.
16

# How to Protect Trade Secrets

- Physical Security
  - Access to grounds and buildings
  - Restrict who can visit
  - Require badges for employees
  - Require badges for visitors
  - Visitor Log
  - Escort visitors through premises



© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.
17

# How to Protect Trade Secrets

- Limited Access Procedures
  - Locked files
  - Password-protected files
  - Trade secrets available to employees only on a need-to-know basis
  - Secure waste receptacles for disposal of confidential information
  - For certain key trade secrets
    - Keep printed original documents in bound form
    - Have custodian of documents
    - Can be signed out only to those with access rights
    - Restrict copying or taking off site

© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.

BRYAN CAVE LEIGHTON PAISNER

---

# How to Protect Trade Secrets

- Agreements
  - Confidentiality and Non-Disclosure Agreements
    - Include both disclosure and use restrictions
  - Customer and Supplier Agreements
  - Employee and Contractor Agreements
    - Prior Employer Confidential Information
    - Non-Compete Restrictions (current & prior employer)
    - Non-Solicitation / Non-Hiring / Non-Interference Restrictions (customer, vendor, employee)
    - Entrance and Exit Interviews
      - Confirm confidentiality obligations
      - Ensure return of confidential materials

© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.

BRYAN CAVE LEIGHTON PAISNER

# Lost Trade Secrets

- Examples of trade secrets lost through inadequate protections:
    - Former employee used manufacturer's customer lists, but the manufacturer did not have NDAs with its marketing reps.
    - Former employee used manufacturer's processes, customer lists, and supplier lists, which were provided only on a need-to-know basis, but were not marked confidential.
    - Former employee used manufacturer's designs, but despite NDA, designs were not marked confidential, were discarded in trash rather than shredded, and were kept in unsecured areas with lax visitor policies.
    - Parts supplier went to great lengths to preserve secrecy among its employees, but customers who toured its facility were not required to sign confidentiality agreements.

BRYAN CAVE LEIGHTON PAISNER BLP

© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.    20



© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.

## Do Your Part to Protect Trade Secrets

- THE CULTURE OF CONFIDENTIALITY
  - ALWAYS BE AWARE OF WHAT YOU ARE TALKING ABOUT AND TO WHOM
  - IF THERE IS *ANY DOUBT* CONTACT YOUR IP EXPERT
  - "NEED TO KNOW" CULTURE, DOESN'T MATTER WHO THEY ARE OR WHAT THEY CLAIM THEY ARE DOING, THEY DON'T NEED TO KNOW

- TRUST AN NDA....? I DON'T THINK SO....
  - SOME TRADE SECRETS ARE SO VALUABLE AND SO REVERSE ENGINEER-ABLE THAT THERE IS NOTHING TO SAY BUT **"NO"**

  EXAMPLES: AT EARLY WARNING IT IS OUR MODELS, SEGMENTATION TECHNIQUES, THE DATA ATTRIBUTES USED, AND OUR FUZZY LOGIC, ETC.



© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.    22

---

## EXAMPLES – losses from T. S. Theft ~ $200-600 Billion Yearly (1-3% of GDP)

- The Masters of the Secret

- Coca Cola
- Google Search Algorithm
- Baseball rubbing mud
- KFC
- NY Times Best Seller
- Listerine
  - Even after it became public the royalties were not negated because they were contractual
- Twinkles
- WD-40

- Berglas Effect Card Trick
- Plasma Screens (stolen from Samsung)
- DuPont
  - The layout of their manufacturing facilities
  - The chemistry, the mixing, etc.
- Big Mac Special Sauce
- Symbols on Led Zeppelin's Album

© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.



© 2022  Bryan Cave Leighton Paisner LLP.  All Rights Reserved.

## Patent Rights

- Definition
    - The right to <u>exclude</u> others from:
        - ➤ Making
        - ➤ Using
        - ➤ Selling
        - ➤ Importing
- A "negative monopoly"



© 2022  Bryan Cave Leighton Paisner LLP.  All Rights Reserved.









## Trademark VS Corporate Entity

**ADJECTIVE     VS     PROPER NOUN**

<u>TRADEMARK</u> (adjective): a distinctive, source identifying mark *associated* with goods and/or services.

Corporate Entity – Legally identified as a name of a corporate entity

Trademark – Legally identified as a descriptor of goods and services

Example: **Harley Davidson, LLC** *versus*
                        **Harley Davidson® Motorcycle**
Or: Early Warning Services, LLC *versus* Early Warning®



© 2022  Bryan Cave Leighton Paisner LLP. , All Rights Reserved.    48

---

## Audience Participation...

- Think about your company's name... then think about your company's brand
- The brand should represent the totality of your company: the culture, the products, the customer service, the employees activities, associations, etc.
- Now think about you company's trademarks: product names, the name of the company, a service's name
- Note how the Brand is triggered by the trademarks and not necessarily the company name
- This is why trademark consistency and clarity is so important, to build the bond with the customer



© 2022  Bryan Cave Leighton Paisner LLP.  All Rights Reserved.    49

## Fair Use is an Option....

### Again, Infringement Yes, Illegal No... Competitive Marketing

  

With Comparative marketing the trademark is being used properly, to reference the source of the product being compared.
This is okay when <u>done in moderation</u>...notice there is not "Coke-a-Cola" on the can. One must be careful even when fairly using *the most trusted brand in the world.*

© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.

BRYAN CAVE LEIGHTON PAISNER **BLP**

---

## Trademark Practical Tips

- Offensive
  - Identify all brands / trademarks
  - Apply for a trademark registration to prevent others from using a confusingly similar trademark
  - Build strong recognition for the trademark
  - Register domain names & social medial accounts
  - Police the marketplace, including on the Internet
- Defensive
  - Avoid confusion with other brands/trademarks
  - Avoid dilution with other brands/trademarks
  - Do not suggest a false connection with another company

© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.

BRYAN CAVE LEIGHTON PAISNER **BLP**



## Copyright Rights

- The right to do and authorize others to do:
  - Copying
  - Preparing derivative works
  - Distributing
  - Publicly performing
  - Publicly displaying

© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.



55

# Copyright Practical Tips

- Offensive
  - Review all significant works of authorship
  - Consider applying for a copyright registration before or soon after publication
- Defensive
  - Employment agreements should prohibit use of former employer's copyrights
  - Do not copy or be "inspired by" other works
  - Document independent creation
  - Innocence is the best defense



© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.    66

# Questions?

| Cory Smith | Warren Johnson |
|---|---|
| Bryan Cave Leighton Paisner LLP | Early Warning Services, LLC |
| 602.364.7442 | 480.426.2115 |
| Cory.Smith@BCLPlaw.com | Warren.Johnson@EarlyWarning.com |
| www.LinkedIn.com/in/cory-smith-2710566 | www.linkedin.com/in/warrenvjohnson |



© 2022 Bryan Cave Leighton Paisner LLP. All Rights Reserved.    67

# EXHIBIT E

# ORDER DENYING REMOTE APPEARANCE

| | | |
|---|---|---|
| 04/11/2026 | 377 | RESPONSE TO ORDER TO SHOW CAUSE re: 372 Order to Show Cause,,,, Case Stayed,,, by Defendant Warren Vurl Johnson. (Attachments: # 1 Exhibit Exhibit 1 – 4 Supporting Response, # 2 Exhibit Exhibit 5 Supporting Response, # 3 Exhibit Exhibits 1 – 6 Supporting Response)(Johnson, Warren Vurl) (Entered: 04/11/2026) |
| 04/13/2026 | 378 | ORDER The Court has reviewed Defendant Johnson's Response to Order to Show Cause (Doc. 377 ). The substance of the response will be considered at the hearing. However, Defendant Johnson included a request to vacate the April 22, 2026 hearing and that request will be denied. In addition, the Court received an informal request from Defendant Johnson to appear remotely at the April 22, 2026 which will also be denied. IT IS ORDERED denying Defendant Johnson's motion to vacate the April 22, 2026, hearing and Defendant Johnson's request to appear by video or telephone. Ordered by Judge Susan M. Brnovich on 4/13/2026. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (ESG) (Entered: 04/13/2026) |
| 04/14/2026 | 379 | Emergency MOTION to Seal Document 377 Response to Order to Show Cause, by Early Warning Services LLC. (Attachments: # 1 Proposed Order)(Adams, Kristin) (Entered: 04/14/2026) |
| 04/14/2026 | 380 | NOTICE re: Expedited Consideration by Early Warning Services LLC re: 379 Emergency MOTION to Seal Document 377 Response to Order to Show Cause, . (Adams, Kristin) (Entered: 04/14/2026) |
| 04/16/2026 | 381 | RESPONSE in Opposition re: 379 Emergency MOTION to Seal Document 377 Response to Order to Show Cause, filed by Warren Vurl Johnson. (Johnson, Warren Vurl) (Entered: 04/16/2026) |
| 04/20/2026 | 382 | NOTICE re: Notice Defedant NonAppearance_April 22 by Warren Vurl Johnson . (Johnson, Warren Vurl) (Entered: 04/20/2026) |
| 04/22/2026 | 383 | MINUTE ENTRY for proceedings held on 4/22/2026 before Judge Susan M. Brnovich: This is the time set for Show Cause Hearing. Defendant Johnson having failed to appear and upon request from Plaintiff, IT IS ORDERED striking Defendant Johnson's Answer to Complaint (Docs. 58 ) and allowing Plaintiff to proceed by default. LATER: IT IS FURTHER ORDERED lifting the stay ordered on March 19, 2026 (Doc. 372). <br><br> APPEARANCES: Kristin Adams for Plaintiff. (Court Reporter Christine Coaly) Hearing held 10:04 AM to 10:08 AM. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (ESG) (Entered: 04/22/2026) |

# EXHIBIT F

# COPYRIGHT REGISTRATIONS FOR INDEXES

**Registration Number**

# TXu 2-519-256

**Effective Date of Registration:**
December 30, 2025
**Registration Decision Date:**
January 13, 2026

## Title

**Title of Work:**    Invention Disclosure Workflow Assist

## Completion/Publication

**Year of Completion:**    2014

## Author

- **Author:**    Warren Johnson
  **Author Created:**    computer program
  **Citizen of:**    United States
  **Domiciled in:**    United States

## Copyright Claimant

**Copyright Claimant:**    Warren Johnson
215 E 18th, Lawrence, KS, 66044, United States

## Limitation of copyright claim

**Material excluded from this claim:**    User-entered data, public domain formulas, abstract functionality, and general spreadsheet layout or design elements.

**New material included in claim:**    computer program

## Rights and Permissions

**Name:**    Warren Johnson
**Email:**    warrenvjohnson@gmail.com
**Telephone:**    (208)317-1686

## Certification

**Name:**    Warren V. Johnson

Page 1 of 2

**Date**:    December 16, 2025

**Correspondence:**    Yes

**Registration Number**

# TXu 2-520-557

**Effective Date of Registration:**
January 09, 2026
**Registration Decision Date:**
January 20, 2026

## Title

**Title of Work:** Intellectual Property General Matter Management System

## Completion/Publication

**Year of Completion:** 2014

## Author

- **Author:** Warren Johnson
  **Author Created:** computer program
  **Citizen of:** United States
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** Warren Johnson
215 E 18th St, Lawrence, KS, 66044

## Certification

**Name:** Warren Johnson
**Date:** January 09, 2026

**Correspondence:** Yes

# EXHIBIT G

# EWS DISCLAIMING TRADE SECRETS AND FALSE DISCOVERY RESPONSES

## SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

EWS has undertaken reasonable efforts to respond to the Interrogatories propounded by Johnson as EWS understands and interprets the Interrogatories, and to the extent that they call for information that is not otherwise privileged or objectionable. If Johnson subsequently asserts a different valid interpretation, EWS reserves the right to supplement its responses and objections.

EWS's responses to these Interrogatories are based on facts presently known to EWS. EWS's investigation, including the review of its own files, is continuing, and EWS may subsequently learn additional facts or uncover additional information or documents in its possession. EWS reserves the right to rely upon all such evidence that may become available during the course of discovery and trial preparation and to use the same at trial or otherwise in this action. EWS, however, undertakes no duty to supplement its responses or objections beyond what is required by the Federal Rules of Civil Procedure, the Local Rules, and applicable law.

**Category A: Trade Secret Classification & Protection**

**INTERROGATORY NO. 1:** Identify all information Plaintiff contends constitutes trade secrets allegedly misappropriated by Johnson, including for each item:

- o The date it was first designated as a trade secret
- o The person(s) who made that designation
- o Any document memorializing that designation

**RESPONSE:**

EWS objects to Interrogatory No. 1 on the ground that it is compound and contains at least three (3) discrete subparts, insofar as it seeks identification of [1(a)] all trade secrets EWS alleges Johnson misappropriated; [1(b)] the date and persons who designated EWS's trade secrets as trade secrets; and [1(c)] any documents memorializing that designation.

EWS further objects to Interrogatory No. 1 on the ground that it seeks the disclosure of information protected by the attorney-client privilege, the attorney

19

work-product doctrine, the common-interest doctrine, or any other applicable privilege or immunity, or that are otherwise protected from disclosure under Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules, or the relevant case law. EWS further objects to Interrogatory No. 1(a) on the grounds that it seeks Highly Confidential – Trade Secret (as defined in EWS's proposed Protective Order) and sensitive information subject to EWS's proposed Protective Order, which remains pending before the Court. *See* Dkts. 241, 253, 256, 258. Pending decision by the Court and prior to the entry of a Protective Order in this litigation, EWS will not produce confidential information concerning its trade secrets responsive to this Interrogatory to any unrepresented party because Defendants, including Johnson, have repeatedly misused and demonstrated complete disregard for EWS's confidential and trade secret information. *See* Dkt. 241 at 5-6. Once a Protective Order issues or the parties reach mutual resolution on the protections for confidential documents produced in this litigation, EWS will produce such documents or information in accordance therewith.

EWS further objects to Interrogatory Nos. 1(b) and 1(c) on the grounds that they seek information not relevant to any claim or defense asserted in this action and are disproportionate to the needs of the case. Whether EWS ever "designated" EWS's trade secrets as trade secrets, the date of said "designation," and the identity of the individual who made the official designation, if any, has no bearing on whether EWS's claimed trade secrets meet the legal standard for trade secrets. *7EDU Impact Acad. Inc. v. You*, 760 F. Supp. 3d 981, 996 (N.D. Cal. 2024) (finding plaintiff sufficiently alleged its documents were trade secrets even though the documents were not "label[ed], marked, or identified in any fashion as 'trade secret' or even 'confidential'"). EWS further objects to this Interrogatory as overly broad, unduly burdensome, and not proportionate to the needs of the case because it seeks the identification of "any" and all documents memorializing that designation over the life of each trade secret, spanning multiple years. Such request requires EWS to

20

exhaustively review, determine, and produce each and every document memorializing such designation. Moreover, EWS is under no obligation to identify documents with duplicative or cumulative information as to the designation of the same trade secrets as trade secrets. EWS will respond to Interrogatory No. 1(c) to identify documents sufficient to demonstrate the memorialization of designations of information identified in response to Interrogatory No. 1(a) to the extent such designation is reduced to written form, kept in the ordinary course, identified after a good-faith, reasonable, and proportionate search, and after a protective order is entered. EWS further objects that this Interrogatory is premature because discovery is ongoing and the full scope of the trade secrets taken by Johnson from EWS is not yet known because Johnson—not EWS—is in exclusive possession, custody, and control of the information concerning all trade secrets that he took and thus, which trade secrets are at issue in this litigation. Johnson is in contempt of court for failing to provide his devices that, *inter alia*, may contain EWS's trade secret information. Dkt. 243. Johnson's refusal to return EWS's trade secret information and to allow imaging of his devices pursuant to court order prevents EWS from presently ascertaining the full scope of trade secret information implicated in this case. EWS therefore will supplement its response to this Interrogatory as discovery continues, including as EWS continues to review documents in its own possession, custody, and control, and as Defendants produce the information unilaterally in their possession, custody, or control on this topic. EWS also reserves its right to seek findings of fact or dispositive determinations on relevant issues if Defendants do not comply with their discovery obligations and pertinent orders of this court that will be determinative of information requested by this Interrogatory.

In accordance with the foregoing objections, EWS responds as follows:

Interrogatory No. 1(a):

Johnson—not EWS—unilaterally has complete knowledge of the full scope of EWS's trade secrets that he unlawfully misappropriated during and after this tenure

21

as in-house counsel at EWS. The trade secrets that Johnson misappropriated, of which EWS is presently aware, consist of EWS's proprietary patent and trademark strategies, as well as EWS's proprietary business practices and business plans concerning those proprietary patent and trademark strategies for the future protection of its brands, inventions, and related partnerships in which EWS's interest was not publicly known as of the time Johnson misappropriated them.

These trade secrets are contained in certain highly confidential documents that EWS's in-house legal team maintains, including detailed indices of confidential and proprietary business concept briefs and invention disclosures relating to EWS's patent portfolio, detailed indices of EWS's trademark matters, documents relating to EWS's domain names, and numerous contracts, including in draft form. Privileged communications among EWS's legal counsel concerning these trade secrets also exist, including the Microsoft Teams Chat referenced in Paragraph 73 of EWS's complaint. Dkt. 1. Moreover, EWS's operative Intellectual Property Policy expressly stated that that "[t]he patent database maintained by the Legal department is considered Trade Secret." Dkt. 28-2 at 5. For the avoidance of doubt, EWS does not claim trade secret protection in the form of any of the aforementioned documents, but rather the underlying brand protection and business strategies reduced to writing within those documents that were maintained as confidential as of the time they were misappropriated.

Because no protective order is presently in place, EWS will not disclose further details concerning the specifics of the trade secrets at this time, but will supplement this response once a protective order sufficiently governing the disclosure of trade secret information is entered.

Interrogatory No. 1(b):

The trade secrets at issue in this litigation that Johnson misappropriated are designated as trade secrets pursuant to EWS company policy upon their respective creation automatically by virtue of their content and level of confidentiality. EWS's

22

Employment Agreement—which Johnson himself executed on August 15, 2014— summarizes EWS's policy that defines "Trade Secrets" as "trade secrets as defined under federal or state law as amended from time to time and also includes without limitations and without regard to form: a) any data or information that is competitively sensitive or commercially valuable and not generally known by the public; b) any scientific or technical information, design, process, procedure, formula, or improvement, computer software, object code, source code, specifications, inventions, system information, whether or not patentable or copyrightable; or c) any data or information that is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Dkt. 18 at 5. EWS's trade secrets detailed in response to Interrogatory No. 1(a) are designated as trade secrets automatically pursuant to company policy at least pursuant to subsections (a) and (c) above because they had not been publicly disclosed and were the subject of measures to keep such strategies secret. Undisclosed inventions and related protections strategies, including strategic decisions about which inventions or improvements to patent or otherwise protect, use, or maintain as secret also separately qualify under subsection (b) above. Because this policy designates trade secrets as such from their inception, no specific individuals are responsible for first "designating" a trade secret as such.

Interrogatory No. 1(c):

After entry of a protective order, EWS will produce, pursuant to Federal Rule of Civil Procedure 33(d), documents sufficient to demonstrate the designation of information identified in response to Interrogatory No. 1(a) to the extent such designation is reduced to written form, kept in the ordinary course, identified after a good-faith, reasonable, and proportionate search, and after a protective order is entered. EWS will amend its response to provide Bates Numbers once it completes its production.

23

**INTERROGATORY NO. 2:**

Describe all measures taken to maintain secrecy of the items identified in Interrogatory 1 as they existed on January 19, 2023, including:

- o Access restrictions
- o Labeling or marking systems
- o Technical controls
- o Training provided to employees

**RESPONSE:**

EWS objects to Interrogatory No. 2 on the ground that the phrase "technical controls" is undefined, vague, ambiguous, and subject to multiple interpretations. EWS will construe "technical controls" to mean computer system, network, file, or document access controls and security measures that limit, track, or prohibit user access.

In accordance with the foregoing objections, EWS responds as follows:

EWS takes substantial efforts to safeguard its Confidential Information and Trade Secrets. EWS restricts access to its computer systems through the use of multifactor authentication and employs a system of document-level security, including maintaining a password-protected, secure database restricted to individuals on a need-to-know basis and only accessible from EWS-deployed electronic devices.

EWS also requires employees to execute an Intellectual Property and Confidentiality Agreement that prohibits employees and former employees alike from disclosing, using, or disseminating any of EWS's confidential information, intellectual property, or trade secrets, and requires employees to turn those materials over to EWS upon the termination of their employment. Johnson himself reviewed and approved EWS's Intellectual Property Policy on multiple occasions (including, without limitation, on November 21, 2014, October 15, 2015, October 10, 2016, and September 19, 2017). As of September 19, 2017, this Policy required EWS's employees, *inter alia*, to "protect Company IP, in addition to the intellectual property

24

work-product doctrine, the common-interest doctrine, or any other applicable privilege or immunity, or that are otherwise protected from disclosure under Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules, or the relevant case law. EWS further objects to Interrogatory No. 1(a) on the grounds that it seeks Highly Confidential – Trade Secret (as defined in EWS's proposed Protective Order) and sensitive information subject to EWS's proposed Protective Order, which remains pending before the Court. *See* Dkts. 241, 253, 256, 258. Pending decision by the Court and prior to the entry of a Protective Order in this litigation, EWS will not produce confidential information concerning its trade secrets responsive to this Interrogatory to any unrepresented party because Defendants, including Johnson, have repeatedly misused and demonstrated complete disregard for EWS's confidential and trade secret information. *See* Dkt. 241 at 5-6. Once a Protective Order issues or the parties reach mutual resolution on the protections for confidential documents produced in this litigation, EWS will produce such documents or information in accordance therewith.

EWS further objects to Interrogatory Nos. 1(b) and 1(c) on the grounds that they seek information not relevant to any claim or defense asserted in this action and are disproportionate to the needs of the case. Whether EWS ever "designated" EWS's trade secrets as trade secrets, the date of said "designation," and the identity of the individual who made the official designation, if any, has no bearing on whether EWS's claimed trade secrets meet the legal standard for trade secrets. *7EDU Impact Acad. Inc. v. You*, 760 F. Supp. 3d 981, 996 (N.D. Cal. 2024) (finding plaintiff sufficiently alleged its documents were trade secrets even though the documents were not "label[ed], marked, or identified in any fashion as 'trade secret' or even 'confidential'"). EWS further objects to this Interrogatory as overly broad, unduly burdensome, and not proportionate to the needs of the case because it seeks the identification of "any" and all documents memorializing that designation over the life of each trade secret, spanning multiple years. Such request requires EWS to

20

exhaustively review, determine, and produce each and every document memorializing such designation. Moreover, EWS is under no obligation to identify documents with duplicative or cumulative information as to the designation of the same trade secrets as trade secrets. EWS will respond to Interrogatory No. 1(c) to identify documents sufficient to demonstrate the memorialization of designations of information identified in response to Interrogatory No. 1(a) to the extent such designation is reduced to written form, kept in the ordinary course, identified after a good-faith, reasonable, and proportionate search, and after a protective order is entered. EWS further objects that this Interrogatory is premature because discovery is ongoing and the full scope of the trade secrets taken by Johnson from EWS is not yet known because Johnson—not EWS—is in exclusive possession, custody, and control of the information concerning all trade secrets that he took and thus, which trade secrets are at issue in this litigation. Johnson is in contempt of court for failing to provide his devices that, *inter alia*, may contain EWS's trade secret information. Dkt. 243. Johnson's refusal to return EWS's trade secret information and to allow imaging of his devices pursuant to court order prevents EWS from presently ascertaining the full scope of trade secret information implicated in this case. EWS therefore will supplement its response to this Interrogatory as discovery continues, including as EWS continues to review documents in its own possession, custody, and control, and as Defendants produce the information unilaterally in their possession, custody, or control on this topic. EWS also reserves its right to seek findings of fact or dispositive determinations on relevant issues if Defendants do not comply with their discovery obligations and pertinent orders of this court that will be determinative of information requested by this Interrogatory.

In accordance with the foregoing objections, EWS responds as follows:

Interrogatory No. 1(a):

Johnson—not EWS—unilaterally has complete knowledge of the full scope of EWS's trade secrets that he unlawfully misappropriated during and after this tenure

as in-house counsel at EWS. The trade secrets that Johnson misappropriated, of which EWS is presently aware, consist of EWS's proprietary patent and trademark strategies, as well as EWS's proprietary business practices and business plans concerning those proprietary patent and trademark strategies for the future protection of its brands, inventions, and related partnerships in which EWS's interest was not publicly known as of the time Johnson misappropriated them.

These trade secrets are contained in certain highly confidential documents that EWS's in-house legal team maintains, including detailed indices of confidential and proprietary business concept briefs and invention disclosures relating to EWS's patent portfolio, detailed indices of EWS's trademark matters, documents relating to EWS's domain names, and numerous contracts, including in draft form. Privileged communications among EWS's legal counsel concerning these trade secrets also exist, including the Microsoft Teams Chat referenced in Paragraph 73 of EWS's complaint. Dkt. 1. Moreover, EWS's operative Intellectual Property Policy expressly stated that that "[t]he patent database maintained by the Legal department is considered Trade Secret." Dkt. 28-2 at 5. For the avoidance of doubt, EWS does not claim trade secret protection in the form of any of the aforementioned documents, but rather the underlying brand protection and business strategies reduced to writing within those documents that were maintained as confidential as of the time they were misappropriated.

Because no protective order is presently in place, EWS will not disclose further details concerning the specifics of the trade secrets at this time, but will supplement this response once a protective order sufficiently governing the disclosure of trade secret information is entered.

Interrogatory No. 1(b):

The trade secrets at issue in this litigation that Johnson misappropriated are designated as trade secrets pursuant to EWS company policy upon their respective creation automatically by virtue of their content and level of confidentiality. EWS's

22

Docusign Envelope ID: 82366F4F-FD7B-46BA-AAD8-99C1766528A4

Employment Agreement—which Johnson himself executed on August 15, 2014—summarizes EWS's policy that defines "Trade Secrets" as "trade secrets as defined under federal or state law as amended from time to time and also includes without limitations and without regard to form: a) any data or information that is competitively sensitive or commercially valuable and not generally known by the public; b) any scientific or technical information, design, process, procedure, formula, or improvement, computer software, object code, source code, specifications, inventions, system information, whether or not patentable or copyrightable; or c) any data or information that is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Dkt. 18 at 5. EWS's trade secrets detailed in response to Interrogatory No. 1(a) are designated as trade secrets automatically pursuant to company policy at least pursuant to subsections (a) and (c) above because they had not been publicly disclosed and were the subject of measures to keep such strategies secret. Undisclosed inventions and related protections strategies, including strategic decisions about which inventions or improvements to patent or otherwise protect, use, or maintain as secret also separately qualify under subsection (b) above. Because this policy designates trade secrets as such from their inception, no specific individuals are responsible for first "designating" a trade secret as such.

Interrogatory No. 1(c):

After entry of a protective order, EWS will produce, pursuant to Federal Rule of Civil Procedure 33(d), documents sufficient to demonstrate the designation of information identified in response to Interrogatory No. 1(a) to the extent such designation is reduced to written form, kept in the ordinary course, identified after a good-faith, reasonable, and proportionate search, and after a protective order is entered. EWS will amend its response to provide Bates Numbers once it completes its production.

23

Docusign Envelope ID: 82366F4F-FD7B-46BA-AAD8-99C1766528A4

of . . . third parties, against deliberate, unintentional, inappropriate, or unauthorized disclosure"; refrain from disclosing "[t]he Company's IP, including trade secrets, . . . to third parties . . . without executed non-disclosure agreements in place"; and, "[u]pon termination of employment or at any time the Company requests, . . . immediately turn over to the Company all Company materials and Trade Secrets and Confidential Information, and all copies thereof."

For those narrow stakeholders permitted to access trade secret information, EWS also expressly limits the use of trade secrets reduced to writing in certain enumerated documents by requiring a confidentiality agreement or other safeguard be in place before sharing the information. EWS's Intellectual Property Policy provides (and provided during Johnson's employment with EWS) that "[t]he patent database maintained by the Legal department is considered Trade Secret and access to the database is limited to Employees who have confidentiality agreements with the Company. Under no circumstance should any portion of the patent database be copied or distributed to third parties without confidentiality agreements. Likewise, new products and services that may be developed by the Company should not be discussed with or disclosed to any third party without having an executed non-disclosure agreement between the parties prior to such disclosure or discussions."

The Policy also provided that EWS's former employees "have a continued obligation to protect this information even after leaving the Company." Employees acknowledge that breach of these obligations in EWS's Intellectual Property and Confidentiality Agreement may cause irreparable injury, and that EWS may seek and obtain injunctive relief in addition to any available legal remedies. EWS's Intellectual Property and Confidentiality Agreement also maintains the policies and procedures concerning further protection of its trade secrets and proprietary information published in its Employee Handbook, requiring that all employees maintain the confidentiality of proprietary information during employment and after departure from EWS.

of . . . third parties, against deliberate, unintentional, inappropriate, or unauthorized disclosure"; refrain from disclosing "[t]he Company's IP, including trade secrets, . . . to third parties . . . without executed non-disclosure agreements in place"; and, "[u]pon termination of employment or at any time the Company requests, . . . immediately turn over to the Company all Company materials and Trade Secrets and Confidential Information, and all copies thereof."

For those narrow stakeholders permitted to access trade secret information, EWS also expressly limits the use of trade secrets reduced to writing in certain enumerated documents by requiring a confidentiality agreement or other safeguard be in place before sharing the information. EWS's Intellectual Property Policy provides (and provided during Johnson's employment with EWS) that "[t]he patent database maintained by the Legal department is considered Trade Secret and access to the database is limited to Employees who have confidentiality agreements with the Company. Under no circumstance should any portion of the patent database be copied or distributed to third parties without confidentiality agreements. Likewise, new products and services that may be developed by the Company should not be discussed with or disclosed to any third party without having an executed non-disclosure agreement between the parties prior to such disclosure or discussions."

The Policy also provided that EWS's former employees "have a continued obligation to protect this information even after leaving the Company." Employees acknowledge that breach of these obligations in EWS's Intellectual Property and Confidentiality Agreement may cause irreparable injury, and that EWS may seek and obtain injunctive relief in addition to any available legal remedies. EWS's Intellectual Property and Confidentiality Agreement also maintains the policies and procedures concerning further protection of its trade secrets and proprietary information published in its Employee Handbook, requiring that all employees maintain the confidentiality of proprietary information during employment and after departure from EWS.

25

Further, EWS requires employees to assent to a User Responsibility Agreement prohibiting employees from photographing with any device EWS's nonpublic information without express management permission. EWS employees are required to review and assent to EWS's User Responsibility Agreement on an annual basis, and in each instance must acknowledge their responsibilities relating to information security.

Participation in EWS's annual trade secret training is also required for all key stakeholders.

EWS's Employment Agreement specifically defines trade secrets pursuant to EWS company policy and makes clear that certain categories of information are automatically designated as trade secrets by virtue of their content and level of confidentiality. EWS's Employment Agreement—which Johnson himself executed on August 15, 2014—summarizes EWS's policy that defines "Trade Secrets" as "trade secrets as defined under federal or state law as amended from time to time and also includes without limitations and without regard to form: a) any data or information that is competitively sensitive or commercially valuable and not generally known by the public; b) any scientific or technical information, design, process, procedure, formula, or improvement, computer software, object code, source code, specifications, inventions, system information, whether or not patentable or copyrightable; or c) any data or information that is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Dkt. 18 at 5.

**INTERROGATORY NO. 3:**

Identify the person(s) responsible for categorizing and designating information as "trade secret," "confidential," or "proprietary" from September 8, 2014 through January 19, 2023, including:

- o Their job title
- o The period of their responsibility
- o Any documents describing their authority

26

**RESPONSE:**

EWS objects to Interrogatory No. 3 on the ground that it is compound and contains at least two (2) discrete subparts, insofar as it seeks identification of: [3(a)] the person(s) responsible for categorizing or designating information as "trade secret," "confidential," or "proprietary" from September 8, 2014, through January 19, 2023, their job title, and periods of responsibility; and [3(b)] any documents describing those individuals' authority. EWS further objects to this Interrogatory on the grounds that it seeks information not relevant to any claim or defense asserted in this action, and is disproportionate to the needs of the case because the identities and job titles of the individual(s) who designate or label materials as confidential, proprietary, or "trade secret" have no bearing on whether EWS's claimed trade secrets meet the legal standard for trade secrets. EWS further objects to this Interrogatory as overly broad, unduly burdensome, and not proportionate to the needs of the case because it seeks the identification of *every* person responsible for the categorizing and designating of information and "any" and all documents describing that authority spanning nearly a decade. Such request requires EWS to exhaustively review information for nearly ten years and determine each and every person who may have been involved in "trade secret," "confidential," or "proprietary" designations regardless of whether such respective designations pertained to the trade secrets or other information at issue in this litigation. Moreover, EWS is under no obligation to identify individuals with duplicative or cumulative information. EWS will respond to Interrogatory No. 3(a) to identify the persons principally involved in the designation of the "trade secret," "confidential," or "proprietary" documents or information at issue in this litigation. EWS will respond to Interrogatory No. 3(b) to identify documents sufficient to describe the authority of individuals identified in response to Interrogatory No. 3(a) to the extent such authority is reduced to written form, kept in the ordinary course, and identified after a good-faith, reasonable, and proportionate search.

In accordance with the foregoing objections, EWS responds as follows:

Interrogatory No. 3(a):

Interrogatory No. 3(b):

After entry of a protective order, EWS will produce, pursuant to Federal Rule of Civil Procedure 33(d), sufficient documents from which the information sought in this Interrogatory may be obtained and will amend its response to provide Bates Numbers once it completes its production.

**INTERROGATORY NO. 4:**

Identify every policy, procedure, handbook, or training document governing trade-secret identification, classification, or protection in effect between September 8, 2014 and January 19, 2023, including:

- o The effective dates
- o The author(s)
- o All amendments or revisions

**RESPONSE:**

EWS objects to Interrogatory No. 4 on the ground that it seeks the disclosure of information protected by the attorney-client privilege, the attorney work-product doctrine, the common-interest doctrine, or any other applicable privilege or immunity, or that is otherwise protected from disclosure under Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules, or the relevant case law, insofar as it requests EWS identify handbooks or training documents that reflect legal advice or guidance pertaining to trade secret protection as well as "all amendments or revisions" to such materials, including purely internal drafts or revisions. EWS further objects to Interrogatory No. 4 on the grounds that it is overly broad, unduly burdensome, and disproportionate to the needs of this case because it seeks *every* policy, procedure, handbook, or training document over the course of nearly nine years, including amendments and revisions thereto regardless of whether those amendments or revisions were ever actually put into effect, and to the extent it includes information

28

# EXHIBIT H

# TTAB DECISIONS EWS CONCEALED

**UNITED STATES PATENT AND TRADEMARK OFFICE**
**Trademark Trial and Appeal Board**
**P.O. Box 1451**
**Alexandria, VA 22313-1451**
General Contact Number: 571-272-8500
General Email: TTABInfo@uspto.gov

RSC

October 1, 2024

Cancellation No. 92085110

*P.A.Z.E., LLC*

*v.*

*Early Warning Services, LLC*

**Rebecca Stempien Coyle, Interlocutory Attorney:**

This proceeding now comes before the Board for consideration of the following motions filed by Respondent Early Warning Services ("Respondent"): (1) May 31, 2024, motion to seal, (2) July 1, 2024, second motion to seal, and (3) July 1, 2024, motion to suspend pending termination of a civil action. Respondent's first motion to seal is contested, and no response was filed to either the second motion to seal or motion to suspend.[1]

As an initial matter, the Board notes Petitioner P.A.Z.E., LLC ("Petitioner") filed two responses to Respondent's first motion to seal.[2] Petitioner's responses appear to

---

[1] The Board has considered all of the parties' arguments, presumes the parties' familiarity with the factual bases for their filings, and does not recount the facts or arguments here, except as necessary to explain this decision. *See Guess? IP Holder LP v. Knowluxe LLC*, 116 USPQ2d 2018, 2019 (TTAB 2015).

[2] 10 TTABVUE, 11 TTABVUE. Record citations are to TTABVUE, the Board's publicly available docket system. *See, e.g., New Era Cap Co., Inc. v. Pro Era, LLC*, 2020 USPQ2d 10596, *2 n.1 (TTAB 2020).

Cancellation No. 92085110

counsel and a former employee and should be sealed. Respondent asserts the document is protected by attorney-client privilege, the privilege has not been waived, and Respondent has not authorized the disclosure of the privileged document to or by Petitioner.[10] In response to Respondent's first motion Petitioner argues that Respondent has not established the Chat is privileged. Petitioner further contends the Chat was publicly available and therefore any privilege is waived.[11]

Respondent's second motion to seal concerns "Exhibit D" and "Exhibit E" to Petitioner's two June 17, 2024, responses to Respondent's first motion to seal. Exhibit D consists of a printout of a webpage that includes images from what appears to be the same social media account as the contested exhibits to Petitioner's pleadings, which also include an image of the Chat, as well as a larger image of the Chat. Exhibit E consists of a printout from another social media account and also includes an image of the Chat.[12] In its second motion to seal Respondent modifies its request for relief, asking that Exhibits D and E be sealed "pending termination of the civil action".[13] As noted above, Petitioner did not respond to this motion.

**The Civil Action**[14]

In the civil action the parties are in the reverse position with Respondent as plaintiff asserting a variety of claims against three defendants: Plaintiff, Brandon

---

[10] 6 TTABVUE 2, *see also id.* at 7-8 (Decl. of Paras R. Shah, Senior Intellectual Property Counsel for Respondent ("Shah Decl.")).

[11] *See* 10 TTABVUE 9-12, 16-17.

[12] *Id.* at 34-40.

[13] 12 TTABVUE 3.

[14] The civil action is styled *Early Warning Services, LLC v. Warren Vurl Johnson, Brandon O'Loughlin, and P.A.Z.E. LLC,* Case No. 2:24-cv-01587-SMB, in the United States District Court for the District of Arizona (the "civil action").

Cancellation No. 92085110

O'Loughlin (plaintiff's CEO), and Warren Vurl Johnson (identified as former intellectual property counsel for Respondent).[15] The claims in the civil action include misappropriation of trade secrets, cybersquatting, and unjust enrichment, and a request for declaratory judgment of non-infringement.[16]

In support of its claims Respondent alleges, inter alia, that defendant Johnson improperly took numerous highly confidential and sensitive documents from Respondent, including a screen capture of a "Privileged Chat" between himself and Respondent's general counsel (wherein Johnson's identity is not shown); Petitioner "has repeatedly attached [the "Privileged Chat"] to its public filings" before the Board; and this "Privileged Chat" is among Respondent's trade secrets which were misappropriated by the defendants in the civil action.[17] Respondent further alleges it owns prior trademark rights to the mark PAZE as well as the stylized Z mark, and that Petitioner has no trademark rights in its asserted PAZE marks.[18]

Among the relief sought Respondent asks the district court to enjoin the defendants, including Petitioner, from using the mark PAZE or the stylized Z mark or any confusingly similar variations; order the defendants to remove from public view all documents containing Respondent's trade secrets; invalidate Petitioner's application Serial Nos. 98252022 and 98255290; and find that Respondent owns prior

---

[15] 13 TTABVUE 9-11.
[16] *Id.* at 25-34.
[17] *Id.* at 17-18, 22, 25-27.
[18] *Id.* at 32-34.

Cancellation No. 92085110

rights in the stylized Z mark and the mark is inherently distinctive, valid, and protectable.[19]

In its motion to suspend Respondent contends many of the same issues in the civil action are presented in the briefing on Respondent's motions to seal, as well as Petitioner's alleged entitlement to a statutory cause of action and its asserted claims in the Board proceeding. Respondent therefore maintains that suspension of Board proceedings, and continued shielding of the privileged documents at issue in the motions to seal, are warranted pending the final determination of the civil action. Again, Petitioner has not responded to the motion to suspend.

**Disposition of the Pending Motions**

The Board first considers the motion to suspend for the pending civil action. While the Board may grant the motion as conceded, in view of the nature of the claims in the civil action and Respondent's motions to seal, the Board provides the following analysis further explaining why suspension is warranted. *See* Trademark Rule 2.127(a), 37 C.F.R. § 2.127(a). "Whenever it shall come to the attention of the Trademark Trial and Appeal Board that a civil action … may have a bearing on a pending case, proceedings before the Board may be suspended until termination of the civil action[.]" Trademark Rule 2.117(a), 37 C.F.R. § 2.117(a); *see also* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") § 510.02(a) (2024). "[T]he civil action does not have to be dispositive of the Board proceeding to warrant suspension, it need only have a bearing on the issues before the Board." *New Orleans*

---

[19] *Id.* at 35-36.

6

Cancellation No. 92085110

*Louisiana Saints LLC v. Who Dat?, Inc.*, 99 USPQ2d 1550, 1552 (TTAB 2011). The Board does not require an issue to be joined in one or both proceedings so long as the Board can ascertain, prior to the filing of an answer(s), whether the final determination of the civil action may have a bearing on the Board proceeding. *See Other Tel. Co. v. Conn. Nat'l Tel. Co.*, 181 USPQ 125, 126-27 (TTAB 1974); *see also* TBMP § 510.02(a).

Here, at a minimum, the district court's determinations regarding Respondent's trademark rights would have a bearing on this proceeding. Moreover, if the district court enjoins Petitioner from using Repondent's asserted marks, such a decision may directly affect Petitioner's entitlement to a statutory cause of action in this proceeding. Accordingly, Respondent's motion to suspend pending the civil action is **granted**.

The Board next addresses the motions to seal. Through its first motion to seal Respondent requests that the exhibits to Petitioner's pleadings which include the Chat be placed under seal.[20] Although Respondent relies on the Standard Protective Order as the basis of its motion, Respondent does not invoke the confidentiality designations of the Standard Protective Order but rather relies on its assertion of attorney-client privilege.[21] Accordingly, the Board does not apply the standard for challenging designations set forth in the Standard Protective Order.[22] Rather, the

---

[20] 6 TTABVUE 2.
[21] *Id.*
[22] *See* Standard Protective Order ¶ 14.

Cancellation No. 92085110

Board construes Respondent's motion as seeking relief for "additional protections not provided" by the Standard Protective Order.[23]

The attorney-client privilege protects communications made in confidence between clients and their lawyers for the purpose of obtaining legal advice. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The attorney-client privilege "should be jealously protected." *Amerace Corp. v. USM Corp.*, 183 USPQ 506, 507 (TTAB 1974) (finding that communications between an attorney and a client regarding trademark infringement is protected by attorney-client privilege); *see also United States v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997) ("the attorney-client privilege is, perhaps, the most sacred of all legally recognized privileges, and its preservation is essential to the just and orderly operation of our legal system.").

When determining if the attorney-client privilege applies "the central inquiry is whether the communication is one that was made by a client to an attorney for the purpose of obtaining legal advice." *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 53 USPQ2d 1747, 1751 (Fed. Cir. 2000). Federal courts typically apply an eight-part test to determine whether information is covered by the attorney-client privilege:

> (1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992) (quoting *United States v. Margolis*, 557 F.2d 209, 211 (9th Cir. 1977)). When the client is a

---

[23] *Id.* at ¶ 17.

Cancellation No. 92085110

company, attorney-client privilege may apply to communication between counsel and high-level corporate officers, as well as between counsel and any corporate employee acting at the direction of corporate superiors in order to secure legal advice for the corporation. *Upjohn*, 449 U.S. at 394, 101 S.Ct. 677; *see also The Goodyear Tire & Rubber Co. v. Uniroyal, Inc.*, 183 USPQ 372 (TTAB 1974).

However, "[t]he burden of determining which communications are privileged and which communications fall outside the scope of the privilege rests squarely on the party asserting the privilege." *In re Queen's Univ. at Kingston*, 820 F.3d 1287, 118 USPQ2d 1221, 1231 (Fed. Cir. 2016). To carry the burden, the party asserting the privilege must "describe in detail" the documents or information sought to be protected. *McCoo v. Denny's, Inc.*, 192 F.R.D. 675, 680 (D. Kan. 2000); *see also FTC v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 180 F.Supp.3d 1, 16 (D.D.C. 2016).

Here, the Board finds Respondent has fallen short of its burden of proving that the exhibits to the pleadings at issue are covered by the attorney-client privilege. Respondent has only stated that its general counsel was one of the persons to the Chat and that Respondent has not waived privilege.[24] Respondent provides no information regarding the former employee's position at the time of the Chat or whether the employee was acting at the direction of superiors. Respondent further fails to show that the Chat is actually a communication regarding specific legal advice

---

[24] 6 TTABVUE 7-8, ¶¶ 2-3 (Shah Decl.).

9

Cancellation No. 92085110

from its general counsel in counsel's capacity as such. Accordingly, Respondent's first motion to seal is **denied without prejudice**.[25]

However, in view of the "sacred" nature of the attorney-client privilege, and in consideration of the Board's disposition of Respondent's remaining motions, the Board will continue to shield Exhibit E to the original petition for cancellation, Exhibit B to the first amended petition for cancellation, and Exhibit B to the second amended petition for cancellation, pending the suspension of this proceeding.[26]

Turning to the second motion to seal, it appears that the Chat at issue in this motion to seal is the same as the Privileged Chat at issue in the civil action.[27] The district court's determination in the civil action as to whether this communication constitutes a "trade secret", is privileged, or is otherwise protectable from public disclosure would have a bearing on a determination of whether documents including the communication filed with the Board should be shielded from public viewing. Accordingly, Respondent's second motion to seal is **granted**, and Exhibits D and E to both of Petitioner's June 17, 2024, submissions will remain sealed pending termination of the civil action.[28]

---

[25] The Board hastens to add that Respondent's motion would have been denied without prejudice if it was considered as challenge to designations under the Standard Protective Order. Such a challenge requires a good faith effort to negotiate prior to making a motion, and Respondent failed to show any such effort to negotiate with Petitioner. Standard Protective Order ¶ 14, *see also U.S. Polo Ass'n v. David McLane Ents., Inc.*, 2019 USPQ2d 108442, at * 2 (TTAB 2019); TBMP § 412.01(b).

[26] Additionally, the prejudice to Respondent if the documents are made public outweighs the prejudice to Petitioner if the documents remain under seal while the Board proceeding is suspended for the civil action.

[27] The Board reiterates the Chat shown in the exhibits to the pleadings is the same as the Chat shown in Exhibits D and E to Petitioner's response brief.

[28] The second motion to seal is also conceded. *See* Trademark Rule 2.127(a), 37 C.F.R. § 2.127(a).

Cancellation No. 92085110

In view of the foregoing, the following documents are placed under seal pending the suspension of this proceeding:

- "Exhibit E" to the original petition for cancellation;
- "Exhibit B" to the first amended petition for cancellation;
- "Exhibit B" to the second amended petition for cancellation;
- "Exhibit D" and "Exhibit E" to Petitioner's first submission of June 17, 2024; and
- "Exhibit D" and "Exhibit E" to Petitioner's second submission of June 17, 2024.

For the avoidance of doubt, the Board is not making any determinations at this time as to whether or not the documents at issue in the motions to seal are properly protected under attorney-client privilege.[29] Upon resumption of these proceedings the Board will entertain further submissions from the parties regarding whether the documents should remain under seal from public view.

However, with the exception of information properly filed under seal, Board proceeding files are to be publicly available. *See* Trademark Rule 2.27(d)-(e), 37 C.F.R. § 2.27(d)-(e); *see also* TBMP § 412.04. Accordingly, when filed documents are shielded from public view, a public copy must be submitted redacting the portions submitted under seal. Trademark Rule 2.126(c), 37 C.F.R. § 2.126(c); *see also* TBMP § 412.04. In view thereof, and because the exhibits to be sealed were submitted by Petitioner, Petitioner must file public copies of the following wherein the exhibits identified above are redacted:

- original petition for cancellation (1 TTABVUE),
- first amended petition for cancellation (4 TTABVUE),
- second amended petition for cancellation (5 TTABVUE), and

---

[29] Nor does the Board make any determinations on whether the documents can otherwise be designated under the Board's Standard Protective Order.

Cancellation No. 92085110

- its June 17, 2024, responses to Respondent's first motion to seal (11 TTABVUE).[30]

Petitioner is allowed **TWENTY DAYS** from the date of this order **to submit the public copies of these docket entries**, failing which the Board may give the sealed exhibits no further consideration.

This cancellation proceeding is otherwise **SUSPENDED** pending the final disposition of the civil action between the parties. Within THIRTY DAYS after the final determination of the civil action, the parties must so notify the Board in writing, including a copy of the court's final order.[31] Upon resumption of the proceedings the Board will reset dates as appropriate, including time for Respondent to answer or otherwise respond to the operative petition for cancellation.

During the suspension period, the parties must notify the Board of any address changes for the parties or their attorneys. In addition, the parties must promptly inform the Board of any other related cases, even if they become aware of such cases during the suspension period.

---

[30] Because 10 TTABVUE and 11 TTABVUE are identical, and so as to not unnecessarily clutter the record, Petitioner need not submit a public version of 10 TTABVUE.

[31] A proceeding is considered to have been finally determined when an order or ruling that ends litigation has been rendered, and no appeal has been filed, or all appeals filed have been decided and the time for any further review has expired." *See* TBMP § 510.02(b).

<table>
<tr>
<td>

THIS ORDER IS NOT A
PRECEDENT OF THE TTAB

</td>
<td>

**UNITED STATES PATENT AND TRADEMARK OFFICE**
**Trademark Trial and Appeal Board**
**P.O. Box 1451**
**Alexandria, VA  22313-1451**
General Contact Number: 571-272-8500
General Email: TTABInfo@uspto.gov

</td>
</tr>
</table>

ajl

October 1, 2024

Opposition No. 91291526

*P.A.Z.E.LLC*

*v.*

*Early Warning Services, LLC*

**Ashlyn Lembree, Interlocutory Attorney:**

This proceeding now comes before the Board for consideration of several motions concerning essentially the same chat message asserted by Applicant to be protected by attorney-client privilege (the "Chat") included in six of Opposer's seven submissions to the Board to date; and, Applicant's July 1, 2024 uncontested motion to suspend pending termination of a civil action.[1] Applicant's May 31, 2024 motion to seal the Chat shown in the original notice of opposition is contested.[2] Applicant's June 7, 2024 second motion to seal the Chat shown in the amended notice of opposition is

---

[1] 17 TTABVUE. Record citations are to TTABVUE, the Board's publicly available docket system. *See, e.g., New Era Cap Co., Inc. v. Pro Era, LLC*, 2020 USPQ2d 10596, *2 n.1 (TTAB 2020).

[2] 4 TTABVUE (Applicant's first motion to seal). 10, 12, 13, and 14 TTABVUE (Opposer's subsequently-withdrawn initial brief ("Withdrawn Brief"), Opposer's substitute brief, Opposer's supplement to its substitute brief ("Supplemental Brief"), and Opposer's construed fourth response, respectively). As discussed herein, Opposer's Supplemenetal Brief and fourth response to the motion are denied consideration. The Board previously shielded the notice of opposition and Withdrawn Brief from public view pending disposition of Applicant's first motion to seal. 6, 12 TTABVUE.

Opposition No. 91291526

contested.[3] Applicant's June 14, 2024 third motion to seal the Chat shown in Opposer's Supplemental Brief is uncontested.[4] Opposer's motion, filed June 17, 2024, that "the Board [issue] an order that [Exhibit 3 to the notice of opposition] be ruled Information Not to Be Designated as Protected" (Opposer's "Designation Motion") is, as discussed herein, construed as Opposer's fourth response to Applicant's first motion to seal and denied consideration.[5] In conjunction with its motion to suspend, Applicant moves for a fourth time to seal the Chat, albeit in that instance the Chat as shown in Opposer's response to Applicant's second motion to seal and as shown in Opposer's Designation Motion.[6] Applicant's fourth motion to seal is uncontested.

The Board has considered all of the parties' arguments, presumes the parties' familiarity with the factual bases for their filings, and does not recount the facts or arguments here, except as necessary to explain this decision. *See Guess? IP Holder LP v. Knowluxe LLC*, 116 USPQ2d 2018, 2019 (TTAB 2015).

As an initial matter, the Board notes Opposer filed four responses to Applicant's first motion to seal.[7] Duplicate submissions unnecessarily complicate this proceeding and Opposer is admonished to take greater care with its filings with the Board. The presentation of one's arguments and authority should be presented thoroughly in the

---

[3] 8 TTABVUE (Applicant's second motion to seal). 16 TTABVUE (Opposer's response brief). The Board previously shielded the amended notice of opposition from public view pending disposition of Applicant's second motion to seal. 12 TTABVUE.

[4] 14 TTABVUE.

[5] 15 TTABVUE. Opposer's "reservat[ion of] its right to answer or otherwise move with respect to [Applicant's three motions to seal]," *id*. at 2, is **denied**. *See* Trademark Rule 2.127(a), 37 C.F.R. § 2.127(a).

[6] 17 TTABVUE 3-4.

[7] *See* n.2, supra.

Opposition No. 91291526

motion or the opposition brief thereto. *Johnston Pump/Gen. Valve Inc. v. Chromalloy Am. Corp.*, 13 USPQ2d 1719, 1720 n.3 (TTAB 1989); TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 502.02(b) (2024). Moreover, submissions with the Board are assigned a single filing date for purposes of calculating the deadline for filing a response or reply brief under Trademark Rule 2.127(a). *OMS Investments, Inc. v. Habit Horticulture LLC*, 2022 USPQ2d 1074, at *1-2 (TTAB 2022). By order dated June 12, 2024, the Board exercised its discretion to substitute Opposer's second response for its first response, thereby setting the single filing date for Opposer's response to Applicant's first motion to seal for purposes of calculating the deadline for Applicant to file its reply brief. In view thereof, Opposer's third response to Applicant's first motion to seal (Opposer's Supplemental Brief), filed subsequent to the Board's order setting the briefing schedule for the motion based on the single date of filing of Opposer's accepted response to the motion, is **denied consideration**. Moreover, inasmuch as Opposer responds to Applicant's first motion to seal in its Designation Motion and its arguments therein address the same issue raised by Applicant's first motion to seal, Opposer's Designation Motion is construed as its fourth response to Applicant's first motion to seal and is **denied consideration** as improperly filed subsequent to Opposer's single, accepted response to Applicant's first motion to seal.

**The Board Proceeding**

On May 16, 2024, Opposer filed a notice of opposition opposing registration of involved application Serial No. 97669754 for the standard character mark PAZE for

3

Opposition No. 91291526

"Financial transaction services, namely, providing secure commercial transaction options and secure electronic funds transfer; processing of secure electronic wallet transactions" in International Class 36.[8]

Opposer filed an amended notice of opposition prior to Applicant's answer, and the Board accepted Opposer's amended notice of opposition as its operative pleading.[9] Under the operative pleading, Opposer alleges, inter alia, that it owns pending applications Serial Nos. 98255290 and 98252002 for, respectively, the standard character and stylized mark PAZE and that "Opposer believes that if the [involved a]pplication is allowed to register it will cause delays and complications with the registration of Opposer's Marks, causing harm and costs to Opposer,"[10] and identifies the following grounds for cancellation: merely descriptive, lack of bona fide intent to use, fraud, nonuse, and that the identification of services was impermissibly expanded during examination.[11] Opposer also submits several exhibits in support of both its notice of opposition and amended notice of opposition, including a document identified as "Exhibit 3" to its original notice of opposition[12] and "Exhibit[s] 3 [and] 5" to its amended notice of opposition.[13]

---

[8] 1 TTABVUE. Application Serial No. 97669754 was filed November 9, 2022 under Trademark Act Section 1(b), 15 U.S.C. § 1052(b) and amended to a filing basis under Trademark Act Section 1(a), 15 U.S.C. § 1052(a) by way of an amendment to allege use filed December 11, 2023 and accepted February 5, 2024.

[9] 12 TTABVUE, *see also* Amended Notice of Opposition (7 TTABVUE).

[10] 7 TTABVUE 5-6, at ¶¶ 22, 27. "Opposer's Marks" is undefined.

[11] *Id*. at 7-25 (counts first through fifth).

[12] 1 TTABVUE 214-15 (Exhibit 3).

[13] 7 TTABVUE 335-36 (Exhibit 3) and 365 (Exhibit 5).

4

Opposition No. 91291526

By order dated June 6, 2024, the Board suspended proceedings pending disposition of Applicant's first motion to seal. By the Board's June 12, 2024 order, proceedings remained suspended pending disposition of both Applicant's first and second motions to seal. Accordingly, the time for Applicant to respond to the amended notice of opposition has also been suspended. The Board will reset time for Applicant to respond to the pleading as appropriate.

**The "Privileged Documents" At Issue in Applicant's Motions to Seal**

Applicant's four motions to seal[14] collectively request that the documents appearing as "Exhibit 3" to the original notice of opposition, "Exhibit[s] 3 [and] 5" of the amended notice of opposition, "Exhibit[s] B [and] C" of Opposer's Supplemental Brief,[15] "Exhibit B" to Opposer's response to Applicant's second motion to seal,[16] and "Exhibit[s] C [and] D" to the Designation Motion[17] be placed under seal. As raised in its June 12, 2024 order, the Board additionally addresses "Exhibit B" and "Exhibit C" to the Withdrawn Brief. These exhibits are substantially identical and consist of one or two pages; where both pages have been submitted, the first page appears to be a screenshot of posts on a social media site with one post including an image of a chat, and the second (or only) page is a larger image of that chat (for purposes of this order the Board will refer to the chat shown in both pages as the "Chat").

---

[14] As previously noted, Applicant's fourth motion to seal was combined with Applicant's motion to suspend for the civil action. 17 TTABVUE 3-4. Applicant's fourth motion to seal moves that Exhibits C and D to Opposer's Designation Motion and Exhibit B to Opposer's response to Applicant's second motion to seal be sealed.
[15] 13 TTABVUE 9-14 (Exhibits B and C).
[16] 16 TTABVUE 18-22 (Exhibit B).
[17] 15 TTABVUE 15-21 (Exhibits C and D).

5

Opposition No. 91291526

Applicant contends that the Chat is a "privileged document" depicting a screen capture of a chat on Applicant's internal messaging system between its general counsel and a former employee and should be sealed. Applicant asserts the document is protected by attorney-client privilege, the privilege has not been waived, and Applicant has not authorized the disclosure of the privileged document to or by Opposer.[18] In its accepted response to Applicant's first motion to seal and in its response to Applicant's second motion to seal, Opposer argues that Applicant has not established the Chat is privileged. Opposer further contends the Chat was publicly available and therefore any privilege is waived or not applicable.[19] As noted above, Opposer did not respond to Applicant's third and fourth motions to seal.

**The Civil Action[20]**

In the civil action the parties are in the reverse position with Applicant as plaintiff asserting a variety of claims against three defendants: Plaintiff [Opposer in the Board proceeding], Brandon O'Loughlin (plaintiff's CEO), and Warren Vurl Johnson (identified as former intellectual property counsel for Applicant).[21] The claims in the

---

[18] *See, e.g.*, 4 TTABVUE 2; *see also id*. at 7-8, ¶¶ 2, 3 (Decl. of Paras R. Shah, Senior Intellectual Property Counsel for Applicant ("Shah Decl.")).

[19] *See* 11 TTABVUE 7-9, 11-16. Opposer's response brief also includes a section entitled "Motions to Redesignate Information per The Standard Protective Order," 11 TTABVUE 9-11, but Opposer makes no motion in this portion of its brief. *See also* 16 TTABVUE 2, 8 (publicly available); *id*. at 8-13 (crime-fraud exception).

[20] The civil action is styled *Early Warning Services, LLC v. Warren Vurl Johnson, Brandon O'Loughlin, and P.A.Z.E. LLC,* Case No. 2:24-cv-01587-SMB, in the United States District Court for the District of Arizona (the "civil action").

[21] 17 TTABVUE 8-11 (Complaint in the civil action).

6

Opposition No. 91291526

civil action include misappropriation of trade secrets, cybersquatting, and unjust enrichment, and a request for declaratory judgment of non-infringement.[22]

In support of its claims in the civil action Applicant alleges, inter alia, that defendant Johnson improperly took numerous highly confidential and sensitive documents from Applicant, including a screen capture of a "Privileged Chat" between himself and Applicant's general counsel (wherein Johnson's identity is not shown); Opposer "has repeatedly attached [the "Privileged Chat"] to its public filings" before the Board; and this "Privileged Chat" is among Applicant's trade secrets which were misappropriated by the defendants in the civil action.[23] Applicant further alleges it owns prior trademark rights to the mark PAZE as well as the stylized Z mark, and that Opposer has no trademark rights in its asserted PAZE marks.[24]

Among the relief sought, Applicant asks the district court to enjoin the defendants, including Opposer, from using the mark PAZE or the stylized Z mark or any confusingly similar variations; order the defendants to remove from public view all documents containing Applicant's trade secrets; invalidate Opposer's application Serial Nos. 98252022 and 98255290; and find that Applicant owns prior rights in, inter alia, the PAZE and stylized Z marks and the marks are inherently distinctive, valid, and protectable.[25]

In its motion to suspend, Applicant contends many of the same issues in the civil action are presented in the briefing on Applicant's motions to seal, as well as

---

[22] *Id*. at 25-34.
[23] *Id*. at 17-18, 22, 25-27.
[24] *Id*. at 32-34.
[25] *Id*. at 35-36.

7

Opposition No. 91291526

Opposer's alleged entitlement to a statutory cause of action and its asserted claims in the Board proceeding. Applicant therefore maintains that suspension of Board proceedings, and continued shielding of the privileged documents at issue in the motions to seal, are warranted pending the final determination of the civil action. Again, Opposer has not responded to the motion to suspend.

**Disposition of the Pending Motions**

The Board first considers the motion to suspend for the pending civil action. While the Board may grant the motion as conceded, in view of the nature of the claims in the civil action and Applicant's motions to seal, the Board provides the following analysis further explaining why suspension is warranted. *See* Trademark Rule 2.127(a). "Whenever it shall come to the attention of the Trademark Trial and Appeal Board that a civil action … may have a bearing on a pending case, proceedings before the Board may be suspended until termination of the civil action[.]" Trademark Rule 2.117(a), 37 C.F.R. § 2.117(a); *see also* TBMP § 510.02(a). "[T]he civil action does not have to be dispositive of the Board proceeding to warrant suspension, it need only have a bearing on the issues before the Board." *New Orleans Louisiana Saints LLC v. Who Dat?, Inc.*, 99 USPQ2d 1550, 1552 (TTAB 2011). The Board does not require an issue to be joined in one or both proceedings so long as the Board can ascertain, prior to the filing of an answer(s), whether the final determination of the civil action may have a bearing on the Board proceeding. *See Other Tel. Co. v. Conn. Nat'l Tel. Co.*, 181 USPQ 125, 126-27 (TTAB 1974); *see also* TBMP § 510.02(a).

8

Opposition No. 91291526

Here, at a minimum, the district court's determinations regarding Applicant's trademark rights would have a bearing on this proceeding. Moreover, if the district court enjoins Opposer from using Applicant's asserted marks, such a decision may directly affect Opposer's entitlement to a statutory cause of action in this proceeding. Accordingly, Applicant's motion to suspend pending the civil action is **granted**.

The Board next addresses the motions to seal. Through its first motion to seal Applicant requests that the exhibits to Opposer's pleadings which include the Chat be placed under seal.[26] Although Applicant relies on the Standard Protective Order as the basis of its motion, Applicant does not invoke the confidentiality designations of the Standard Protective Order but rather relies on its assertion of attorney-client privilege.[27] Accordingly, the Board does not apply the standard for challenging designations set forth in the Standard Protective Order.[28] Rather, the Board construes Applicant's motion as seeking relief for "additional protections not provided" by the Standard Protective Order.[29]

The attorney-client privilege protects communications made in confidence between clients and their lawyers for the purpose of obtaining legal advice. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The attorney-client privilege "should be jealously protected." *Amerace Corp. v. USM Corp.*, 183 USPQ 506, 507 (TTAB 1974) (finding that communications between an attorney and a client regarding trademark infringement is protected by attorney-client privilege); *see also United*

---

[26] 4 TTABVUE 2.

[27] *Id.*

[28] *See* Standard Protective Order ¶ 14.

[29] *Id.* at ¶ 17.

9

Opposition No. 91291526

*States v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997) ("the attorney-client privilege is, perhaps, the most sacred of all legally recognized privileges, and its preservation is essential to the just and orderly operation of our legal system.").

When determining if the attorney-client privilege applies "the central inquiry is whether the communication is one that was made by a client to an attorney for the purpose of obtaining legal advice." *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 53 USPQ2d 1747, 1751 (Fed. Cir. 2000). Federal courts typically apply an eight-part test to determine whether information is covered by the attorney-client privilege:

> (1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992) (quoting *United States v. Margolis*, 557 F.2d 209, 211 (9th Cir. 1977)). When the client is a company, attorney-client privilege may apply to communication between counsel and high-level corporate officers, as well as between counsel and any corporate employee acting at the direction of corporate superiors in order to secure legal advice for the corporation. *Upjohn*, 449 U.S. at 394, 101 S.Ct. 677; *see also The Goodyear Tire & Rubber Co. v. Uniroyal, Inc.*, 183 USPQ 372 (TTAB 1974).

However, "[t]he burden of determining which communications are privileged and which communications fall outside the scope of the privilege rests squarely on the party asserting the privilege." *In re Queen's Univ. at Kingston*, 820 F.3d 1287, 118 USPQ2d 1221, 1231 (Fed. Cir. 2016). To carry the burden, the party asserting the

10

Opposition No. 91291526

privilege must "describe in detail" the documents or information sought to be protected. *McCoo v. Denny's, Inc.*, 192 F.R.D. 675, 680 (D. Kan. 2000); *see also FTC v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 180 F.Supp.3d 1, 16 (D.D.C. 2016).

Here, the Board finds Applicant has fallen short of its burden of proving that the Chat document is covered by the attorney-client privilege. Applicant has only stated that its general counsel was one of the persons to the Chat and that Applicant has not waived privilege.[30] Applicant provides in its motions to seal no information regarding the former employee's position at the time of the Chat or whether the employee was acting at the direction of superiors. Applicant further fails to show that the Chat is actually a communication regarding specific legal advice from its general counsel in counsel's capacity as such. Accordingly, Applicant's first and second motions to seal, except as stated herein, are **denied without prejudice**.[31]

However, in view of the "sacred" nature of the attorney-client privilege, in consideration of the Board's disposition of Applicant's remaining motions,[32] and because the district court's determination in the civil action as to whether the communication at issue in the civil action constitutes a "trade secret", is privileged,

---

[30] 4 TTABVUE 7-8, ¶¶ 2-3 (Shah Decl.).

[31] The Board hastens to add that Applicant's motion would have been denied without prejudice if it was considered as challenge to designations under the Standard Protective Order. Such a challenge requires a good faith effort to negotiate prior to making a motion, and Applicant failed to show any such effort to negotiate with Opposer. Standard Protective Order ¶ 14, *see also U.S. Polo Ass'n v. David McLane Ents., Inc.*, 2019 USPQ2d 108442, at * 2 (TTAB 2019); TBMP § 412.01(b).

[32] As noted previously, Applicant's motion to suspend for the civil action is granted. Moreover, Applicant's third and fourth motions to seal are **granted** as conceded to the extent that the submissions are sealed from public view but that the Board will entertain further submissions from the parties regarding whether the documents should remain under seal from public view upon resumption of proceedings. *See* Trademark Rule 2.127(a).

11

Opposition No. 91291526

or is otherwise protectable from public disclosure would have a bearing on a determination of whether documents including the Chat filed with the Board should be shielded from public viewing, the Board will continue to shield "Exhibit 3" to the original notice of opposition, "Exhibit[s] 3 [and] 5" of the amended notice of opposition, "Exhibit[s] B [and] C" to the Withdrawn Brief, "Exhibit[s] B [and] C" of Opposer's Supplemental Brief, "Exhibit B" to Opposer's response to Applicant's second motion to seal, and "Exhibit[s] C [and] D" to the Designation Motion pending the suspension of this proceeding.[33]

In view of the foregoing, the following documents (found at 1, 7, 10, 13, 15, and 16 TTABVUE) are placed under seal pending the suspension of this proceeding:

- "Exhibit 3" to the original notice of opposition;
- "Exhibit 3" and "Exhibit 5" to the amended notice of opposition;
- "Exhibit B" and "Exhibit C" to Opposer's Withdrawn Brief;
- "Exhibit B" and "Exhibit C" to Opposer's Supplemental Brief;
- "Exhibit B" to Opposer's response to Applicant's second motion to seal; and,
- "Exhibit B" to Opposer's Designation Motion.

For the avoidance of doubt, the Board is not making any determinations at this time as to whether or not the documents at issue in the motions to seal are properly protected under attorney-client privilege.[34] Upon resumption of these proceedings the Board will entertain further submissions from the parties regarding whether the documents should remain under seal from public view.

---

[33] Additionally, the prejudice to Applicant if the documents are made public outweighs the prejudice to Opposer if the documents remain under seal while the Board proceeding is suspended for the civil action.

[34] Nor does the Board make any determinations on whether the documents can otherwise be designated under the Board's Standard Protective Order.

12

Opposition No. 91291526

However, with the exception of information properly filed under seal, Board proceeding files are to be publicly available. *See* Trademark Rule 2.27(d)-(e), 37 C.F.R. § 2.27(d)-(e); *see also* TBMP § 412.04. Accordingly, when filed documents are shielded from public view, a public copy must be submitted redacting the portions submitted under seal. Trademark Rule 2.126(c), 37 C.F.R. § 2.126(c); *see also* TBMP § 412.04. In view thereof, and because the exhibits to be sealed were submitted by Opposer, Opposer must file public copies of the following wherein the exhibits identified above are redacted:

- original notice of opposition (1 TTABVUE);
- amended notice of opposition (7 TTABVUE);
- Withdrawn Brief (10 TTABVUE);
- Supplemental Brief (13 TTABVUE);
- Opposer's response to Applicant's second motion to seal (15 TTABVUE); and,
- Designation Motion (16 TTABVUE).

Opposer is allowed **TWENTY DAYS** from the date of this order **to submit the public copies of these docket entries**, failing which the Board may give the sealed exhibits no further consideration.

This cancellation proceeding is otherwise **SUSPENDED** pending the final disposition of the civil action between the parties. Within **THIRTY DAYS** after the final determination of the civil action, the parties must so notify the Board in writing, including a copy of the court's final order.[35] Upon resumption of the proceedings the

---

[35] A proceeding is considered to have been finally determined when an order or ruling that ends litigation has been rendered, and no appeal has been filed, or all appeals filed have been decided and the time for any further review has expired. *See* TBMP § 510.02(b).

13

Opposition No. 91291526

Board will reset dates as appropriate, including time for Applicant to answer or otherwise respond to the operative notice of opposition.

During the suspension period, the parties must notify the Board of any address changes for the parties or their attorneys. In addition, the parties must promptly inform the Board of any other related cases, even if they become aware of such cases during the suspension period.

14

ii.     *The Teams Chat*

The Teams Chat is undoubtedly privileged, however, it is unlikely that EWS will prove its status as a trade secret.  The Teams Chat contains Johnson's legal advice to EWS regarding a pending contract negotiation.  (Cheney Decl. ¶ 10; Shah Decl. ¶¶ 10–11.)  While legal advice is privileged, such information is not also automatically a trade secret.  *See Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981); *see also TDBBS LLC v. Ethical Prod. Inc.*, No. CV-19-01312-PHX-SMB, 2019 WL 1242961, *5 (D. Ariz. Mar. 18, 2019) (remarking that "[c]onfidential information is not the same as trade secret information").  Given the limited context and content of the Teams Chat, the Court concludes that while EWS has shown serious ethical concerns about Johnson's conduct, it has not demonstrated a likelihood of success on establish the Teams Chat as a trade secret.

2. Misappropriation

Once claimant has established a trade secret exists, he must show that the defendant has misappropriated that secret.  *Grado*, 603 F. Supp. 3d at 809.  The DTSA defines misappropriation, in part, as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent" by a person with some level of duty restricting disclosure.  18 U.S.C. § 1839(5).  The AUTSA defines misappropriation as either of the following:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who either:

(i) Used improper means to acquire knowledge of the trade secret.

(ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

(iii) Before a material change of his position, knew or had reason to

- 10 -